## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| DAVID LYMAN, TIMOTHY THUERING, and VINCENT BRADY, on behalf of themselves and all others similarly situated, | ) ) ) ) ) |
| | Case No.: |
| | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | ) ) |
| v. | ) ) |
| | **DEMAND FOR JURY TRIAL** |
| FORD MOTOR COMPANY, | ) ) ) |
| Ford. | ) ) |

## PLAINTIFFS' CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs David Lyman, Timothy Thuering, and Vincent Brady bring this action against Ford Ford Motor Company, ("Defendant" or "Ford"), by and through their attorneys, individually and on behalf of all others similarly situated, and allege as follows:

## INTRODUCTION

1.     This is a class action lawsuit brought by Plaintiffs on behalf of themselves and classes of current and former owners of model year 2018-2020 Ford F-150 vehicles containing the 5.0L engine (hereinafter referred to collectively as the

"F-150 Vehicles" or "Class Vehicles"). Ford designed, manufactured, marketed and warranted the Class Vehicles.[1]

2. This action arises from Ford's failure, despite its longstanding knowledge of a material manufacturing defect, to disclose to Plaintiffs and similarly situated consumers that the Class Vehicles are predisposed to an excessively high rate of engine oil consumption (the "Oil Consumption Defect"). This defect – which typically manifests itself during and shortly after the limited warranty period has expired – will inevitably cause the Class Vehicles to prematurely burn off and/or consume abnormal and excessive amounts of engine oil.

3. Significantly, the existence of the Oil Consumption Defect poses a safety risk to the operator and passengers of the vehicle because it prevents the engine from maintaining the proper level of engine oil, and causes an excessive amount of engine oil consumption that can neither be reasonably anticipated nor predicted. Further, the Oil Consumption Defect can cause unexpected engine stalling and engine failure while the Class Vehicles are in operation at any time and under any driving condition or speed. This exposes the driver and occupants of the Class Vehicles, as well as others who share the road with them, to an increased risk of accident, injury, or death.

---

[1] Plaintiffs reserve the right to amend or add to the vehicle models included in the definition of Class Vehicles after conducting discovery.

4.      Not only did Ford actively conceal the fact that particular components within the Class Vehicles' engines are defective, but also did not reveal that the existence of the Oil Consumption Defect would diminish the intrinsic and resale value of the Class Vehicles and lead to the safety concerns described herein.

5.      Ford has long been aware of the Oil Consumption Defect. Yet, notwithstanding its longstanding knowledge of this manufacturing defect, Ford has routinely refused to adequately repair the Class Vehicles without charge when the defect manifests. Indeed, in many cases Ford even has refused to disclose the Oil Consumption Defect's existence when Class Vehicles displaying symptoms consistent with the defect are brought in for service, instead choosing to ignore the defect until it has caused significant mechanical problems necessitating costly repairs or providing a band-aid repair to mask the oil consumption from consumers.

6.      Many Plaintiffs and Class members have communicated with Ford and/or Ford's agents to request that they remedy and/or address the Oil Consumption Defect and/or resultant damage at no expense. Ford has routinely failed to do so.

7.      Ford has also refused to take any action to correct this concealed manufacturing defect when it manifests in the Class Vehicles outside of the warranty period. Since the Oil Consumption Defect can manifest shortly outside of the warranty period for the Class Vehicles – and given Ford's knowledge of this concealed, safety related manufacturing defect – Ford's attempt to limit the warranty

3

with respect to the Oil Consumption Defect is unconscionable and unenforceable here.

8.     Despite notice and knowledge of the Oil Consumption Defect from the numerous complaints it has received, information received from dealers, National Highway Traffic Safety Administration ("NHTSA") complaints, and its own internal records – including durability testing, Ford has not recalled the Class Vehicles to repair the Oil Consumption Defect, offered its customers a suitable repair or replacement free of charge, or offered to reimburse its customers who have incurred out-of-pocket expenses to repair the defect.

9.     As a result of Ford's unfair, deceptive and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiff, have suffered an ascertainable loss of money and/or property and/or loss in value. The unfair and deceptive trade practices committed by Ford were conducted in a manner giving rise to substantial aggravating circumstances.

10.    Had Plaintiffs and the Class members known about the Oil Consumption Defect at the time of purchase or lease, they would not have purchased or leased the Class Vehicles or would have paid substantially less for them.

11.    Plaintiffs are also informed and believe, and on that basis allege, that as the number of complaints increased, and Class members grew dissatisfied with the Class Vehicles' excessive rate of oil consumption, Ford was forced to acknowledge

that the Class Vehicles suffer from an inherent defect. Instead of providing an adequate repair for the Oil Consumption Defect, Ford has simply attempted to mask the Oil Consumption Defect from Class Members.

12.    As a result of the Oil Consumption Defect and the monetary costs associated with attempting to repair such a defect and purchasing additional engine oil, Plaintiffs and the Class members have suffered injury in fact, incurred damages, and have otherwise been harmed by Ford's conduct.

13.    As a direct result of Ford's wrongful conduct, Plaintiffs and members of the Classes have been harmed and are entitled to actual damages, including damages for the benefit of the bargain they struck when purchasing their vehicles, the diminished value of their vehicles, statutory damages, attorneys' fees, costs, restitution, and injunctive and declaratory relief.

14.    Accordingly, Plaintiffs bring this action to redress Ford's violations of the Magnuson Moss Warranty Act, New York General Business Laws, the California Consumer Legal Remedies Act, the California Unfair Competition Laws, the California False Advertising Law, the Song-Beverly Act, and the Ohio Consumer Sales Practices Act, and also seek recovery for Ford's breach of express warranty, breach of implied warranty, unjust enrichment, fraudulent concealment, and negligent misrepresentation.

## **JURISDICTION AND VENUE**

15.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act of 2005, because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because plaintiff and Ford are citizens of different States. This court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367 and jurisdiction over the Magnuson Moss Warranty Act claim by virtue of diversity jurisdiction being exercised under the Class Action Fairness Act ("CAFA").

16.     This Court has personal jurisdiction over Ford pursuant to 18 U.S.C. § 1965(b) & (d). This Court has personal jurisdiction over Ford because it has its principal place of business here, minimum contacts with the United States, this judicial district, and this State, and it intentionally availed itself of the laws of the United States and this state by conducting a substantial amount of business throughout the state, including the design, manufacture, distribution, testing, sale, lease, and/or warranty of Ford vehicles in this State and District. At least in part because of Ford's misconduct as alleged in this lawsuit, the Class Vehicles ended up on this state's roads and in dozens of franchise dealerships.

17.     Venue properly lies in this District and vicinage pursuant to 28 U.S.C. § 1391(a), (b) and (c) because Ford maintains its principal place of business in this District, because a substantial part of the events or omissions giving rise to Plaintiffs'

6

claims occurred in this District, and because Ford conducts a substantial amount of business in this District. Accordingly, Ford has sufficient contacts with this District to subject Ford to personal jurisdiction in this District and venue is proper.

## PARTIES

### Plaintiff David Lyman

18.     Plaintiff David Lyman is a citizen and resident of the State of New York who resides in Oneida County.

19.     Plaintiff Lyman owns a 2018 Ford F-150 for personal, family, and/or household use that he purchased new from Nye Automotive Group, an authorized Ford dealership, in Oneida, New York on or about April 15, 2018. The VIN of his Class vehicle is: 1FTFX1E58JFB07571. The current mileage of Plaintiff's Class Vehicle is 45,400.

20.     Prior to purchasing his Class Vehicle, Plaintiff viewed Ford marketing materials regarding the safety and reliability of the Class Vehicle, including Ford's online advertising and TV commercials, and spoke with Ford sales representatives concerning the vehicle's features. Ford had the opportunity to disclose the Oil Consumption Defect through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by Ford dealerships, through vehicle brochures and other informational documents, or on Ford's website.

However, Ford failed to disclose that the Class Vehicle possessed the Oil Consumption Defect.

21.     Within a week or two of purchase, Plaintiff heard his Class Vehicle's engine start to rattle. Plaintiff inspected the oil level and observed that the dipstick had fallen to the "add" designation. Plaintiff contacted the dealership and expressed concern because the vehicle only had a few miles at the time of purchase, and the dealership instructed Plaintiff to bring the vehicle back to be topped off with engine oil.

22.     Plaintiff brought his Class Vehicle to Steet-Ponte Ford Lincoln in Utica, New York on another occasion within the first year of purchase and had an oil consumption test performed. The dealership informed Plaintiff the vehicle was consuming engine oil, that the amount of oil being consumed was "in spec" and thus no warranty repairs would be offered to Plaintiff. The dealership also informed Plaintiff that Ford had not issued any technical service bulletins related to the issue.

23.     Plaintiff's Class Vehicle continues to consume oil at an abnormally high pace - a quart of engine oil every 1,500 miles. As a result, Plaintiff continues to endure the expense and inconvenience of having to constantly monitor his engine oil levels and both change the engine oil and add additional oil frequently.

24.     Had Plaintiff known, or otherwise been made aware, of the Oil Consumption Defect in the Class Vehicles and Ford's inability to repair or cure it,

he would not have purchased his Class Vehicle or otherwise would have paid significantly less for it.

25.     When Plaintiff purchased his Class Vehicle, he reasonably relied on the reasonable expectation that his Class Vehicle would be equipped with an engine that was free from defects and safe to operate and/or Ford could, and would, properly repair and eradicate any such defects.

26.     At all times relevant herein, Plaintiff operated his 2018 F-150 in a reasonably foreseeable manner and as the vehicle was intended to be used but can no longer do so given the recurring problems caused by the Oil Consumption Defect.

27.     Plaintiff has suffered an ascertainable loss as a result of Ford's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the Oil Consumption Defect and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of his Class Vehicle.

28.     Neither Ford nor any of its agents, dealers or other representatives informed Plaintiff of the Oil Consumption Defect and associated safety risk prior to the purchase of his Class Vehicle.

**Plaintiff Timothy Thuering**

29.     Plaintiff Timothy Thuering is a citizen and resident of the State of Ohio who resides in Williams County.

9

30.     Plaintiff Thuering owns a 2018 Ford F-150 for personal, family, and/or househould use that he purchased used from Derrow Shirkey Ford Lincoln, an authorized Ford dealership, in Montpelier, Ohio in November 2019. The VIN of his Class vehicle is: 1FTEW1E53JFD35847. At the time of purchase, his Class Vehicle had approximately 29,000 miles on the odometer and came with the remainder of Ford's factory warranties.

31.     Prior to purchasing his Class Vehicle, Plaintiff viewed Ford marketing materials regarding the safety and reliability of the Class Vehicle, including Ford's online advertising, spoke with Ford sales representatives concerning the vehicle's features, and test drove the Class Vehicle. Ford had the opportunity to disclose the Oil Consumption Defect through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by Ford dealerships, through vehicle brochures and other informational documents, or on Ford's website. However, Ford failed to disclose that the Class Vehicle possessed the Oil Consumption Defect.

32.     Within the first few months of purchase, Plaintiff took his Class Vehicle on a trip to Wisconsin, which was approximately 1,000 miles. During the trip, Plaintiff checked the engine oil and the dipstick read that the Class Vehicle was two quarts low. Prior to leaving on the trip, Plaintiff had his engine oil changed.

33.     Upon returning home, Plaintiff took his Class Vehicle back to Derrow Shirkey, and the service manager informed him that it was possible the dealership employees did not fill the oil up during the oil chang. The dealership filled his Class Vehicle with engine oil.

34.     Plaintiff monitored the oil levels of his Class Vehicle thereafter and observed that by the time the next oil change was due, his Class Vehicle was approximately 1.5 quarts low on oil.

35.     The dealership performed an oil leak test and instructed Plaintiff to drive for 1,000 miles after placing a dye in the engine oil. The dealership informed Plaintiff that it did not find a leak in his engine.

36.     Upon further inquiry by Plaintiff regarding the abnormal engine oil consumption, the dealership informed Plaintiff that consuming a quart per 1,000 miles was considered normal. The dealership also informed Plaintiff that it had received a "memo" from Ford that said to add an additional quart of oil at every oil change and to fill the oil level above the max fill mark on the dipstick.

37.     Plaintiff's Class Vehicle continues to consume oil at an abnormally high pace – 2 quarts of engine oil every 3,000 miles. As a result, Plaintiff continues to endure the expense and inconvenience of having to constantly monitor his engine oil levels and both change the engine oil and add additional oil frequently.

38.    Had Plaintiff known or otherwise been made aware of the Oil Consumption Defect in the Class Vehicles and Ford's inability to repair or cure it, he would not have purchased his Class Vehicle or otherwise would have paid significantly less for it.

39.    When Plaintiff purchased his Class Vehicle, he reasonably relied on the reasonable expectation that his Class Vehicle would be equipped with an engine that was free from defects and safe to operate and/or Class could, and would, properly repair and eradicate any such defects.

40.    At all times relevant herein, Plaintiff operated his 2018 F-150 in a reasonably foreseeable manner and as the vehicle was intended to be used, but can no longer do so given the recurring problems caused by the Oil Consumption Defect

41.    Plaintiff has suffered an ascertainable loss as a result of Ford's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the Oil Consumption Defect and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of his Class Vehicle.

42.    Neither Ford nor any of its agents, dealers or other representatives informed Plaintiff of the Oil Consumption Defect and associated safety risk prior to the purchase of his Class Vehicle.

**Plaintiff Vincent Brady**

43.     Plaintiff Vincent Brady is a citizen and resident of the State of California who resides in San Joaquin County.

44.     Plaintiff Brady owns a 2019 Ford F-150 for personal, family, and/or household use that he purchased new from Heritage Ford Lincoln, an authorized Ford dealership, in Modesto, California in July 2019. The VIN of his Class vehicle is: 1FTEW1E54KKC36253. The current mileage of his Class Vehicle is 13,000.

45.     Prior to purchasing his Class Vehicle, Plaintiff viewed Ford marketing materials regarding the safety and reliability of the Class Vehicle, including Ford's online advertising, and spoke with Ford sales representatives concerning the vehicle's features. Ford had the opportunity to disclose the Oil Consumption Defect through its advertising, in owner's manuals, in correspondence sent to Plaintiffs and Class members, through representations by Ford dealerships, through vehicle brochures and other informational documents, or on Ford's website. However, Ford failed to disclose that the Class Vehicle possessed the Oil Consumption Defect.

46.     After driving his Class Vehicle 4,000 miles, Plaintiff checked the engine oil levels in his Class Vehicle and observed it was a few quarts low. Plaintiff brought his Class Vehicle back to Heritage Ford to inquire about the cause, and was informed that his Class Vehicle was brand new and needed to be broken in and that consuming oil was normal. The dealership topped off his engine oil.

47.    At 5,000 miles, Plaintiff checked the engine oil levels again and observed it was a quart low. Plaintiff had his oil changed at Heritage Ford, who overfilled his engine oil by approximately one-half of a quart.

48.    At 8,000 miles, Plaintiff checked the engine oil levels again and observed it was approximately two quarts low. Plaintiff again brought his Class Vehicle back to Heritage Ford, who performed an oil consumption test. First, the dealership changed his oil, sealed the dipstick, and instructed Plaintiff to bring his Class Vehicle back every 1,000 miles. The oil consumption test determined that Plaintiff's Class Vehicle was burning approximately 1 quart of oil every 1,500 miles. Plaintiff asked if the dealership overfilled the engine oil prior to starting the oil consumption test, and the dealership representative informed Plaintiff that it had not.

49.    At 9,261 miles, Plaintiff brough his Class Vehicle back to Heritage Ford. The dealership checked the engine oil after letting the vehicle sit for approximately 5 minutes and checked the oil. The dealership informed Plaintiff that the dipstick was not sealed.

50.    At 12,000 miles, Plaintiff checked the engine oil levels again and observed it was again consuming oil and that Plaintiff was approximately one quart low. Plaintiff brought his Class Vehicle back to Heritage Ford, who told him that he was consuming engine oil at a rate that was considered normal and that he would not be eligible for warranty repairs at that time. The dealership informed Plaintiff

that he was approximately one-half quart low. The dealership added engine oil during this visit.

51.    At 13,000 miles, Plaintiff checked the engine oil again and observed it was one-half quart low. Approximately 100 miles later, Plaintiff brought his Class Vehicle back to Heritage Ford, who performed another oil change.

52.    Plaintiff's Class Vehicle continues to consume oil at an abnormally high pace – at least 1 quart of engine oil every 1,500 miles. As a result, Plaintiff continues to endure the expense and inconvenience of having to constantly monitor his engine oil levels and both change the engine oil and add additional oil frequently.

53.    Had Plaintiff known or otherwise been made aware, of the Oil Consumption Defect in the Class Vehicles and Ford's inability to repair or cure it, he would not have purchased his Class Vehicle or otherwise would have paid significantly less for it.

54.    When Plaintiff purchased his Class Vehicle, he reasonably relied on the reasonable expectation that his Class Vehicle would be equipped with an engine that was free from defects and safe to operate and/or Class could, and would, properly repair and eradicate any such defects.

55.    At all times relevant herein, Plaintiff operated his 2019 F-150 in a reasonably foreseeable manner and as the vehicle was intended to be used but can no longer do so given the recurring problems caused by the Oil Consumption Defect.

56.     Plaintiff has suffered an ascertainable loss as a result of Ford's unfair and deceptive conduct, breach of contractual, common law and statutory duties, and omissions and/or misrepresentations associated with the Oil Consumption Defect and associated safety risk, including but not limited to, out-of-pocket losses and diminished value of his Class Vehicle.

57.     Neither Ford nor any of its agents, dealers or other representatives informed Plaintiff of the Oil Consumption Defect and associated safety risk prior to the purchase of his Class Vehicle.

**Ford**

58.     Ford Ford is a corporation formed under Delaware law with its principal office located at One American Drive, Dearborn, Michigan 48126. Ford designs, tests, manufactures, distributes, warrants, sells, and leases various vehicles under several prominent brand names, including Ford and Lincoln in this District and throughout the United States. At all times relevant to this action, Ford and/or its agents manufactured, distributed, marketed, sold, leased, and warranted the Class Vehicles throughout the United States. Ford and/or its agents manufactured the Class Vehicles knowing about the Oil Consumption Defect, without either disclosing it at the time of sale or attempting to remedy it. Ford and/or its agents also developed and disseminated the owner's manuals, warranty booklets, advertisements, and other promotional materials relating to the Ford F-150.

59.     Ford sells the Class Vehicles through Ford franchise dealerships. Ford distributes information about the Class Vehicles to its dealers for the purpose of passing that information to consumers. Ford also understands that its dealers pass on information from Ford about the characteristics, benefits, and quality of its vehicles to consumers. The dealers act as Ford's agents in selling the Class Vehicles and disseminating information about the Class Vehicles to customers and potential customers. Ford also disseminates information about its vehicles on its website. At the point of sale, as well as in written materials and on its website, Ford could have told the truth.

## FACTUAL ALLEGATIONS

### A. The Oil Consumption within the Class Vehicles

60.     Ford designs, engineers, manufactures and sells vehicles in this District and throughout the United States through its network of authorized motor vehicle dealers.

61.     Ford's F-Series truck has been the best-selling vehicle in the United States for 37 years. The F-Series maintains a dominant market share, representing nearly one-third of all pickup trucks sold in the United States, and leading as America's best-selling truck for four decades. Over the past three years, Ford has

sold an average of 900,000 F-150s per year.[2] Worldwide, an F-Series truck is sold every 29.3 seconds.

62.     The F-Series has been immensely profitable for Ford. As of 2018, approximately $50 billion dollars of Ford's annual $160 billion in sales come from the sale of the F-Series truck alone. To put this in context, reporting indicates that if the Ford F-Series was its own Fortune 500 company, it would exceed the annual revenue of behemoths such as Oracle, American Express, and Best Buy.

63.     The 5.0L engine, which Ford used in the Class Vehicles, is a 5.0 liter engine that was manufactured by Ford Ford at its Essex Engine Plant in Windsor, Ontario. The 5.0L engine, named the "Coyote" by Ford, is a modular V-8 piston engine with direct fuel injection, four-valve dual overhead cylinder heads cast, forged steel crankshaft and a high 12.0:1 compression ratio.

64.     The Class Vehicles were also put to market with a feature known as deceleration fuel shut off ("DFSO"). This feature will shut off fuel delivery when the engine is decelerating in an attempt to reduce fuel consumption and increase overall MPG. When the driver accelerates, the fuel automatically begins flowing again and the vehicle accelerates as the driver commands.

---

[2]     https://www.autoweek.com/news/trucks/a32945300/ford-averages-over-100-f-150-pickups-sold-per-hour-247/ (last visited Jan. 4, 2020) (Exhibit E).

65.    According to Ford's owner's manuals, the 5.0L Coyote engines in the Class Vehicles have an engine oil capacity of 8.8 quarts, including the oil within the oil filter.[3]

66.    According to Ford, each Class Vehicle contains an Intelligent Oil-Life Monitor that determines when you should change the engine oil based on how you use your vehicle.[4] The oil change indicator may illuminate as early as 3,000 miles since a prior oil change but under no circumstances does Ford recommend oil change intervals exceed 10,000 miles or one year between intervals.[5]

67.    As background, the 5.0L Coyote engines contained in the Class Vehicles use eight reciprocating pistons to convert pressure into a rotating motion. Gasoline is mixed with air in the combustion chambers of the engine. To generate such rotating motion, a four-step sequence is used (the "Combustion Cycle"). First, the intake stroke begins with the inlet valve opening and a vaporized fuel mixture is pulled into the combustion chamber. Second, the compression stroke begins with the inlet valve closing and the piston beginning its movement upward, compressing the

---

[3]                          *See,*                          *e.g.*, https://media.ford.com/content/dam/fordmedia/North%20America/US/product/2020/f150/2020-F150-TechSpecs.pdf (last visited Jan. 4, 2021) (Exhibit F).
[4] https://www.fordservicecontent.com/Ford_Content/vdirsnet/OwnerManual/Home/Content?variantid=7026&languageCode=en&countryCode=USA&Uid=G2042723&ProcUid=G2042724&userMarket=USA&div=f&vFilteringEnabled=False (last visited Jan. 4, 2021) (Exhibit G).
[5] *Id.*

fuel mixture in the combustion chamber. Third, the power stroke begins when the spark plug ignites the fuel mixture, expanding the gases and generating power that is transmitted to the crankshaft. Fourth, the exhaust stroke begins with the exhaust valve opening and the piston moving back down, allowing the exhaust gases to escape the cylinder. The exhaust valve then closes, the inlet valve opens, and the Combustion Cycle repeats itself.  A diagram of the Combustion Cycle is below:



68.    During this process, engine oil is used to lubricate the piston and cylinder wall as the piston moves up and down through the four-stroke sequence. Engine oil is also necessary in this process to reduce wear on moving parts throughout the engine, improve sealing, and cool the engine by carrying heat away from the moving parts. If there is an insufficient amount of engine oil, the engine

will not have the necessary lubrication or cooling, thereby causing premature wear of internal parts, inadequate performance, and/or catastrophic engine failure.

69.   The top sidewall of each engine piston contains rings that, when correctly sized and installed, and when properly tensioned, prevent engine oil from entering the combustion chamber, as well as optimizing compression. On each piston, there are three rings: the top compression ring, the second compression ring, and the oil control ring.

70.   The top compression ring is the top ring, or closest ring to the inlet and combustion gases, and is exposed to the greatest amount of chemical corrosion and the highest operating temperature. The compression ring transfers approximately 70% of the combustion chamber heat from the piston to the cylinder wall.

71.   The second compression ring, also known as the wiper ring, is used to further seal the combustion chamber and to wipe the cylinder wall clean of excess oil. Combustion gases that pass by the top compression ring are stopped by the second compression ring.

72.   The bottom ring, known as the oil control ring, is used to wipe excess oil from the cylinder wall during piston movement and return excess oil through the ring openings and oil drain holes to the engine oil pan. The oil control ring includes two thin rails or running surfaces.

73.    If engine oil is able to pass between any of these piston rings and the surface of the cylinder wall, then the engine oil will enter the combustion chamber of the engine. Once engine oil is in the combustion chamber, it will not only cause a decrease in engine performance, but the engine oil will also be burned off during the Combustion Cycle sequence thereby reducing the overall amount of oil contained in the engine. Furthermore, engine oil in the combustion chamber will also cause a decrease in fuel efficiency, cause carbon deposits to form within the engine, and damage the vehicle ignition and emission components. An exemplar diagram of a piston with these rings is shown below:



74.     Upon information and belief, the piston and piston ring assembly in the Class Vehicles contain a manufacturing defect including, *inter alia*, insufficient piston ring tension, causing them to allow engine oil into the combustion chamber of the engine. As a result, engine oil is not separated from the Combustion Cycle as intended. Instead, engine oil is burned and consumed during the Combustion Cycle. Additionally, and as a result, the crankcase becomes pressurized since gases from the Combustion Cycle are caused to enter the crankcase.

75.     Throughout the Combustion Process, engine oil is pumped from the crankcase, circulated throughout the engine, filtered and then returned to the crankcase to begin the cycle again. To reduce the risk of crankcase contamination and improve vehicle emissions, the positive crankshaft ventilation ("PCV") system was invented in the early 1960s. The PCV system involves the recycling of these unwanted gases through a valve (the "PCV valve") and circulates them back into the intake manifold, where they are pumped back into the cylinders for another chance at being burned during the combustion cycle. A diagram of a typical PCV system is below:



76.     In the Class Vehicles, the PCV system is inadequate and fails to reduce pressure within the crankcase caused by combustion gases escaping from the combustion chamber, past the piston and oil rings, and into the crankcase. This is because the increased blow-by as a result of the reduced piston and oil control ring tensions in an effort to decrease overall friction within the engine in the hopes of gaining greater MPG. As a result, this has a direct negative impact on the vehicles durability, life expectancy, performance and emissions.

**B. The Oil Consumption Defect causes higher emissions.**

77.     As discussed above, on information and belief, the engine oil control strategy in the Class Vehicles does not work as intended, allowing oil to escape past

the oil control and piston rings and enter into the combustion chamber during the Combustion Process. Once in the combustion chamber, oil is burned off rather than returned for further lubrication. This not only causes a decrease in engine performance but also decreases fuel efficiency, causes carbon deposits to form, and can damage the engine and various ignition and emission components.

78.   Optimum cylinder combustion depends on the correct air to fuel ratio in order to provide a near stoichiometric mixture (*i.e.*, the fuel amount is neither excessive nor lacking).[6] The oxygen sensors monitor unburned oxygen in the exhaust gases and send this information to the vehicle's engine control module, which then uses this information to determine if the fuel mixture is rich (too much fuel) or lean (not enough fuel) and adjusts the air/fuel mixture as necessary. The oxygen sensors also measure oxygen levels after the exhaust reacts with the catalytic converter, to help the engine run efficiently and to minimize emissions. The catalytic converters are emissions control devices designed to convert toxic pollutants, contained in exhaust gases, to less toxic pollutants by catalyzing a redox reaction (oxidation or reduction).

---

[6] The stoichiometric mixture for a gasoline engine is the ideal ratio of air to fuel that burns  all fuel with  no  excess air.  For gasoline  fuel,  the stoichiometric  air–fuel mixture is about 14.7:1 i.e. for every one gram of fuel, 14.7 grams of air are required.

79.     While a significant amount of the engine oil is burned within the combustion chamber during the Combustion Process, the remaining unburned oil exits the engine via the exhaust system, including through the catalytic converter. Excess oil entering into the exhaust system causes increases in harmful emissions.

80.     The Oil Consumption Defect can contaminate Class Vehicles' oxygen sensors, catalytic converters, and spark plugs, damaging and causing inefficiency of those parts, and leading to less efficient engines and increased emissions. Contamination can impair the oxygen sensors' accuracy, for example, hampering the catalytic converters and causing the engine to not properly detect emission issues. Likewise, the catalytic converters can become poisoned after engine oil is burned during the combustion cycle. The burnt oil is incorporated into the vehicle's expelled exhaust gases, with the exhaust containing substances that coat the working surfaces of the catalytic converters (encapsulating the catalyst so that it cannot contact and treat the exhaust).

81.     The catalytic converter is the central component to a vehicle's emissions system. Since 1975, all cars and light-duty trucks have come equipped with when the Clean Air Act standards on harmful emissions came into effect.[7] The catalytic converter converts dangerous compounds produced in the combustion

---

[7] *Automobile Emissions Reduction Efforts in the U.S. – Chronology,* EPA Air and Radiation Office of Mobile Services (1999), http://www.ehso.com/ehshome/auto-emissions_chronol.htm (last visited Jan. 4, 2021) (Exhibit H).

process such as carbon monoxide (CO), unburnt hydrocarbons (HC), and nitrogen oxides (Nox) into less harmful carbon dioxide ($CO_2$), nitrogen ($N_2$), and water ($H_2O$).

82.     A catalytic converter has no moving parts and is designed to last the entire useful life of a vehicle. Pressure pushes exhaust gases through two ceramic honeycomb structures made of heat resistant clay contained within a stainless-steel case. Each of the channels within the honeycomb structure are lined with precious metals such as platinum, rhodium and palladium that act as catalysts to the conversion process. When carbon monoxide (CO), unburnt hydrocarbons (HC), and nitrogen oxides (Nox) molecules come into contact with the platinum, rhodium and palladium, the molecules are stripped apart and then recombined into less harmful carbon dioxide ($CO_2$), nitrogen ($N_2$), and water ($H_2O$). The honeycomb structure increases surface area for these precious metals to come into contact with the harmful carbon monoxide (CO), unburnt hydrocarbons (HC), and nitrogen oxides (NOx).

83.     If excess oil enters into the catalytic converter, the conversion process is disrupted. Excess oil will coat the working surfaces of the ceramic honeycombs so that the platinum, rhodium and palladium cannot react with the toxic exhaust gases. This is called "catalyst poisoning" and causes the vehicle to release higher levels of harmful emissions.

27

84.     Excess oil in the exhaust system can cause other problems that lead to higher emissions. On both sides of the catalytic converter, O2 sensors monitor the concentration of oxygen in the exhaust gases circled in green in the diagram below. The O2 sensors transmit that data to the Engine Control Unit ("ECU").

85.     The phosphorus in the excess oil will foul the O2 sensor, causing the O2 sensor to degrade or fail. When the O2 sensor is fouled, it will communicate to the vehicle's ECU that the fuel/air mixture circulating through the engine is too lean - meaning that there is too little fuel and too much air in the mixture.

86.     The ECU responds by adding fuel to the fuel/air mixture creating a "rich" fuel mixture ("rich" because there is too much gasoline and too little air). When engines run using a "rich" fuel mixture, fuel economy declines because the engine is receiving more fuel than it can consume during the combustion process.

87.     If the issue is not repaired, the excess fuel will burn when it mixes with oxygen inside the catalytic converter and melt the ceramic honeycomb structures. As a result, the catalytic converter's ability to reduce harmful emissions will be compromised.

88.     When the catalytic converter or O2 sensors are compromised, the Check Engine light should illuminate on the display panel informing the driver of a problem. Upon information and belief, the Class Vehicles fail to provide notice of an issue to the driver. The result is that drivers are left completely unaware that the

dangerous Oil Consumption Defect is also causing the Class Vehicles to have an emissions system that is defective, pollutes at levels that exceed the intended levels, and violate state and federal emissions standards.

89.    On January 17, 2006, the EPA issued two final rules related to exhaust emission durability for passenger trucks and other vehicles. Under these rules, truck and engine manufacturers can use one of two methods for testing the exhaust emissions' durability—using a chassis dynamometer to test the vehicles after they have run for a given period of time or using a "bench aging" procedure which involves using extreme heat to test certain components, including the catalytic converters.

90.    In either case, certificate holders must test and certify that the vehicles will comply with EPA emissions standards throughout their "useful life," which is currently defined as 120,000 miles. As the Clean Air Act Handbook describes it, "[t]he demonstration of light-duty vehicle emission durability for purposes of certification consists of two elements: (1) emission deterioration (the extent emissions will increase during the vehicle's useful life); and (2) component durability (whether emission-related components will operate properly for the useful life of the vehicle)."

91.    As a result, Ford knew about the Oil Consumption Defect from the beginning, because they are required to test the Class Vehicles for their useful life, and the Oil Consumption Defect would have manifested itself during those tests.

**B.    Ford's Longstanding Knowledge of the Defect**

### a.  Prior TSBs Demonstrate Ford's Longstanding Knowledge of Oil Consumption Issues in its Vehicles

92.    Ford is no stranger to the Oil Consumption Defect in the Class Vehicles. In March 2019, Ford issued a technical service bulletin ("TSB") regarding excessive oil consumption in the 2018 Ford F-150 vehicles equipped with a 5.0L engine ("TSB 19-2058). TSB 19-2058 is attached hereto as Exhibit A.

93.    Ford issues TSBs to its authorized dealerships in order to provide instructions on how to repair Ford vehicles or respond to particular consumer complaints. These communications standardize service throughout Ford's agent dealership network, and explicitly are not meant for consumer review. Further, these communications often do not reveal the root cause of a problem, only describe a complaint and a remedy, frequently in terms that a lay person would not understand, and do not disclose the severity or scope across all the vehicles to which the TSB relates.

94.    TSB 19-2058 explains that the 5.0L engine in the 2018 F-150 vehicles may exhibit excessive oil consumption with no visible oil leaks. As a result, technicians are instructed to replace the positive crankcase ventilation (PCV) valve

as a component of the PCV system.

95.     After replacement of the PCV valve, the technician is instructed to change the engine oil and oil filter and, *inter alia*, must explain to the customer that they are to check the oil every 200 miles in order to diagnose the excessive oil consumption.

96.     After driving the vehicle for not less than 3,000 miles, the customers were instructed to bring the vehicles back to the Ford service center for assessment of the excessive oil consumption. If the amount of oil consumed exceeded 3,000 miles per quart then the technician was instructed to replace the engine long block assembly, i.e. this equates to an entire engine replacement. Ford calculated that a technician would require approximately twelve (12) hours to conduct this repair.

97.     In May 2019, Ford issued a second TSB regarding excessive oil consumption in the 2018 Ford F-150 vehicles equipped with a 5.0L engine ("TSB 19-2133). TSB 19-2133 is attached hereto as Exhibit B. TSB 19-2133 is generally the same as TSB 19-2058, except for an additional step related to marking and measuring the oil consumption.

98.     In November 2019, Ford issued a third technical service bulletin regarding excessive oil consumption in the 2018 Ford F-150 vehicles equipped with a 5.0L engine and also included the MY 2019 as well ("TSB 19-2338). TSB 19-2338 is attached hereto as Exhibit C.

31

99.   TSB 19-2338 explains that the 5.0L engine in the 2018 and 2019 F-150 vehicles may exhibit excessive oil consumption with no visible oil leaks.

100.   TSB 19-2338 goes on to state that:

Engineering analysis of the engine assemblies replaced under warranty for a customer concern of excessive oil consumption has found that the majority of engines did not require replacement. Additional engineering analysis has found an excessive oil consumption condition may have been caused by the powertrain control module (PCM) strategy which purposely closes the throttle plate during the deceleration fuel shut off (DFSO) events resulting in high intake manifold vacuum which can pull oil past the piston rings and into the combustion chamber. To correct the condition, a revised PCM calibration is in the process of being released to adjust the throttle plate opening angle to reduce engine manifold vacuum during DFSO events.

If the only symptom exhibited is excessive oil consumption do not attempt diagnosis or repairs for this condition at this time. The revised calibration is expected to be available December 2019. Monitor OASIS for updates.

  a.  Check the oil level on the oil level indicator. Add oil as necessary to bring the oil level to the MAX fil line on the oil level indicator.

101.   Accordingly, TSB 19-2338 instructed technicians to stop replacing engines – a measure needed to adequately correct the oil dilution issue - and instead do nothing but add oil to the engine "as necessary" to bring the oil level to the MAX fill line on the oil level indicator.

102.   In December 2019, Ford issued a fourth technical service bulletin regarding MY 2018-2019 of the Class Vehicles ("TSB 19-2365"). TSB 19-2365 is attached hereto as Exhibit D.

103.   Similar to TSB 19-2338, TSB 19-2365 attributed the excessive oil

32

consumption to the possibility of high intake manifold vacuum during deceleration fuel shut off (DFSO) resulting in oil being pulled into the combustion chamber. The proposed correction under the TSB includes reprogramming of powertrain control module ("PCM"), installing a new engine oil level indicator (a/k/a "dipstick") and changing the engine oil and oil filter.

104.   Most notably, the revised dipstick "uses a wider 1.9 liter (2 quart) normal operating range." As a result, and rather than adequately repair the Oil Consumption Defect, Ford simply lowered the minimum fill level on the revised dipstick to mask the oil consumption problem in the Class Vehicles. This change means that a dipstick reading that was once at or below the minimum fill line, previously requiring an engine replacement, and perhaps caused customers to become alarmed or concerned with excessive oil consumption, is now considered normal and within Ford's acceptable parameters. This change only sought to save Ford the cost of repairs and did nothing to correct the Oil Consumption Defect.

105.   Upon information and belief, Ford's change to the operation of the DFSO also reduced the fuel efficiency or MPG of the Class Vehicles.

## 2.   <u>Reports to NHTSA and Ford's Technical Service Bulletins</u>

106.   The National Highway Traffic Safety Administration ("NHTSA") has received numerous complaints about the Oil Consumption Defect. Below is a sampling of a portion of the complaints:

**NHTSA ID Number:** 11079796
**Complaint Date** March 16, 2018
**Consumer Location** PORT CHARLOTTE, FL
**Vehicle Identification Number** 1FTFW1RG8JF****
**Summary of Complaint**
THIS ISSUE IS HAPPENING WIDESPEAD AMONGST OWNERS OF FORD'S
NEW 3.5L HIGH OUTPUT POWERTRAIN. UPON OPEN THROTTLE, THE
ENGINE WILL INSTANTLY DROP OFF ALL POWER, CAUSING THE
TRUCK TO DANGEROUSLY AND UNEXPECTEDLY DROP TO ZERO
MILES PER HOUR. VERY DANGEROUS AND LIFE THREATENING WHILE
ENTERING ROADWAYS OR INTERSTATE ROADS WITH TRAFFIC. UPON
OPEN THROTTLE, A "LOW OIL PRESSURE" LIGHT TAKES OVER THE
VIEWING AREA ON THE DASH CLUSTER AND THEN DISAPPEARS
AFTER RESTARTING THE VEHICLE. UPON RESTARTING, THE TRUCK
WILL FAIL AND PROVIDE A "LOW OIL PRESSURE" SIGNAL AGAIN
AFTER APPLYING OPEN THROTTLE. THIS CAN HAPPEN WHEN TAKING
OFF FROM A DEAD STOP OR UNDER CRUISING SPEEDS, WHEN OPEN
THROTTLE IS APPLIED, THE ENGINE FAILS AND CUTS OFF ALL
POWER. IT DOESNT MATTER IF YOU ARE TURNING OR GOING
STRAIGHT, THE ISSUE HAPPENS REGARDLESS. ALWAYS HAPPENS
UNDER OPEN THROTTLE. THIS HAS BECOME A WIDESPEAD ISSUE
WITH OWNERS OF THE TRUCK FROM MODEL YEAR 2017-2018. FORD
NEEDS TO RESPOND AND FIX THIS ISSUE FOR THE SAFETY OF THEIR
CUSTOMERS.

**NHTSA ID Number:** 11196590
**Complaint Date** April 15, 2019
**Consumer Location** BLOOMINGTON, IN
**Vehicle Identification Number** 1FTFX1E57JK****
**Summary of Complaint**
THIS NEW TRUCK'S, WHICH WAS PURCHASED IN JANUARY OF 2019,
5.0 LITER ENGINE USED 2.5 QUARTS OF ENGINE OIL IN THE FIRST 3500
MILES. THE TRUCK IS CURRENTLY UNDERGOING AN OIL
CONSUMPTION TEST AT MY EXPENSE.

**NHTSA ID Number:** 11207419
**Complaint Date** May 14, 2019
**Consumer Location** GALVESTON, TX
**Vehicle Identification Number** 1FTEW1E53JF****
**Summary of Complaint**

34

EXCESSIVE OIL CONSUMPTION APPROXIMATELY ONE QUART PER 1000-1500 MILES

**NHTSA ID Number:** 11209595
**Complaint Date** May 23, 2019
**Consumer Location** PROCTORVILLE, OH
**Vehicle Identification Number** 1FTEW1E52JF****
**Summary of Complaint**
5.0 V-8. MY TRUCK CONSUMES OVER 2 QUARTS OF OIL EVERY 2500 MILES. FORD SAYS THIS IS NORMAL. MY TRUCK'S FUEL ECONOMY IN ANY DRIVING CONDITIONS IS NEVER BETTER THAN 11.9 MPG'S WHICH SHOULD BE AND WAS MUCH BETTER THAN THIS WHEN I FIRST BOUGHT IT. MY ENGINE KNOCKS. MY ENGINES WHINES AND WHISTLES. MY ENGINE IS DOWN ON POWER NOTICEABLY ON THE INTERSTATE WHICH MAKES DRIVING THE TRUCK DANGEROUS. ALL OF THIS FORD SAYS IS NORMAL. NONE OF THIS IS NORMAL UNLESS IT WAS A 1976 PINTO. THIS TRUCK SHOULD BE REMOVED FROM THE ROAD PERMANENTLY

**NHTSA ID Number:** 11253685
**Complaint Date** September 6, 2019
**Consumer Location** CUMMING, GA
**Vehicle Identification Number** 1FTEW1E55JF****
**Summary of Complaint**
TRANSMISSION ISSUE: INTERMITTENT LOUD BANG UPON STARTING THE ENGINE. INTERMITTENT RATTLE DURING NORMAL ACCELERATION AND DECELERATION. THERE IS ALSO HARSH UP AND DOWNSHIFTS IN THE VEHICLE. DURING NORMAL DRIVING CONDITIONS, THE VEHICLE WILL BE UP SHIFTING AND THEN IT WILL LOSE POWER UNTIL IT FINDS THE CORRECT GEAR, WHEN IT WILL THEN SLAM INTO GEAR. AGAIN THESE ARE ALL INTERMITTENT AND HARD TO MAKE HAPPEN ON DEMAND. ON OCCASION THE VEHICLE WILL BE SITTING AT A STOP LIGHT AND THE TRANSMISSION WILL BANG INTO ANOTHER GEAR, ALL WHILE BEING COMPLETELY STATIONARY. THE VEHICLE HAS A 13,200 MILES ON IT, AND IS CURRENTLY UNDERGOING AN OIL CONSUMPTION SURVEY THROUGH THE DEALERSHIP DUE TO THE MOTOR BURNING OIL. ALL OF THESE ARE ONGOING ISSUES THAT HAPPEN ON RANDOM DAYS AND TIMES, WHILE BOTH COLD AND WARM.

**NHTSA ID Number:** 11256631
**Incident Date** July 31, 2019
**Consumer Location** LOGAN, OH
**Vehicle Identification Number** 1FTFW1RG5JF****
**Summary of Complaint**
TL* THE CONTACT OWNS A 2018 FORD F-150. WHILE DRIVING 60 MPH,
THE OIL PRESSURE WARNING INDICATOR ILLUMINATED ON THE
INSTRUMENT PANEL. THE CONTACT STATED THAT THE IGNITION
TURNED OFF IN THE MIDDLE OF THE ROAD; HOWEVER, SHE
MANAGED TO PARK THE VEHICLE ON THE SIDE OF THE ROAD. THE
CONTACT CHECKED THE OIL PRESSURE AND ADDED OIL TO THE
VEHICLE. THE CONTACT RESTARTED THE VEHICLE AND DROVE
HOME. THE CONTACT ASSOCIATED THE FAILURE WITH NHTSA
CAMPAIGN NUMBER: 17V672000 (ENGINE). THE VEHICLE WAS TAKEN
TO DON WOOD FORD LINCOLN (LOCATED AT 2065 E STATE ST,
ATHENS, OH 45701, (740) 593-6642), BUT THEY WERE UNABLE TO
DUPLICATE THE FAILURE. THE CONTACT STATED THAT THE FAILURE
CONTINUED AND SMOKE APPEARED COMING FROM THE LEFT TAIL
PIPE. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE
FAILURE MILEAGE WAS 22,000.*DT*JB

**NHTSA ID Number:** 11271179
**Complaint Date** October 26, 2019
**Consumer Location** YOUNGSVILLE, LA
**Vehicle Identification Number** 1FTEW1C53JK****
**Summary of Complaint**
THE TRANSMISSION WILL TWIST THE DRIVESHAFT AT STARTUP,
STATIONARY, AND CAUSE THE REAR END TO POP VERY LOUDLY. I'VE
SHOWN FORD ENGINEERING A VIDEO OF IT, I WAS TOLD THAT IT
WAS NORMAL. I'VE NEVER HEARD OF A VEHICLE DOING THIS
BEFORE.

THERE IS A RATTLING SOUND ON DECELERATION, LOUDEST WHEN
THE ENGINE IS COLD AND LESSONS OR MAYBE EVEN GOES AWAY
AFTER WARMED UP.

THE ENGINE WAS REPLACED EARLIER THIS YEAR BECAUSE OF AN
OIL CONSUMPTION ISSUE.

THE TRUCK HAS MEMORY POWER DRIVER'S SEAT AND POWER

MIRRORS THAT SHOULD GO INTO PLACE DEPENDING ON THE KEY FOB THAT IT DETECTS.

RANDOMLY BOTH SIDE MIRRORS WILL START MOVING AND POPPING BEFORE GOING BACK INTO POSITION. THIS ALWAYS OCCURS BEFORE THE VEHICLE IS STARTED. I'VE NOTICED THAT IT IS USUALLY WHEN IT DETECTS THE KEY FOB OR WHEN I USE THE FOB FOR SOME FUNCTION.

THE SEAT RANDOMLY DOESN'T GO INTO THE MEMORY POSITION AT STARTUP.

**NHTSA ID Number:** 11288096
**Complaint Date** December 10, 2019
**Consumer Location** TERRE HAUTE, IN
**Vehicle Identification Number** 1FTEW1E51JK****
**Summary of Complaint**
BOUGHT THE TRUCK NEW AUGUST 28, 2018 AT 6000 MILES THE TRUCK CONSUMED 3 1/2 QUARTS OF OIL YES THAT'S 6000 MILES SINCE THEN THE TRUCKS HAD AN EXCESSIVE OIL USAGE STILL HASN'T BEEN FIXED 15 MONTHS LATER IT'S BURNED OVER 2 GALLONS OF OIL AND 26,000 MILES FORD REPLACE THE ENGINE AND IT'S BURNING MORE OIL NOW THAN IT EVER HAS IT BURNED 2 QUARTS OF OIL IN 1500 MILES

**NHTSA ID Number:** 11288357
**Incident Date** December 11, 2019
**Consumer Location** FULSHEAR, TX
**Vehicle Identification Number** 1FTFW1E57KK****
**Summary of Complaint**
EXCESSIVE OIL CONSUMPTION. I AM A QUART LOW AT JUST UNDER 2000 MI. TIMING CHAIN RATTLE DURING DECELERATION WHEN COLD. WARPED DASH PANEL PASSENGER SIDE.

**NHTSA ID Number:** 11290813
**Complaint Date** December 23, 2019
**Consumer Location** BERKELEY SPRINGS, WV
**Vehicle Identification Number** 1FTEW1E53JK****
**Summary of Complaint**

37

FIRST COMPLAINT ON AUGUST 21/19. TO HAGERSTOWN FORD
DEALERSHIP THAT THIS TRUCK DOES NOT OPERATE CORRECTLY!
THE HARDSHIFT CLUCK, USING OIL 1QT LOW AT 2400 MILES,
WARPING DASH, RATTLING SOUNDS BAD.(LIKE VALUES RATTLING)
MY DOOR LATCHES FREEZE.. I HAVE NOW AS OF 12/23/19 HAVE
ADDED A TOTAL OF 5QTS OF OIL TO THIS TRUCK WITH ONLY JUST
OVER 5000 MILES ON IT.YOU CAN SMELL BURNED OIL COMING FROM
UNDER THE HOOD AND EXHAUST.I HAVE SEVERAL VIDEO
DOCUMENTATION TO MY STATEMENT! I SPOKE WITH LARRY WHEN
THE TRUCK WAS DROPPED OFF IN NOVEMBER TO HAVE DASH
REPLACED FOR A WEEK,TO CALL ME AND TELL ME THEY DIDN'T
HAVE THE CORRECT DASH? I HAVE CONTACTED LARRY IN REGARDS
TO THIS VEHICLE OIL USE IS UNREAL!!! NO NEW VECHILE GOES
THROUGH OIL LIKE THIS! I AM TOLD TO KEEP ADDING OIL.. WHY ARE
YOU NOT COVERING THE OIL, IT'S UNDER WARRANTY? THIS TRUCK
IS BY FAR THE WORST VECHILE I HAVE EVER OWNED!!!!! I FEEL I'M
GETTING THE RUN AROUND N IF SOMETHING ISN'T RESOLVE SOON I
WILL TAKE FURTHER ACTION. SO I'VE ALSO BEEN ADVISE THAT THE
OIL BACKFLOW THAT'S BURNING OUT THE EXHAUST THE FILTERS
WILL HAVE OIL CONSUMPTION THROUGH THEM AS WELL!! DID I GET
A LEMON! I THINK SO!

**NHTSA ID Number:** 11291184
**Complaint Date** December 25, 2019
**Consumer Location** GILBERT, WV
**Vehicle Identification Number** 1FTEW1E53KF****
**Summary of Complaint**
ENGINE BURNING OIL SHUTS DOWN MAKING NOISE IT'S BEEN
HAULED IN GARAGE. FOUR TIMES IT'S A NEW PICKUP I'VE NOT HAD
BUT TROUBLE OUT OF IT I WON'T IT FIXED

**NHTSA ID Number:** 11298821
**Complaint Date** January 12, 2020
**Consumer Location** ANNA, IL
**Vehicle Identification Number** 1FTMF1C56KK****
**Summary of Complaint\**
EXCESSIVE OIL CONSUMPTION IN FIRST 500 MILES (USED 2 QUARTS)
5.0 LITER ENGINE

**NHTSA ID Number:** 11300171

**Complaint Date** January 17, 2020
**Consumer Location** LAS VEGAS, NV
**Vehicle Identification Number** 1FTFX1E52JK****
**Summary of Complaint**
ON SEPTEMBER 15, 2018 I PURCHASED A NEW 2018 FORD F150 5.0 V8.
ON 02/16/2019 (4,546 MILES) AFTER THE FIRST OIL CHANGE IT BEGAN
MAKING A KNOCKING LIKE NOISE. FORD SAID IT WAS NORMAL, BUT
THE KNOCK WASN'T THERE BEFORE THE OIL CHANGE. FORD TRIED
TO SAY IT WAS THE DIRECT INJECTION MAKING THE NOISE. WHICH
MIGHT BE TRUE BUT OTHER OWNERS HAVE REPORTED THE
KNOCKING NOISES AND HAVE HAD SCORED CYLINDERS THAT
REQUIRED THE ENGINE BLOCKS TO BE REPLACED BY FORD. ALSO ON
07/04/2019 (10,416 MILES) I NOTICED THAT THE ENGINE WAS MAKING
A RATTLING NOISE WHEN COLD FROM 1200-2000 RPM. AFTER
RESEARCHING THIS NOISE, I DISCOVERED THAT THERE IS A TSB FOR
THE RATTLING NOISE. ON 07/16/2019 I TOOK MY TRUCK BACK TO THE
DEALER (FRIENDLY FORD IN LAS VEGAS) AND THE TSB WAS
PREFORMED ON THE TRUCK (TSB# 18-2354) THE TSB DID NOT FIX THE
ISSUE. ON 10/23/2019 (12,600 MILES) I TOOK MY TRUCK TO TEAM FORD
IN LAS VEGAS. THE SERVICE DEPARTMENT STATED THAT FORD
TOLD THEM THE ISSUE WAS NORMAL OPERATING
CHARACTERISTICS. IF EITHER OF THESE NOISES WERE NORMAL,
THEN IT WOULD HAVE MADE THEM WHEN IT WAS BRAND NEW.
THESE PROBLEMS HAVE BEEN BROUGHT UP TO FORD BY NUMEROUS
OWNERS OF F150'S AND MUSTANGS WITH THE SAME ENGINE. FORD
REFUSES TO FIX ANYTHING AND JUST SAYS THE ISSUES ARE
NORMAL. SINCE FORD INSSUED A TSB FOR THE RATTLE ISSUE AND
REPLACED ENGINE BLOCKS FOR THE KNOCKING IT TELLS ME FORD
KNOWS THESE ARE ISSUES AND THEY ARE NOT NORMAL WITHOUT
NHTSA OR FTC INTERVENTION FORD MAY NOT FIX THESE PROBLEMS
UNDER WARRANTY. THEY WILL BECOME MORE OF AN ISSUE
OUTSIDE OF WARRANTY AND THE CONSUMER WILL HAVE TO PAY
FOR AN ISSUE FORD SHOULD FIX

LINK TO TSB:
HTTPS://WWW.MUSTANG6G.COM/FORUMS/ATTACHMENTS/18-2354-
FORD-F150-5-0-TSB-PDF.321793/

**NHTSA ID Number:** 11310348
**Complaint Date** February 20, 2020

**Consumer Location** GLOUCESTER, VA
**Vehicle Identification Number** 1FTEW1E58JF****
**Summary of Complaint**
VEHICLE CONSUMED A FEW QUARTS OF OIL BEFORE IT'S NEXT OIL
CHANGE WAS DUE. JUST BOUGHT THE TRUCK WITH LOW MILEAGE.
NO REASON FOR IT TO CONSUME LIKE THAT. NO LEAKS. NOTICED
WHEN A CHANGE OIL SOON WARNING CAME UP AS I BACKED OUT OF
MY DRIVEWAY.THOUGH IT WAS ODD CONSIDERING IT WAS
PREMATURE. WHEN I CHECKED, ALMOST NO OIL WAS ON THE
DIPSTICK. IT WAS FULL 5 WEEKS AGO WHEN I CHECKED IT LAST.

**NHTSA ID Number:** 11317583
**Complaint Date** March 11, 2020
**Consumer Location** TERRE HAUTE, IN
**Vehicle Identification Number** 1FTEW1E51JK****
**Summary of Complaint**
TL* THE CONTACT OWNS A 2018 FORD F-150. THE CONTACT STATED
THAT WHILE DRIVING AND TURNING LEFT, THE VEHICLE STALLED
WITH THE SHIFT TO PARK WARNING DISPLAYED. THE CONTACT
STATED THAT THE POWER STEERING ASSIST WAS INOPERABLE. THE
CONTACT ALSO STATED THAT THE BACK-UP CAMERA FAILED
INTERMITTENTLY. THE VEHICLE WAS TAKEN TO MACE FORD
LOCATED AT (4501 US-41, TERRE HAUTE, IN 47802) TWICE TO BE
DIAGNOSED. THE MECHANIC WAS UNABLE TO DUPLICATE THE
FAILURE OR RETRIEVE A FAULT CODE FOR THE CAUSE OF THE
FAILURE. THE CONTACT WAS CONCERNED ABOUT OIL
CONSUMPTION. THE VEHICLE WAS NOT REPAIRED. THE
MANUFACTURER WAS NOT MADE AWARE OF THE FAILURE. THE
FAILURE MILEAGE WAS APPROXIMATELY 6,000.*DT*JB

**NHTSA ID Number:** 11338836
**Complaint Date** July 12, 2020
**Consumer Location** LAS CRUCES, NM
**Vehicle Identification Number** 1FTEW1E51KK****
**Summary of Complaint**
THE VEHICLE ONLY HAS 13,500 MILES ON IT AND IT CONSUMES OIL
DRAMATICALLY AND THERE IS AN OFF THROTTLE RATTLE IN THE
ENGINE. ADDITIONALLY, ONE OF THE CYLINDERS DOES NOT APPEAR
TO BE FIRING AND IT HAS NO OIL PRESSURE.

**NHTSA ID Number:** 11372591
**Incident Date** November 2, 2020
**Consumer Location** ANNISTON, AL
**Vehicle Identification Number** 1FTEW1E52LK****
**Summary of Complaint**
OIL CONSUMPTION ON THE 5.0 LITER V8 ENGINE. THE ENGINE IS
CONSUMING OIL WITHOUT EVIDENCE OF AN OIL LEAK. FORD HAS A
TSB FOR THIS 19-2365 WHICH COVERS YEAR MODEL 2018-2020. THERE
ARE OTHER TSBS FOR OLDER YEAR MODELS WITH THIS SAME
ENGINE. FORD SAYS LESS THAN 1 QUART OF OIL CONSUMED IN 3000
MILES OR LESS IS NORMAL. THEIR FIX IS A LONGER AND WIDER DIP
STICK AND A SOFTWARE UPDATE. THIS DOES NOT FIX THE OIL
CONSUMPTION. THERE IS A PROBLEM WITH THE DESIGN OF THE
ENGINE BLOCK WITHIN THE CYLINDERS.

**NHTSA ID Number:** 11374147
**Complaint Date** November 11, 2020
**Consumer Location** CENTREVILLE, VA
**Vehicle Identification Number** 1FTEW1E50LF****
**Summary of Complaint**
EXCESSIVE OIL CONSUMPTION. I HAVE ALREADY HAD THE SERVICE
APPLIED FROM THE TECHNICAL BULLETIN, BUT NOT MUCH RELIEF
FROM THE LOSS OF OIL. I HAVE TO ADD AT LEAST A QUART HALF
WAY BETWEEN OIL CHANGES. I WOULD LIKELY LOSE 2 QUARTS OR
MORE BETWEEN OIL CHANGES IN TOTAL. I HAVE BARELY 5000
MILES, ?FIX? APPLIED AT 2500 MILES. AT 5100 MILES ALREADY OVER
A QUART LOW. MOSTLY CITY DRIVING. SOME PULLING OF SMALLER
RV TRAILER. TRAILER WEIGHT IS 5800 POUNDS.

**NHTSA ID Number:** 11375901
**Complaint Date** November 23, 2020
**Consumer Location** ANOKA, MN
**Vehicle Identification Number** 1FTEW1E54LK****
**Summary of Complaint**
BOUGHT THE TRUCK NEW OCTOBER 2020 AND CHECKED THE OIL
AFTER A MONTH HAVING THE TRUCK HAVING 1600 MILES ON IT AND
THERE WAS NO OIL ON THE DIPSTICK. IT?S A 5.0 COYOTE V8. TOOK IT
TO THE DEALER IMMEDIATELY AND THEY ADDED 5 QTS OF OIL!
THERE IS A TSB OUT WHERE THEY CHANGE PCM SOFTWARE AND

41

REPLACE THE DIPSTICK. SHOULDN?T THIS BE DONE BEFORE I TOOK THE TRUCK HOME IF THEY KNEW ABOUT IT??

**NHTSA ID Number:** 11382812
**Complainte Date** December 10, 2020
**Consumer Location** GALLATIN, TN
**Vehicle Identification Number** 1FTEW1E52JK****
**Summary of Complaint**
LEAKS OIL

DEALER CANT STOP THE PROBLEM. CONSTANT LEAK. 2018 SHOULD NOT HAVE THIS TYPE PROBLEM

GOING TO CAUSE ENGINE FAILURE. NOT SAFE

THIS IS AN ONGOING ISSUE.

**NHTSA ID Number:** 11383826
**Complaint Date** December 16, 2020
**Consumer Location** ANOKA, MN
**Vehicle Identification Number** 1FTEW1E55LK****
**Summary of Complaint**
MY NEW 2020 F150 WITH 5.0 V8 TRUCK OVER CONSUMES OIL, ADDING A QUART OF OIL EVERY 1000 MILES. BROUGHT TO DEALER EVERY WEEK AFTER ABOUT 500 MILES AND THEY ADD AT LEAST A HALF QUERY OR MORE EVERY TIME. I BOUGHT IN OCTOBER 2020 AND IN THE FIRST MONTH I WENT THROUGH 4 QTS OF OIL.

107.   Ford, through (1) its public acknowledgement of the problem; (2) its own records of customers' complaints, (3) dealership repair records, (4) records from the National Highway Traffic Safety Administration (NHTSA), (5) warranty and post-warranty claims, (6) internal pre-sale durability testing and internal investigations, and (7) other various sources, has always known or should have known of the Oil Consumption Defect in the Class Vehicles. Yet, at no time has

Ford disclosed these defects to consumers or warned consumers despite knowing the defects persist today with no known way to remediate the existing Class Vehicles.

108.   Ford failed to adequately research, test and/or manufacture the Class Vehicles before warranting, advertising, promoting, marketing, and/or selling them as suitable and safe for use in an intended and/or reasonably foreseeable manner.

109.   Ford is experienced in the manufacture of consumer vehicles. As an experienced manufacturer, Ford conducts tests, including pre-sale durability testing, to verify the vehicles it sells are free from defects and align with Ford's specifications and intended use of the Class, including routine highway travel.

110.   Upon information and belief, Ford performs a four-part durability evaluation on its vehicles before they are released for sale to the general public. The four steps are a virtual analysis, data acquisition, bench testing, and road testing.

111.   The virtual analysis stage is conducted by Ford engineers. It is designed to identify risk areas early in the development process by using software simulations to identify potential part failures by using advanced mathematical models. This process allows Ford to identify and correct any issues with its vehicles before they are produced and when it is the least costly to remedy.

112.   The data acquisition stage is also conducted by Ford engineers. Ford engineers collect and analyze road load data (data regarding the expected load the vehicles will undergo during their anticipated lifetime).

113.   Bench testing involves testing individual components of the vehicle to simulate real world conditions. Bench testing is designed to verify the overall soundness of a design under controlled conditions. The testing performed typically includes testing various component parts to failure.

114.   Through a variety of quality control metrics, Ford knew or should have known of the Oil Consumption Defect in the Class Vehicles prior to and shortly after the time of sale to Class members.

115.   Consumers have incurred and will continue to incur expenses for repair of engine, should they desire a permanent fix, because the TSB does not adequately resolve the Oil Consumption Defect. This is so despite Ford's plain knowledge—for years—of a latent defect contained in the Class Vehicles manufactured by Ford.

116.   Upon information and belief, Ford, through (1) its own records of customers' complaints, (2) dealership repair records, (3) warranty and post-warranty claims, (4) internal pre-sale durability testing and internal investigations (sometimes referred to as "star" reports), and (5) a variety of other sources, including the F-150 forum referenced above, was well aware of the Oil Consumption Defect.

117.   Despite Ford's knowledge of the Oil Consumption Defect, it failed to notify customers of the nature and extent of the problems with Class Vehicles or provide any adequate remedy. Ford continued to sell Class Vehicles with the Oil Consumption Defect through its authorized dealers all over the United States.

118.   Ford knew of the Oil Consumption Defect and its associated defects when performing these quality control metrics on the Class Vehicles.

### D.     Ford Touts Safety in its Marketing and Advertising

119.   Ford touts that "we continue to develop new, innovative technologies that enhance vehicle safety and help customers feel safe and confident on the road."[8] Ford further states that "[w]e use warranty repairs per thousand vehicles at three months in service as a key metric for measuring initial quality. Initial quality goes beyond warrantable defects, to include measures of customer excitement with new product features."[9]

120.   Ford also advertises its commitment to improving the safety of its vehicles: "Quality is critical to the safety of our customers and, therefore, to our responsibilities and success as a company. Safety continues to be one of the highest priorities in the design of our vehicles. We are committed to designing and manufacturing vehicles that achieve high levels of safety over a wide range of real-world conditions."[10]

121.   In order to achieve Ford's safety goals, it further advertises that it "is continuously working to enhance the safety of our products, a fundamental aspect of

---

[8]   https://corporate.ford.com/microsites/sustainability-report-2020/putting-people-first.html (last visited Jan. 4, 2020) (Exhibit I).
[9] *Id.*
[10]   http://ophelia.sdsu.edu:8080/ford/03-30-2018/microsites/sustainability-report-2016-17/customers-products/safety/index.html (last visited Jan 4., 2020) (Exhibit J).

our Quality Operating System (QOS)."[11] In order to achieve this, Ford states that it "conduct[s] engineering analyses, computer simulations and crash testing to evaluate the performance of vehicles and components at a number of sites around the world."[12]

122.  Further, Ford states that "[i]n addition to meeting or exceeding regulatory requirements, our processes, tools and facilities confirm that our vehicles align with our own stringent internal guidelines on safety design, as well as Ford-specified levels of performance for Public Domain tests. We regularly re-evaluate and update these guidelines as appropriate."[13]

### E.   Warranties Related to the Defect

123.  The Class Vehicles come with a three-year/36,000 mile Basic Limited Warranty. The Basic Limited Warranty lasts for three years from the date delivery of the Class Vehicle is taken, or for 36,000 miles on the odometer, whichever occurs first. The Class Vehicles also come with a five-year/60,000mile Powertrain Warranty. The Powertrain Warranty covers the engine, transmission, and drive systems. Accordingly, the Powertrain Warranty is the applicable warranty related to the Oil Consumption Defect.

124.  Ford instructs vehicle owners and lessees to bring their vehicles to a

---

[11] *Id.*

[12] *Id.*

[13] *Id.*

Ford dealership for the warranty repairs. Many owners and lessees have presented Class Vehicles to Ford dealerships with complaints about the Oil Consumption Defect.

125.   Despite Ford's knowledge of the problem—and presumably how to appropriately remediate and prevent the Oil Consumption Defect from recurring (replace the short block and rotating assembly with improved cylinder crosshatching and higher tension piston rings so as to prevent oil from entering the combustion cycle)—Ford refuses to provide appropriate warranty coverage, instead implementing the band-aid TSB and/or informing consumers that the Oil Consumption Defect is normal and oil should be added on a regular basis between oil change intervals, none of which is covered by the warranty nor will it solve the Oil Consumption Defect.

## TOLLING OF STATUTES OF LIMITATION

126.   Any applicable statute(s) of limitations has been tolled by Ford's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and members of the Class could not have reasonably discovered the true, latent defective nature of the Oil Consumption Defect until shortly before this class action litigation was commenced.

127.   Ford Ford was and remains under a continuing duty to disclose to Plaintiffs and members of the Class the true character, quality, and nature of the

Class Vehicles, that this defect is based on poor manufacturing, and that it will require continued costly repairs, poses a safety concern, and diminishes the resale value of the Class Vehicles. As a result of the active concealment by Ford, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## **CLASS ALLEGATIONS**

128.  Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following proposed classes:

> **Nationwide Class:**
> All persons in the United States who purchased or leased a Class Vehicle.

> **California Subclass:**
> All members of the Nationwide Class who are residents of California or purchased, or leased their Class Vehicle in California, primarily personal, family or household purposes, as defined by California Civil Code § 1791(a).

> **Ohio Subclass:**
> All members of the Nationwide Class who are residents of Ohio or purchased or leased their Class Vehicle in Ohio.

> **New York Subclass:**
> All members of the Nationwide Class who are residents of New York or purchased or leased their Class Vehicle in New York.

129.  Excluded from the Class are Ford, its employees, officers, directors, legal representatives, heirs, successors, wholly- or partly-owned, and its subsidiaries

and affiliates; Ford dealers; proposed Class counsel and their employees; the judicial officers and associated court staff assigned to this case and their immediate family members; all persons who make a timely election to be excluded from the Class; governmental entities; and the judge to whom this case is assigned and his/her immediate family.

130.   This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

131.   <u>Numerosity</u>. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Class Vehicles may be identified during the pendency of this action and all owners and lessors notified by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice. The Class members may be easily derived from Ford's sales records.

132.   <u>Commonality and Predominance</u>. Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

    a.  Whether Ford engaged in the conduct alleged herein;

49

b. Whether Ford designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

c. Whether the Oil Consumption Defect constitutes a safety defect;

d. Whether Ford knew about, and failed to disclose, the Oil Consumption Defect at the time Plaintiffs and the Class members purchased their Class Vehicles;

e. Whether Ford manufactured, marketed, and distributed the Class Vehicles knowing that the Oil Consumption Defect could and would occur;

f. Whether Ford's conduct violates consumer protection statutes, false advertising laws, sales contracts, warranty laws, and other laws as asserted herein;

g. Whether Ford owed a duty to warn Plaintiffs and Class Members about the Oil Consumption Defect;

h. Whether Plaintiffs and the other Class members overpaid for their Class Vehicles;

i. Whether Ford breached the warranty by failing to properly inspect and repair the Oil Consumption Defect;

j. Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

k. Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

133. <u>Typicality</u>. Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Ford's wrongful conduct as described above.

50

134.    <u>Adequacy</u>. Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

135.    <u>Declaratory and Injunctive Relief</u>. Federal Rule of Civil Procedure 23(b)(2): Ford has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief with respect to the Class as a whole.

136.    <u>Superiority</u>. Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the members of the Class to individually seek redress for Ford's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the

51

delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIOLATIONS ALLEGED

### FIRST CAUSE OF ACTION
### VIOLATION OF MAGNUSON-MOSS WARRANTY ACT,
### (15 U.S.C. § 2301, *et seq.*) ("MMWA")
### (On Behalf of the Nationwide Class and/or the Ohio, New York and California Classes)

137. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

138. The MMWA provides a private right of action by purchasers of consumer products against retailers who, *inter alia*, fail to comply with the terms of an implied or written warranty. 15 U.S.C. § 2310(d)(1). As alleged herein, Ford has failed to comply with its implied warranty of merchantability with regard to the Class Vehicles.

139. The Class Vehicles are consumer products, as that term is defined in 15 U.S.C. § 2301(1).

140. Plaintiffs and each member of the Classes defined above are consumers, as that term is defined in 15 U.S.C. § 2301(3).

141.    Ford is a supplier and warrantor, as those terms are defined in 15 U.S.C. § 2301(4)-(5).

142.    The MMWA provides a cause of action for breach of written or implied warranty or other violations of the Act. 15 U.S.C. § 2310(d)(1).

143.    Ford's warranties are "written warranties" within the meaning of 15 U.S.C. § 2301(6).

144.    Ford breached the express warranties by providing a 3 year/36,000 mile New Vehicle Limited Warranty and a 5 year/60,000 mile Powertrain Warranty with the purchase or lease of all Class Vehicles, thereby warranting to repair or replace any part defective in material or workmanship at no cost to the owner or lessee; selling and leasing Class Vehicles with the Oil Consumption Defect, and thus were defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and refusing and/or failing to honor the express warranties by effectively repairing or replacing the defective parts free of charge and within a reasonable time.

145.    Ford also provided Plaintiffs and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of their Class Vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As part of the implied warranty of merchantability, Ford warranted that the Class Vehicles were fit for their ordinary

purpose as safe passenger motor vehicles, would pass without objection in the trade as manufactured and marketed, and were adequately contained, packaged, and labeled.

146.   Ford breached these implied warranties and are therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share common manufacturing defects in that they suffer from the Oil Consumption Defect and can suddenly fail during normal use and operation. Ford has admitted that the Class Vehicles are defective through its TSBs.

147.   Ford was provided notice of the claims raised by Plaintiffs and was afforded a reasonable opportunity to cure. Ford failed to cure in that it has not offered a repair to Plaintiffs and consumers for the Oil Consumption Defect. Until Plaintiffs' representative capacity is determined, notice and opportunity to cure through Plaintiffs, and on behalf of the Class, can be provided under 15 U.S.C. § 2310(e).

148.   Ford's acts and omissions in violation of the MMWA are "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," and they are unlawful. 15 U.S.C. § 2310(b); 15 U.S.C. § 45(a)(1).

149.   Plaintiffs and the members of the Classes have suffered, and are entitled to recover, damages as a result of Ford's breach of express and/or implied warranties and violations of the MMWA.

150.    Plaintiffs also seek an award of costs and expenses, including attorneys'

fees, under the MMWA to prevailing consumers in connection with the

commencement and prosecution of this action. 15 U.S.C. § 2310(d)(2). Plaintiffs

and the prospective Classes intend to seek such an award, including expert witness

costs and other recoverable costs, as prevailing consumers at the conclusion of this

lawsuit.

## SECOND CAUSE OF ACTION
## VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT
### (Cal. Civ. Code § 1750, *et seq.*) ("CLRA")
### (On Behalf of the California Class)

151.    Plaintiffs incorporate by reference all allegations of the preceding

paragraphs as though fully set forth herein.

152.    Plaintiff Brady brings this cause of action on behalf of himself and on

behalf of the members of the California Class against Ford.[14]

153.    Ford is a person as that term is defined in California Civil Code

§ 1761(c).

154.    Plaintiff Brady and the Class Members are "consumers" as that term is

defined in California Civil Code §1761(d).

155.    Ford engaged in unfair and deceptive acts in violation of the CLRA by

the practices described above, and by knowingly and intentionally concealing from

---

[14] Plaintiff Brady's venue affidavit is attached as Exhibit K.

Plaintiff and Class Members that the Class Vehicles suffer from a defect(s) (and the costs, risks, and diminished value of the vehicles as a result of this problem). These acts and practices violate, at a minimum, the following sections of the CLRA:

> (a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;

> (a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;

> (a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

> (a)(9) Advertising goods and services with the intent not to sell them as advertised.

156.   Ford's unfair or deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

157.   Ford knew that the Class Vehicles were defectively manufactured, would consume abnormal amounts of engine oil, and were not suitable for their intended use.

158.   Ford was under a duty to Plaintiff and the Class Members to disclose the defective nature of the Class Vehicles because:

a. Ford was in a superior position to know the true state of facts about the safety defect and associated repair costs in the Class Vehicles and their engines;

b. Plaintiff Brady and the Class Members could not reasonably have been expected to learn or discover that the Class Vehicles and their engine had dangerous safety defect until manifestation of the defect;

c. Ford knew that Plaintiffs and the Class Members could not reasonably have been expected to learn or discover the Oil Consumption Defect and the associated repair costs that it causes until the manifestation of the defect; and

d. Ford actively concealed the defect and the associated repair costs by asserting to Plaintiff and Class Members that the levels of engine oil consumption were considered normal, despite knowing the repairs needed to correct the defect.

159. In failing to disclose the Oil Consumption Risk and the associated safety risks and repair costs that result from it, Ford has knowingly and intentionally concealed material facts and breached its duty to disclose.

160. The facts concealed or not disclosed by Ford to Plaintiff and the Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Ford's Class Vehicles or pay a lesser

price. Had Plaintiffs and the Class known about the defective nature of the Class Vehicles and their engines, they would not have purchased or leased the Class Vehicles or would have paid less for them.

161.   182.   Plaintiff Brady provided Ford with notice of its violations of the CLRA pursuant to Cal. Civ. Code § 1782(a) on December 30, 2020, and seeks only injunctive relief at this time. After the 30-day notice period expires under the CLRA, Plaintiffs will amend their complaint to seek monetary damages under the CLRA.

162.   Plaintiff Brady's and the other California Class Members' injuries were proximately caused by Ford's fraudulent and deceptive business practices

163.   Therefore, Plaintiffs and the other Class Members seek all relief available under the CLRA.

<div align="center">

**THIRD CAUSE OF ACTION**
**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE § 17200) ("UCL")**
**(On Behalf of the California Class)**

</div>

164.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

165.   Plaintiff Brady brings this cause of action on behalf of himself and on behalf of the members of the California Class against Ford.

166.   The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or

<div align="center">58</div>

practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

167.   Ford has engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiffs and the Class Members that the Class Vehicles suffer from a defect (and the costs, safety risks, and diminished value of the vehicles as a result of these problems). Ford should have disclosed this information because it was in a superior position to know the true facts related to the Oil Consumption Defect, and Plaintiffs and Class Members could not reasonably be expected to learn or discover the true facts related to the defect.

168.   The Oil Consumption Defect constitutes a safety issue because it can cause the Class Vehicles to run out of engine oil and fail, and as such, Ford had a duty to disclose the safety issue to consumers.

169.   These acts and practices have deceived Plaintiffs and are likely to deceive the public. In failing to disclose the defect and suppressing other material facts from Plaintiffs and the Class Members, Ford breached its duties to disclose these facts, violated the UCL, and caused injuries to Plaintiffs and the Class Members. The omissions and acts of concealment by Ford pertained to information that was material to Plaintiffs and the Class Members, as it would have been to all reasonable consumers.

170.   The injuries suffered by Plaintiffs and the Class Members are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and the Class Members should have reasonably avoided.

171.   Ford's acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750 *et seq.*, and California Commercial Code § 2313.

172.   Plaintiffs seek to enjoin further unlawful, unfair and/or fraudulent acts or practices by Ford, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

## FOURTH CAUSE OF ACTION
### VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW
### (CAL. BUS. & PROF. CODE § 17500, *et seq.*) ("FAL")
### (On Behalf of the California Class)

173.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

174.   Plaintiff Brady brings this cause of action on behalf of himself and on behalf of the members of the California Class against Ford.

175.   California Business & Professions Code § 17500 states: "It is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto,

60

to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

176.   Ford caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiffs and the other Class Members.

177.   Ford has violated section 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of their Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

178.   Plaintiffs and the other Class Members have suffered an injury in fact, including the loss of money or property, as a result of Ford's unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiffs and the other Class Members relied on the misrepresentations and/or omissions of Ford with respect to the safety and reliability of the Class Vehicles. Ford's representations were untrue because the Class Vehicles suffer from the Oil Consumption Defect. Had

Plaintiffs and the other Class Members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them. Accordingly, Plaintiffs and the other Class Members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

179.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business. Ford's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of California and nationwide.

180.   Plaintiffs, individually and on behalf of the other Class Members, request that this Court enter such orders or judgments as may be necessary to enjoin Ford from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class Members any money Ford acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

<div align="center">

**FIFTH CAUSE OF ACTION**
**VIOLATION OF THE SONG-BEVERLY ACT (IMPLIED WARRANTY)**
**(CAL. CIV. CODE §§ 1792, 1791.1, *et seq.*)**
**(On Behalf of the California Class)**

</div>

181.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

182.   Plaintiff Brady brings this cause of action on behalf of himself and on behalf of the members of the California Class against Ford.

183.   At all relevant times hereto, Ford was the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Ford knew or should have known of the specific use for which the Class Vehicles were purchased.

184.   Ford provided Plaintiffs and the Class Members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. The Class Vehicles, however, are not fit for their ordinary purpose because, *inter alia*, the Class Vehicles suffered from the Oil Consumption Defect at the time of sale that causes the Class Vehicles to consume excessive and abnormal amounts of engine oil.

185.   The Class Vehicles are not fit for the purpose of providing safe and reliable transportation because of the defect.

186.   Ford impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use. This implied warranty included, *inter alia*, the following: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by Ford were safe and reliable for providing transportation and would not prematurely and catastrophically fail; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use – providing safe and reliable transportation – while the Class Vehicles were being operated.

187.   Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and

intended purpose. Instead, the Class Vehicles are defective, including, but not limited to, the Oil Consumption Defect.

188.   Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

<div align="center">

**SIXTH CAUSE OF ACTION**
**VIOLATION OF THE SONG-BEVERLY ACT (EXPRESS WARRANTY)**
**(CAL. CIV. CODE §§ 1792, 1791.1, *et seq.*)**
**(On Behalf of the California Class)**

</div>

189.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

190.   Plaintiff Brady brings this cause of action on behalf of himself and on behalf of the members of the California Class against Ford.

191.   At all relevant times hereto, Ford was the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Ford knew or should have known of the specific use for which the Class Vehicles were purchased.

192.   Ford made express warranties to Plaintiff Brady and the other California Class members within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

193.   Ford breached these warranties by selling and leasing Class Vehicles with the Oil Consumption Defect, requiring repair or replacement within the

applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

194.   Ford did not promptly replace or buy back the vehicles of Plaintiff and proposed California Class members.

195.   As a direct and proximate result of Ford's breach of its express warranties, Plaintiff Brady and the other California Class members received goods whose condition substantially impairs their value to Plaintiff and the other Class members. Plaintiff and the other Class members have been damaged as a result of, *inter alia*, the diminished value of Ford's products, the Class Vehicles' malfunctioning, and actual and potential increased maintenance and repair or replacement costs.

196.   Pursuant to Cal. Civ. Code §§ 1793.2 and 1794, Plaintiff Brady and the other Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

197.   Pursuant to Cal. Civ. Code § 1794, Plaintiff Brady and the other California Class members are entitled to costs and attorney fees.

<center>**SEVENTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(On Behalf of the Nationwide Class and/or the Ohio, New York and California**</center>

<center>65</center>

**Classes)**

198.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

199.   Ford manufactured and distributed Class Vehicles throughout the United States for sale to Plaintiffs and the Class Members.

200.   Ford impliedly warranted to Plaintiffs and members of the Class that their Class Vehicles were free of defects and were merchantable and fit for their ordinary purpose for which such goods are used.

201. As alleged herein, Ford breached the implied warranty of merchantability because the Class vehicles suffer from the Oil Consumption Defect. The Class Vehicles are therefore defective, unmerchantable, and unfit for their ordinary, intended purpose.

202.   After Plaintiffs experienced the Oil Consumption Defect and contacted the dealership on multiple occasions without relief, Plaintiffs gave reasonable and adequate notice to Ford that the Class Vehicles were defective, unmerchantable, and unfit for their intended use or purpose.

203.   Due to the Oil Consumption Defect, Plaintiffs and the members of each of the Classes are unable to operate their vehicles as intended in a safe condition, substantially free from defects. The Class Vehicles do not provide safe and reliable

transportation to Plaintiffs and the members of the Classes. As a result, Plaintiffs and members of the Classes are unable to safely drive their Class Vehicles.

204.   Plaintiffs did not receive or otherwise have the opportunity to review, at or before the time of sale, the written warranty containing the purported exclusions and limitations of remedies. Accordingly, any such exclusions and limitations of remedies are unconscionable and unenforceable, and Plaintiffs are entitled to all remedies available under Article 2 of the Uniform Commercial Code and other state laws of each Class. Any purported warranty disclaimers, exclusions, and limitations were unconscionable and unenforceable. As a direct and proximate result of the breach of implied warranty of merchantability, Plaintiffs and members of the Classes have been injured in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY
### (On Behalf of the Nationwide Class and/or the Ohio, New York and California Classes)

205.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

206.   Ford provided all purchasers and lessees of the Class Vehicles with the same express warranties described herein, which became part of the basis of the bargain.

207.   The parts affected by the Oil Consumption Defect were distributed by Ford in the Class Vehicles and are covered by the warranties Ford provided to all purchasers and lessors of Class Vehicles.

208.   Ford breached these warranties by selling and leasing Class Vehicles with the Oil Consumption Defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

209.   Plaintiffs notified Ford of the breach within the warranty period, but Ford already knew of the Oil Consumption Defect and yet chose to conceal it and failed to comply with its warranty obligations.

210.   As a direct and proximate cause of Ford's breach, Plaintiffs and the members of the Class bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiffs and the Class have also incurred and will continue to incur costs related to the diagnosis and repair of the Oil Consumption Defect.

211.   Ford's attempt to disclaim or limit these express warranties is unconscionable and unenforceable under the circumstances here.

212.   Specifically, Ford's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

213. The time limits contained in Ford's warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Classes. A gross disparity in bargaining power existed between Ford and the Class Members, and Ford knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

214. Plaintiffs and the Classes have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

## NINTH CAUSE OF ACTION
## UNJUST ENRICHMENT
**(On Behalf of the Nationwide Class and/or the Ohio, New York and California Classes)**

215. Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

216. This claim is pled in the alternative to Plaintiffs' contract-based claims.

217. Ford knew or should have known that Plaintiffs and the Class paid for the Class Vehicles with the expectation that they would perform as represented and were free from defects.

218. Plaintiffs and the Class conferred substantial benefits on Ford by purchasing the defective Class Vehicles. Ford knowingly and willingly accepted and enjoyed those benefits.

219. Ford's retention of these benefits is inequitable.

220.    As a direct and proximate cause of Ford's unjust enrichment, Plaintiffs and the Class are entitled to an accounting, restitution, attorneys' fees, costs and interest.

## TENTH CAUSE OF ACTION
### VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW
### (N.Y. GEN. BUS. LAW § 349)
### (On Behalf of the New York Class)

221.    Plaintiff Lyman ("Plaintiff") for purposes of all New York Class claims) hereby incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

222.    This claim is brought on behalf of the New York Subclass.

223.    The New York General Business Law (New York GBL) makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. GEN. BUS. LAW § 349.

224.    New York Plaintiff and the New York Subclass members are "persons" within the meaning of N.Y. GEN. BUS. LAW § 349(h).

225.    Ford is a "person," "firm," "corporation," or "association" within the meaning of N.Y. GEN. BUS. LAW § 349.

226.    In the course of Ford's business, Ford willfully failed to disclose and actively concealed that the Class Vehicles suffer from a defect (and the costs, safety risks, and diminished value of the vehicles as a result of these problems). Ford should have disclosed this information because it was in a superior position to know the true

70

facts related to the Oil Consumption Defect, and Plaintiffs and Class Members could not reasonably be expected to learn or discover the true facts related to the defect.

227.   The Oil Consumption Defect constitutes a safety issue because it can cause the Class Vehicles to run out of engine oil and fail, and as such, Ford had a duty to disclose the safety issue to consumers.

228.   A reasonable consumer would expect the Class Vehicles to operate without known safety hazards or excess emissions. Accordingly, Ford engaged in unfair and deceptive trade practices, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in N.Y. Gen. Bus. Law § 349.

229.   Ford's acts had the capacity, tendency or effect of deceiving or misleading consumers; failed to state a material fact that deceives or tends to deceive; and constitute deception, fraud, false pretense, false promise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection therewith.

230.   Ford's actions as set forth above occurred in the conduct of trade or commerce.

231.   Because Ford's deception takes place in the context of public health, its deception affects the public interest. Further, Ford's unlawful conduct constitutes

unfair acts or practices that have the capacity to deceive consumers, and that have a broad impact on consumers at large.

232.   Ford's conduct proximately caused injuries to Plaintiffs and the Class.

233.   Because Ford's willful and knowing conduct caused injury to Plaintiffs and the Class, Plaintiffs and the Class seek recovery of actual damages or $50, whichever is greater; discretionary treble damages up to $1,000; punitive damages; reasonable attorneys' fees and costs; an order enjoining Ford's deceptive conduct; and any other just and proper relief available under N.Y. GEN. BUS. LAW § 349.

234.   Plaintiffs and the Class also seek punitive damages because Ford engaged in aggravated and outrageous conduct.

## ELEVENTH CAUSE OF ACTION
## VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW
### (N.Y. GEN. BUS. LAW § 350)
### (On Behalf of the New York Class)

235.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this complaint.

236.   This claim is brought on behalf of the New York Class.

237.   The New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the

advertising fails to reveal facts material in the light of … representations [made] with respect to the commodity….” N.Y. Gen. Bus. Law § 350-a.

238.  Ford caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiffs and Class members.

239.  Ford has violated N.Y. Gen. Bus. Law § 350 because the omissions regarding the oil consumption, emission levels, and safety and reliability of the Class Vehicles as described above, were material and likely to deceive a reasonable consumer.

240.  Plaintiffs and Class members have suffered injury, including the loss of money or property, as a result of Ford’s false advertising. In purchasing or leasing their Class Vehicles, Plaintiffs and Class members relied on the representations and/or omissions of Ford with respect to the oil consumption, emission levels, and safety and reliability of the Class Vehicles. Ford’s representations turned out to be untrue as described herein. Had Plaintiffs and Class members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

241. Accordingly, Plaintiffs and the Class overpaid for their Class Vehicles and did not receive the benefit of the bargain for their Class Vehicles, which have also suffered diminution in value.

242. Because Ford fraudulently concealed the true oil consumption, emission levels, and safety and reliability of the Class Vehicle, the value of the Class Vehicles has greatly diminished.

243. Plaintiffs, individually and on behalf of Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Ford from continuing its unfair, unlawful and/or deceptive practices. Plaintiffs and Class members are also entitled to recover their actual damages or $500, whichever is greater. Because Ford acted willfully or knowingly, Plaintiffs and Class members are entitled to recover three times actual damages, up to $10,000.

<div align="center">

**TWELFTH CAUSE OF ACTION**
**VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT**
**(Ohio Rev. Code §§ 1345.01 *et seq.*)**
**(On Behalf of the Ohio Class)**

</div>

244. Plaintiff Thuering ("Plaintiff" for purposes of all Ohio claims) incorporates by reference the allegations of all foregoing paragraphs as if they had been set forth in full herein.

245. Plaintiff and the other Ohio Subclass members are "consumers" as defined by the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01 ("OCSPA"). Ford is a "supplier" as defined by the OCSPA. Plaintiff's and the other

Ohio Subclass members' purchases or leases of the Class Vehicles were "consumer transactions" as defined by the OCSPA.

246.  By willfully failing to disclose and actively concealing the Oil Consumption Defect, Ford engaged in deceptive business practices prohibited by the OCSPA, including (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that the Class Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising the Class Vehicles with the intent not to sell them as advertised, and (4) engaging in acts or practices which are otherwise unfair, misleading, false, or deceptive to the consumer.

247.  In the course of its business, Ford willfully failed to disclose and actively concealed the Oil Consumption Defect discussed herein, and otherwise engaged in activities with a tendency or capacity to deceive. Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

248.  Ford knew the Class Vehicles they provided suffered from the Oil Consumption Defect and knew that the Class Vehicles did not operate safely, as

advertised. Ford knew this for years, but concealed all information concerning the Oil Consumption Defect.

249.   Ford was also aware that it valued profits over safety, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised and jeopardized the safety of the vehicle's occupants. Ford concealed this information as well.

250.   By failing to disclose that the Class Vehicles did not operate safely because of the Oil Consumption Defect, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, Ford engaged in deceptive business practices in violation of the OCSPA.

251.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Ohio Class members, about the true performance of the Class Vehicle with the Oil Consumption Defect, the quality of Ford's brand, the devaluing of safety and performance at Ford, and the true value of the Class Vehicles.

252.   Ford intentionally and knowingly misrepresented material facts regarding the Class Vehicles with an intent to mislead Plaintiff and the Ohio Class.

253.   Ford owed Plaintiffs a duty to disclose the true safety, performance, and reliability of the Class Vehicles, and the devaluing of safety and performance at Ford, because Ford:

a.   Possessed exclusive knowledge that it valued profits and cost-cutting over safety and performance, and that it was manufacturing, selling, and distributing vehicles throughout the United States that did not perform as advertised;

b.   Intentionally concealed the foregoing from Plaintiff and the Class; and/or

c.   Made incomplete representations about the safety and performance of the Class Vehicles generally, and the Oil Consumption Defect in particular, while purposefully withholding material facts from Plaintiff and the Class that contradicted these representations.

254.   Because Ford fraudulently concealed the Oil Consumption Defect and the true performance of the Class Vehicles, the value of the Class Vehicles has diminished.

255.   The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of Ford in this Complaint, including, but not limited to, the failure to honor both implied warranties and express warranties, the making and distribution of false, deceptive,

and/or misleading representations, and the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of the OCSPA. These cases include, but are not limited to, the following:

    a. *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

    b. *State ex rel. Betty D. Montgomery v. Volkswagen Motor Co.*, (OPIF #10002Engine Stalling);

    c. *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.*, (OPIF #10002025);

    d. *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

    e. *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

    f. *State ex rel. Jim Petro v. Craftmatic Organization, Inc.*, (OPIF #10002347);

    g. *Mark J. Craw Volkswagen, et al. v. Joseph Airport Toyota, Inc.*, (OPIF #10001586);

    h. *State ex rel. William J. Brown v. Harold Lyons, et al.* (OPIF #10000304);

    i. *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);

    j. *Khouri v. Don Lewis* (OPIF #100001995);

78

k. *Mosley v. Performance Mitsubishi aka Automanage* (OPIF #10001326);

l. *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524); and

m. *Brown v. Spears* (OPIF #10000403).

256.   As a result of its violations of the OCSPA, as detailed above, Ford caused actual damage to Plaintiff and, if not stopped, will continue to harm Plaintiff. Plaintiff currently owns a Class Vehicle that is defective. The Oil Consumption Defect has caused the value of the Class Vehicles to decrease.

257.   Plaintiff and the Class sustained damages as a result of Ford's unlawful acts and are therefore entitled to damages and other relief as provided under the OCSPA.

258.   Plaintiffs also seek court costs and attorneys' fees as a result of Ford's violations of the OCSPA, as provided in Ohio Rev. Code § 1345.09.

<u>**THIRTEENTH CAUSE OF ACTION**</u>
**FRAUDULENT CONCEALMENT**
**(On Behalf of the Nationwide Class and/or the Ohio, New York and California Classes)**

259.   Plaintiffs incorporate by reference the allegations of all foregoing paragraphs as if they had been set forth in full herein.

260.   At all relevant times, Ford was engaged in the business of designing, manufacturing, distributing, and selling the Class Vehicles.

261.    Ford, acting through its representatives or agents, sold and/or lease the Class Vehicles throughout the United States.

262.    Ford willfully, falsely, and knowingly omitted various material facts regarding the quality and character of the Class Vehicles, including that they suffered from the Oil Consumption Defect.

263.    Rather inform consumers of the truth regarding the Oil Consumption Defect, Ford concealed material information related to the Oil Consumption Defect.

264.    Ford omitted this material information to drive up sales and maintain its market power, as consumers would not purchase the Class Vehicles, or would pay substantially less for them, had consumers known the truth.

265.    Plaintiffs and the Class members had no way of knowing about the Oil Consumption Defect.

266.    Plaintiffs and Class members could not have discovered the above information on their own, because Ford was in the exclusive possession of such information.

267.    Although Ford has a duty to ensure the accuracy of information regarding the performance of its Class Vehicles, it did not fulfil these duties.

268.    Plaintiffs and Class members sustained injury due to the purchase of Class Vehicles that suffered from the Oil Consumption Defect.

269.   Ford's acts were done maliciously, oppressively, deliberately, and with intent to defraud, and in reckless disregard of Plaintiffs and Class members' rights and well-being, and in part to enrich itself at the expense of consumers. Ford's acts were done to gain commercial advantage over competitors, and to drive consumers away from consideration of competitor's vehicles. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## FOURTEENTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
### (On Behalf of the Nationwide Class and/or the Ohio, New York and California Classes)

270.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

271.   Ford had a duty to provide honest and accurate information to its customers so that customers could make informed decisions on the substantial purchase of automobiles.

272.   Ford specifically and expressly misrepresented material facts to Plaintiffs and Class members, as discussed above.

273.   Ford knew, or in the exercise of reasonable diligence, should have known, that the ordinary and reasonable consumer would be misled by the Ford's misleading and deceptive advertisements.

81

274. Plaintiffs and the Class members justifiably relied on Ford's misrepresentations and have been damaged thereby in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Classes defined above, respectfully request that the Court enter judgment against Ford and award the following relief:

A.    Certification of this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as the representative of the Classes, and Plaintiffs' counsel as counsel for the Classes;

B.    An order awarding declaratory relief and temporarily and permanently enjoining Ford from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.    Appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Ford to repair, recall, and/or replace the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class members with appropriate curative notice regarding the existence and cause of the Oil Consumption Defect;

D.    An award of appropriate damages to repair or replace the Class Vehicles;

E.     A declaration that Ford is financially responsible for all Class notice and the administration of Class relief;

F.     An order awarding any applicable statutory and civil penalties;

G.     An order requiring Ford to pay both pre- and post-judgment interest on any amounts awarded;

H.     An award of costs, expenses, and attorneys' fees as permitted by law; and

I.     Such other or further relief as the Court may deem appropriate, just, and equitable.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: January 6, 2021          Respectfully submitted,

<div style="margin-left: 3em">

<u>By</u>*: /s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Emily E. Hughes (P68724)
Dennis A. Lienhardt (P81118)
William Kalas (P82113)
THE MILLER LAW FIRM, P.C.
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Fax: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com
wk@millerlawpc.com

</div>

Joseph G. Sauder
Matthew D. Schelkopf
Joseph B. Kenney
**SAUDER SCHELKOPF**
1109 Lancaster Avenue
Berwyn, PA 19312
Telephone: (888) 711-9975
Facsimile: (610) 421-1326
jgs@sstriallawyers.com
mds@sstriallawyers.com
jbk@sstriallawyers.com

William H. Anderson
**HANDLEY FARAH & ANDERSON PLLC**
4730 Table Mesa Drive
Suite G-200
Telephone: (303) 800-9109
Facsimile: (844) 300-1952
wanderson@hfajustice.com

Jon Herskowitz
**BARON & HERSKOWITZ**
9100 S. Dadeland Blvd.
Suite 1704
Miami, FL 33156
Telephone : (305) 670-0101
Facsimile: (305) 670-2393
jon@bhfloridalaw.com

*Attorneys for Plaintiffs and the Class*