UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID LYMAN, *et al.*,

      Plaintiffs,

                          Case No. 21-10024
                          U.S. DISTRICT COURT JUDGE
                          GERSHWIN A. DRAIN

v.

FORD MOTOR COMPANY,

      Defendant.

_____/

**OPINION AND ORDER DENYING FORD'S MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' EXPERT KEVIN W. CAVES [#229]; GRANTING IN PART AND DENYING IN PART FORD'S MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF COLIN JORDAN [#231]; GRANTING IN PART AND DENYING IN PART FORD'S MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF ALLISE WACHS [#232]; GRANTING FORD'S MOTION TO STRIKE ALLISE WACHS'S UNTIMELY SUPPLEMENTAL REPORT [#234]; DENYING FORD'S MOTION TO EXCLUDE THE OPINIONS AND TESTIMONY OF EDWARD STOCKTON [#233]; AND GRANTING PLAINTIFFS' MOTION TO EXCLUDE CERTAIN TESTIMONY AND OPINIONS OF NATHAN SODERBORG [#254]**

## I.    INTRODUCTION

Presently before the Court are the following motions: (1) Defendant Ford

Motor Company's ("Ford") Motion to Exclude the Opinions of Plaintiffs' Expert

Kevin W. Caves [#229]; (2) Ford's Motion to Exclude the Opinions and Testimony of Colin Jordan [#231]; (3) Ford's Motion to Exclude the Opinions and Testimony of Allise Wachs [#232]; (4) Ford's Motion to Exclude the Opinions and Testimony of Edward Stockton [#233]; (5) Plaintiffs' Motion to Exclude Certain Testimony and Opinions of Nathan Soderborg [#254]; and (6) Ford's Motion to Strike the Untimely "Supplemental" Report of Allise Wachs [#234]. Upon review of the parties' submissions, the Court concludes that oral argument will not aid in the disposition of the motions, and thus they will be decided on the briefs. *See* E.D. Mich. L.R. 7.1(f)(2).

For the reasons that follow:

- Ford's Motion to Exclude the Opinions of Plaintiffs' Expert Kevin W. Caves [#229] is DENIED;

- Ford's Motion to Exclude the Opinions and Testimony of Colin Jordan [#231] is GRANTED IN PART AND DENIED IN PART;

- Ford's Motion to Exclude the Opinions and Testimony of Allise Wachs [#232] is GRANTED IN PART AND DENIED IN PART;

- Ford's Motion to Exclude the Opinions and Testimony of Edward Stockton [#233] is DENIED;

- Plaintiffs' Motion to Exclude Certain Testimony and Opinions of Nathan Soderborg [#254] is GRANTED; and

- Ford's Motion to Strike the Untimely "Supplemental" Report of Allise Wachs [#234] is GRANTED.

2

II.   **BACKGROUND**

In this putative class action, Plaintiffs bring claims against Ford based upon an alleged defect in Ford F-150 vehicles containing a 5.0L engine for model years 2018 through 2020 ("the Class Vehicles"). Plaintiffs allege that the 5.0L engine's piston ring assembly and cylinder coating are defective, causing the engines to consume oil at an excessive rate. Plaintiffs claim this oil consumption defect is a serious issue for vehicle longevity and safety, and that Ford knew or should have known of the defect prior to and shortly after the time of sale.

According to Plaintiffs, Ford sends communications called Technical Service Bulletins ("TSBs") to its authorized dealerships to provide them with instructions on how to repair Ford vehicles and respond to particular consumer complaints. Ford allegedly issued a number of TSBs concerning excessive oil consumption in the Class Vehicles, including TSB 19-2365. Plaintiffs assert that TSB 19-2365 attributed the excessive oil consumption to the possibility of high intake manifold vacuum during deceleration fuel shut off, resulting in oil being pulled into the combustion chamber. TSB 19-2365 proposes a remedy to the oil consumption issue, which Plaintiffs posit includes reprogramming the powertrain control module, installing a newly redesigned engine oil level indicator (also known as a "dipstick"), and changing the engine oil and oil filter. Plaintiffs allege that the redesigned dipstick uses a wider 1.9-liter normal operating range, and that "[a]s a result, and

rather than adequately repair the Oil Consumption Defect, Ford simply changed the length of the dipstick to mask the oil consumption problem in the Class Vehicles." ECF No. 162, PageID.8180. According to Plaintiffs, "the new dipsticks encourage owners to over-fill the engine oil sump and thus prolong the time/mileage interval between filling the engine oil and registering a low oil level reading. In other words, an oil level that once registered at or below the minimum fill line on the factory-installed dipstick—which would have caused customers to become alarmed or concerned about excessive oil consumption and possibly qualified for an engine replacement under" an earlier TSB—"is now considered normal and within Ford's acceptable parameters." *Id.* at PageID.8180-81. Plaintiffs allege that "[t]his change only sought to save Ford the cost of repairs and did nothing to correct the Oil Consumption Defect." *Id.* at PageID.8181.

Plaintiffs' Third Amended Complaint asserts various consumer protection, fraudulent concealment, negligent representation, and breach of warranty claims arising from this purported defect, on behalf of a nationwide class or state subclasses. While many Plaintiffs have been dismissed from this case, the remaining Plaintiffs' claims arise under Washington, California, Virginia, Pennsylvania, Illinois, and Ohio state law.

Ford challenges the admissibility of the opinions and testimony of four of Plaintiffs' expert witnesses: Dr. Kevin Caves, Dr. Colin Jordan, Dr. Allise Wachs,

4

and Edward Stockton. Ford also moves to strike Dr. Wachs's supplemental report due to its purported untimeliness. Plaintiffs, on the other hand, move to exclude certain opinions of Dr. Nathan Soderborg, one of Ford's expert witnesses.

## III.   LEGAL STANDARD

### A. Federal Rule of Evidence 702

Federal Rule of Evidence 702 governs the admissibility of expert testimony, providing as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"Parsing the language of the Rule, it is evident that a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528-29 (6th Cir. 2008). First, the witness must be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "The court's investigation of qualifications should

5

not be onerous or inordinately exacting, but rather must look to underlying competence, not labels." *Zuzula v. ABB Power T & D Co.*, 267 F. Supp. 2d 703, 713 (E.D. Mich. 2003). Whatever the form, the expert's "qualifications must provide a foundation for an expert to answer the specific questions in the expert report." *Thomas v. Lambert*, 606 F. Supp. 3d 592, 599 (E.D. Mich. 2022) (cleaned up).

Second, the testimony must be relevant, meaning it "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The "relevancy" prong of Rule 702 requires that an expert's opinions adequately "fit" the facts of the case. *Daubert*, 509 U.S. at 591. To meet this standard, the proffered opinion must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. LeBlanc*, 45 F. App'x 393, 400 (6th Cir. 2002) (citation omitted).

Third, the testimony must be reliable. *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (citing Fed. R. Evid. 702). "Rule 702 guides the trial court by providing general standards to assess reliability: whether the testimony is based upon 'sufficient facts or data,' whether the testimony is the 'product of reliable principles and methods,' and whether the expert 'has applied the principles and methods reliably to the facts of the case.' " *Id.* (quoting Fed. R. Evid. 702). In addition, the Supreme Court in *Daubert* identified several factors for courts to consider when evaluating reliability, including (1) whether the theory or technique has been tested;

6

(2) whether the theory or technique can or has been peer reviewed or published; (3) the known or potential error rate; (4) the existence and maintenance of standards controlling the technique's operation; and (5) general acceptance by the relevant scientific community and the testimony's degree of acceptance therein. *Daubert*, 509 U.S. at 593-94. These factors are not meant to establish a "definitive checklist or test," and instead may be tailored to the facts of a particular case. *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)).

In *Smelser v. Norfolk Southern Railway Co.*, 105 F.3d 299 (6th Cir. 1997), the Sixth Circuit observed that, on remand in *Daubert* ("*Daubert II*"), the Ninth Circuit identified an additional factor relevant to assessing the reliability of expert testimony: "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying." *Id.* at 302 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995)). The Ninth Circuit explained that testimony grounded in research conducted independently of litigation "provides important, objective proof that the research comports with the dictates of good science." *Daubert II*, 43 F.3d at 1317. At the same time, the court recognized that the fact "that an expert testifies for money does not necessarily cast doubt on the reliability of his testimony, as few

experts appear in court merely as an eleemosynary gesture." *Id.* Rather, the concern is that "a scientist's normal workplace is the lab or the field, not the courtroom or the lawyer's office." *Id.*

The Sixth Circuit expanded on *Daubert II* in *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 435 (6th Cir. 2007) as follows:

> If it is clear that a proposed expert's testimony flows naturally from his own current or prior research (or field work), then it may be appropriate for a trial judge to apply the *Daubert* factors in somewhat more lenient fashion. This would not mean that such an expert is to be accorded a presumption of reliability, but it would be in line with the notion that an expert who testifies based on research he has conducted independent of the litigation "provides important, objective proof that the research comports with the dictates of good science." *Daubert II*, 43 F.3d at 1317. However, if a proposed expert is a "quintessential expert for hire," then it seems well within a trial judge's discretion to apply the Daubert factors with greater rigor[.] . . . Such an expert is not [to] be accorded a presumption of unreliability, but the party proffering the expert must show some objective proof—such as the expert's extensive familiarity with the particular [issue] in question . . .—supporting the reliability of the expert's testimony.

Ultimately, the critical inquiry under Rule 702 is "whether a putative expert's testimony would be inadmissible junk science or instead would be testimony falling within the 'range where experts might reasonably differ.' " *Thomas v. Novartis Pharms. Corp.*, 443 F. App'x 58, 60 (6th Cir. 2011) (quoting *Kumho Tire*, 526 U.S. at 153). "[R]ejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530 (internal quotations omitted). The court's task is not to determine whether an opinion is "correct," but rather whether it "rests upon a reliable foundation, as opposed to, say, unsupported speculation."

*Id.* at 529-30.

It is important to distinguish between genuine questions of reliability and questions of credibility and accuracy. *In re Scrap Metal*, 527 F.3d at 529–30. Any issue regarding the credibility or accuracy of admitted expert testimony goes not to the admissibility of the evidence, but to the weight of the evidence, and can be addressed via cross-examination and "presentation of contrary evidence" by opposing counsel. *Id.* at 532 (quoting *Daubert*, 509 U.S. at 579).

**B. Amendments to Rule 702**

Rule 702 was amended in 2000 to include subsections (b) through (d) "in order to reflect the Supreme Court's emphasis that an expert's opinion should be grounded in the actual facts of the case, valid under the principles of the discipline that furnished the base of special knowledge, and structured so as to 'fit' the facts of the case into the theories and methods that the expert espouses." *Chapman v. Gen. Motors LLC*, No. 2:19-cv-12333-TGB-DRG, 2023 WL 2745161, at *2 (E.D. Mich. Mar. 31, 2023) (citing *Daubert*, 509 U.S. at 591-93). The Rule was amended again in 2023, in relevant part, "to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. The Advisory Committee explained that many courts had erroneously "held that the

critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." *Id.* To remedy the error, the Rule was amended to clarify that "the preponderance standard" under Rule 104(a) "applies to the three reliability-based requirements added in 2000— requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard." *Id.*

In amending Rule 702, the Advisory Committee indicated that "[n]othing in the amendment imposes any new, specific procedures. Rather, the amendment is simply intended to clarify that Rule 104(a)'s requirement applies to expert opinions under Rule 702." *Id.* Accordingly, courts have consistently recognized that the amendment did not substantively change Rule 702's requirements. *See, e.g.*, *EcoFactor, Inc. v. Google LLC*, 137 F. 4th 1333, 1339 n.8 (Fed. Cir. 2025) (recognizing that the amendment "did not substantively change the relevant [Rule 702] standard"); *In re Acetaminophen—ASD-ADHD Products Liab. Litig.*, 707 F. Supp. 3d 309, 335 n.27 (S.D.N.Y. 2023) ("Nothing in the amendment imposes any new, specific procedures."); *Reflex Media, Inc. v. SuccessfulMatch.com*, 758 F. Supp. 3d 1046, 1049 (N.D. Cal. 2024) (explaining that the "amendment is not intended to be a 'seachange' in the performance of the Court's 'gatekeeper' function with respect to the admissibility of expert opinions").

The Advisory Committee further explained that Rule 702 does not require

10

"the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support," as Rule 104(a) "does not require perfection." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. On the other hand, Rule 104(a) "does not permit the expert to make claims that are unsupported by the expert's basis and methodology." *Id.*

IV.   **ANALYSIS**

   **A. Ford's Motion to Exclude Dr. Kevin Caves**

   Ford moves to exclude Dr. Caves's expert opinions and testimony. Dr. Caves is one of Plaintiffs' damages expert who opines, in relevant part, that economic injury and aggregate damages to members of the proposed classes can be reliably determined using a choice-based conjoint ("CBC") analysis. As he explains in his report, CBC is a survey-based methodology that quantifies the value consumers assign to individual product attributes that are not separately priced. The product at issue "is expressed as a bundle of features, and each feature contributes something to the overall utility that the consumer derives from the product." ECF No. 229-1, PageID.10005. The CBC survey disaggregates the product into its component parts, commonly referred to as "attributes," and presents respondents with a series of choice tasks. In each task, respondents are shown multiple fictitious products, each reflecting different combinations of attributes and price points, and are asked to select the option, if any, they would purchase in real life. According to Dr. Caves,

11

"[b]y selecting the most-preferred bundle of features among the choices presented to them—that is, the choice that maximizes a respondent's utility—survey respondents reveal the value they derive from individual features." *Id.*

Dr. Caves conducted a CBC analysis with respect to the alleged oil consumption defect in the Class Vehicles. His survey presented respondents with fictitious automobiles with different options available for five distinct attributes: (1) Make/Model/Trim/Body; (2) Fuel Efficiency; (3) Drivetrain/Engine; (4) Price; and (5) Oil Consumption Defect. Respondents were prompted to select which, if any, of the automobiles they would purchase in real life. Prior to beginning the survey, respondents completed a pre-survey questionnaire that presented descriptions and images of each attribute, and their understanding of each attribute was confirmed through a series of comprehension questions. While completing the survey, respondents could access these descriptions at any time by hovering their cursors over the attribute.

Relevant to Ford's motion is the "Oil Consumption Defect" attribute, which Dr. Caves's survey defined to respondents as follows:

- This vehicle **may** be defective. Even though this vehicle is supposed to consume oil at a rate of 10,000 miles per quart, many customers have reported significantly higher oil consumption, leading to frequent oil replacement and trips to the dealership to service the vehicle.

- About **one out of every six** vehicle owners will experience enough problems with oil consumption that they take the vehicle to the dealership for diagnostic

testing and attempted repair. Vehicle owners are about 14 times more likely to do so than in the prior model year.

- Warranty claims due to oil consumption for this type of vehicle are expected to be approximately four times greater than what the manufacturer considers excessive and problematic.

- If the vehicle is defective, you may need to purchase and add oil to the vehicle multiple times between service intervals. Failure to do so may result in engine stalling, engine damage, and even engine failure, requiring expensive repairs.

- If the vehicle is defective, even if you refill the oil as indicated above, and even if you take the vehicle to the dealership for diagnostic testing and attempted repair, the vehicle's excessive oil consumption may still make it prone to mechanical problems such as decreased engine performance, engine damage, decreased fuel efficiency, and increased emissions.

- If the vehicle is defective, **there is no known repair** that will fully resolve this problem of excessive oil consumption, other than selling the vehicle and purchasing a different vehicle.

*Id.* at PageID.10021 (emphasis in original and internal footnotes omitted). The Oil Consumption Defect attribute takes on two possible levels: (1) "YES: May Have Oil Consumption Defect (One in Six Chance)"; and (2) "NO: Does Not Have Oil Consumption Defect." *Id.* at PageID.10022.

Ford claims exclusion of Dr. Caves's expert opinions and testimony is warranted because (1) he has a disqualifying conflict of interest; (2) he is unqualified to opine on CBC survey design; (3) his CBC survey is unreliable; (4) his opinions are irrelevant; and (5) his opinions do not reflect a reliable application of his methodology to the facts of the case.

13

i. Conflict of Interest

Ford argues that Dr. Caves's expert opinions and testimony should be excluded due to a conflict of interest arising from his involvement in prior litigation involving Ford. In that earlier matter—*In re MyFord Touch Consumer Litigation*, No. 13-cv-03072 (N.D. Cal.) ("*MyFord Touch*")—Ford retained an economist to provide opinions on classwide injury and aggregate damages to the putative class. Dr. Caves acted as a consultant and designed a CBC survey to assist the economist in formulating his expert opinions.

"Expert disqualification may be warranted when a party retains expert witnesses who previously worked for an adversary and who acquired confidential information during the course of" their work for that party. *3D Sys., Inc. v. Envisiontec, Inc.*, No. 05-74891, 2008 WL 4449595, at *1 (E.D. Mich. Oct. 1, 2008) (citation and internal quotation marks omitted). This Court utilizes a two-part test to determine whether an expert has a disqualifying conflict of interest: "(1) whether the expert had a confidential relationship with the adversary; and (2) whether the adversary disclosed confidential information to the expert that is relevant to the current litigation." *Thompson, I.G., LLC v. Edgetech I.G., Inc.*, No. 11-12839, 2012 WL 3870563, at *2 (E.D. Mich. Sept. 6, 2012) (citation omitted).

With respect to the first element, the party seeking disqualification must demonstrate that "it was reasonable for it to believe that a confidential relationship

14

existed" with the expert. *Id.* at *4 (citation omitted). In essence, Ford's position is that it had a confidential relationship with Dr. Caves solely by virtue of his role as a consultant in the *MyFord Touch* litigation. But courts routinely recognize that the mere fact that an expert performed work for an opposing party and, in that capacity, was exposed to confidential information does not, standing alone, warrant disqualification. *See, e.g.*, *Dyson, Inc. v. Bissell Homecare, Inc.*, 951 F. Supp. 2d 1009, 1023 (N.D. Ill. 2013). Beyond asserting that Dr. Caves previously worked as a consultant on a Ford matter and reviewed confidential materials in the course of that engagement, Ford identifies no additional facts demonstrating the existence of a confidential relationship sufficient to justify disqualification.

Indeed, the primary case Ford relies upon, *Thompson I.G., LLC v. Edgetech I.G., Inc.*, No. 11-12839, 2012 WL 3870563 (E.D. Mich. Sept. 6, 2012), is inapposite to the present case. There, this Court excluded an expert witness based on a clear conflict of interest arising from his prior employment relationship with the opposing party. The expert had served as a senior-level employee for nearly fifteen years, co-invented the product giving rise to the case, and executed multiple agreements obligating him to maintain the confidentiality of proprietary information even after his employment ended. Here, in contrast, Dr. Caves was never employed by Ford. Instead, he was engaged as a consultant for the limited purpose of designing a CBC survey to assist Ford's expert in the *MyFord Touch* litigation. Ford identifies no

confidentiality agreement, nondisclosure agreement, or similar undertaking executed by Dr. Caves. Nor did Dr. Caves play any role in designing, developing, or inventing the Class Vehicles or their constituent parts. Accordingly, unlike *Thompson*, the facts before the Court do not support a finding that Dr. Caves possessed a confidential relationship with Ford that would warrant disqualification.

As for the second element—whether Ford disclosed confidential information to Dr. Caves that is relevant to the present case—Ford does not specifically identify the confidential information Dr. Caves reviewed during the *MyFord Touch* litigation. Instead, Ford asserts only that it "sent its expert team confidential documents and deposition transcripts to assist them in preparing their opinions." ECF No. 229, PageID.9977. Absent more specific information on this issue, the Court cannot readily ascertain whether Dr. Caves reviewed confidential information that is relevant to the present case. Indeed, courts routinely find that the movant must specifically identify the confidential information reviewed by the expert. *See, e.g.*, *Hewlett-Packard Co. v. EMC Corp.*, 330 F. Supp. 2d 1087, 1094 (N.D. Cal. 2004) ("Because the burden is on the party seeking to disqualify the expert, that party should point to specific and unambiguous disclosures that if revealed would prejudice the party."); *see also Eastman Kodak Co. v. Kyocera Corp.*, No. 10-CV-6334CJS, 2012 WL 4103811, at *10 (W.D.N.Y. Sept. 12, 2012); *Johnson v. NaphCare, Inc.*, No. 3:19-cv-54, 2021 WL 12300815 (S.D. Ohio May 4, 2021).

For these reasons, the Court finds that Ford has failed to meet its burden of demonstrating the existence of a conflict of interest that would warrant disqualifying Dr. Caves from offering expert opinions and testimony for Plaintiffs.

ii.  Dr. Caves's Qualifications

Next, Ford argues that Dr. Caves is unqualified to provide expert testimony on CBC survey design. Although Ford acknowledges Dr. Caves's academic and professional experience in economics, it asserts that this experience "has nothing to do with survey design." ECF No. 229, PageID.9978.

The Court disagrees. Dr. Caves earned his Ph.D. in economics from the University of California, Los Angeles, in 2005, specializing in applied econometrics and industrial organization. As he explained at his deposition, econometric analysis often involves discrete choice modeling, which is commonly used in conjoint surveys. ECF No. 255-2, PageID.12121-22. Moreover, his doctoral dissertation utilized the same techniques that underly conjoint models, and as such, he is "very familiar with how they work." ECF No. 229-2, PageID.10127. In addition, over the course of his career, Dr. Caves has designed, implemented, and analyzed CBC surveys in multiple litigation matters and offered expert testimony in one case. ECF No. 229-1, PageID.9996. Against this backdrop, the Court finds that Dr. Caves's education and professional experience provide him with a sufficient foundation to opine on CBC survey design. *See In re Whirlpool Corp. Front-Loading Washer*

17

*Prods. Liab. Litig.*, 45 F. Supp. 3d 724, 756 (N.D. Ohio 2014) (finding that expert's qualifications as an economist and econometrician qualified him to testify regarding conjoint surveys because "[c]onjoint analysis is a subdiscipline of economics" and "[i]t is of little consequence to questions of admissibility that an expert lacks expertise in the very specialized area").

Ford raises several other arguments concerning Dr. Caves's qualifications that are similarly unavailing. Ford asserts that Dr. Caves has not published on this issue, does not regularly use conjoint methods in his day-to-day work, and has only ever prepared a conjoint survey design for purposes of litigation. These arguments go to weight, not admissibility, and Ford will be free to probe these purported shortcomings during cross-examination.

### iii.   Reliability of Dr. Caves's Survey

Ford argues that Dr. Caves's survey is unreliable because it employs suggestive questions and graphics creating "demand effects" or "cues" that imply or favor a particular response. ECF No. 229, PageID.9980. Specifically, Ford challenges Dr. Caves's use of the term "defect" with respect to the "Oil Consumption Defect" attribute, as well as the inclusion of a red oil-pressure warning lamp graphic along the "Yes" response option:



ECF No. 229-1, PageID.10089. Ford asserts that by presenting the Oil Consumption

Defect attribute in this manner, Dr. Caves "essentially told consumers that vehicles

with the 'Oil Consumption Defect" were defective and warned them away with a

red warning lamp." ECF No. 229, PageID.9981-82. Ford further contends that, as

set forth in the F-150 Owner's Manual, the oil lamp graphic is the same used to

identify a possible "malfunction" requiring a driver to immediately stop the vehicle

and turn it off:

**Oil Pressure Warning Lamp**

It illuminates when you switch the ignition on.

If it illuminates when the engine is running this indicates a malfunction. Stop your vehicle as soon as it is safe to do so and switch the engine off. Check the engine oil level. If the oil level is sufficient, this indicates a system malfunction. Have your vehicle checked as soon as possible.

19

ECF No. 229-3, PageID.10160. Ford suggests that Dr. Caves's use of the oil lamp graphic might have improperly influenced survey responses, rendering the survey unreliable.

The Court disagrees. First, the term "defect" accurately describes the attribute Dr. Caves intended to measure. The dictionary definition of "defect" is "an imperfection or abnormality that impairs quality, function, or utility."[1] Dr. Caves's survey explains that the "Oil Consumption Defect" attribute refers to a condition where a vehicle, expected to consume oil at a rate of one quart per 10,000 miles, has instead been reported by many consumers as consuming oil at significantly higher rates, which in turn can cause frequent oil replacement and potential mechanical problems. Against this backdrop, the Court finds that the use of the term "defect" is an accurate and appropriate characterization of the attribute Dr. Caves sought to analyze, and as such, does not improperly bias the survey such that it is unreliable.

The Court finds the same to be true with respect to Dr. Caves's use of a red oil lamp graphic. Dr. Caves uses various graphics and colors with respect to other attributes and their corresponding levels. For example, he uses a gas pump graphic with respect to the "Fuel Efficiency (City/Hwy/Combined)" attribute. *See, e.g.*, ECF No. 229-1, PageID.10090. The pump appears in yellow with respect to the "19/22/20

---

[1] *Defect*, Merriam-Webster, https://www.merriam-webster.com/dictionary/defect.

MPG" level, orange for the "17/23/19 MPG" level, and green with respect to the "19/24/21 MPG" level. *Id.* Moreover, the vehicles depicted under the "Make/Model/Trim/Body" attribute appear in various colors. *Id.* Notably, the survey presents *all* attribute options corresponding to the fictitious automobiles at once, and as such, respondents saw all colors and icons at one point of time, making it unlikely the respondent would select one option solely by virtue of it containing a red oil lamp. For example:

If only these Full Size Pickup Trucks were available for purchase, which would you choose? (Click or hover over each feature for details.)

(5 of 20)



Id. at PageID.10091. Viewed as a whole, the survey design does not suggest that the

red oil lamp graphic would improperly steer respondents toward selecting vehicles

associated with the oil consumption defect any more than the survey's other visual cues.

The Court finds the same to be true with respect to Dr. Caves's use of the oil lamp itself. Indeed, while this graphic might be the same as that which would warn of a potential "malfunction," it is used for both levels of the attributes—i.e., "Yes" and "No." As such, in the Court's judgment, it is unlikely that Dr. Caves's use of the oil lamp improperly biases the survey because it is used for all potential levels of the attribute.

Finally, Ford contends that Dr. Caves's use of the term "defect" with respect to the "Oil Consumption Defect" attribute "runs afoul of the law." ECF No. 229, PageID.9983. In support, Ford cites an out of district case stating that "[i]n order to be considered reliable, a survey must resemble the way consumers would view the products in the marketplace." *Native Am. Arts, Inc. v. Bud K World Wide, Inc.*, No. 7:10-CV-124, 2012 WL 1833877, at \*6 (M.D. Ga. May 18, 2012). Against this backdrop, Ford contends that "no dealership would sell an F-150 by marketing it as defective." ECF No. 229, PageID.9983. But by that same logic, one would also expect that a dealership would not sell defective vehicles in the first instance, yet that is precisely what Plaintiffs allege Ford did here. As such, the fact that dealerships would not market vehicles as "defective" is beside the point.

For these reasons, the Court finds that exclusion of Dr. Caves's survey is not warranted on this basis.

### iv.   Relevance of Dr. Caves's Opinions

Ford next contends that Dr. Caves's opinions are irrelevant because they do not "fit" the facts of the case in several respects. First, Ford takes issue with the fact that Dr. Caves's model does not apply to used vehicles or purchases. According to Ford, given that four of the six remaining Plaintiffs purchased their vehicles used, Dr. Caves's "methodology does not speak to the purported damages of the majority of Named Plaintiffs, or the thousands of putative class members who purchased their Class Vehicles used, and thus lacks the requisite 'fit.' " ECF No. 229, PageID.9983-84. But this argument overlooks the fact that Rule 702, by its plain language, permits expert testimony that will help the trier of fact to "determine a *fact* in issue." Fed. R. Evid. 702. It does not require that an expert's testimony be relevant to *every single issue* presented to the factfinder.

Second, Ford asserts that Dr. Caves's opinions do not fit the facts of the case because his methodology is designed only to calculate aggregate damages, rather than any given Plaintiffs' damages. But beyond so claiming, Ford does not explain *how* this renders Dr. Caves's opinions irrelevant. Indeed, as this Court has recognized, "[t]he fact that a method does not yield a precise measure of damages for every individual class member does not mean that the testimony is inadmissible

24

or unhelpful for the purpose of determining if a method exists to determine classwide damages, because 'it is appropriate for the proposed damages to be approximations.'" *Won v. Gen. Motors, LLC*, No. 19-11044, 2022 WL 3010886, at *7 (E.D. Mich. July 28, 2022) (quoting *Ramos v. Banner Health*, 1 F.4th 769, 780 (10th Cir. 2021)).

Lastly, Ford argues that Dr. Caves's opinions are irrelevant to Plaintiffs' California claims because he did not analyze any actual transactions or sales in the marketplace. Ford notes that damages for the California Consumer Legal Remedies Act claims are limited to "the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received," Cal. Civ. Code § 3343(a), and California Unfair Competition Law claims are limited to restitution, measured by the "difference between what the plaintiff paid and the value of what the plaintiff received." *In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83, 96 (Cal. Ct. App. 2009) (citation omitted). Even accepting Ford's position as true, however, the fact remains that Dr. Caves's opinions may be relevant to non-California claims.

For these reasons, the Court finds that exclusion on this basis is not warranted.

     v.   <u>Reliability of Dr. Caves's Application of Methodology to the Facts of the Case</u>

Next, Ford argues that Dr. Caves's opinions do not reflect a reliable application of his principles and methods to the facts of the case because his survey

25

fails to adequately account for supply-side considerations. Specifically, Ford contends that Dr. Caves improperly used market data reflecting the retail prices consumers actually paid for 2023 Ford F-150s, rather than the prices associated with the 2018-2020 Class Vehicles at issue in this case. Ford further argues that Dr. Caves erroneously assumed that Ford would have produced the same number of vehicles during the relevant period regardless of any price reduction reflected in his analysis, and that the prices of other full-sized pickups would have remained the same.

"[O]bjections that conjoint survey analyses do not adequately account for supply-side factors have become routine." *Chapman v. Gen. Motors LLC*, No. 2:19-CV-12333-TGB-DRG, 2023 WL 2745161, at *11 (E.D. Mich. Mar. 31, 2023) (citation omitted). As this Court has recognized, there is a "clear trend in the federal courts . . . against striking a conjoint analysis report based upon a failure to consider supply-side considerations." *In re Gen. Motors Corp. Air Conditioning Mktg. and Sales Prac. Litig.*, No. 18-md-02818, 2023 WL 2215953, at *13 (E.D. Mich. Feb. 24, 2023) (cleaned up). In accordance with this trend, this Court routinely rejects arguments seeking to exclude expert witnesses on the basis of failing to account for supply-side considerations. *See, e.g., id.*; *Chapman*, 2023 WL 2745161, at *11-12.

In any event, the Court finds Ford's arguments unpersuasive. First, Dr. Caves's use of 2023 Ford F-150 vehicle prices does not render his survey unreliable. Dr. Caves administered the survey in 2023, and the "Price" attribute was defined to

26

respondents as "the price you would actually pay for the vehicle—not the manufacturer's suggested retail price." ECF No. 229-1, PageID.10080. His use of contemporaneous pricing data reflected the real-world market conditions existing at the time respondents completed the survey. Had Dr. Caves instead used 2018-2020 prices, respondents may have evaluated the vehicle attributes under outdated market conditions, which in turn could have distorted the value they assigned to the fictitious vehicles.

Nor is the Court persuaded by Ford's contention that Dr. Caves improperly assumed Ford would have produced the same number of vehicles regardless of any reduction in price, and that Dr. Caves does not account for the effects that disclosure would have on competition. These criticisms challenge the assumptions embedded in Dr. Caves's analysis, not the reliability of the methodology as applied to the facts of this case. As such, this challenge goes to weight, not admissibility, and Ford is free to probe this purported shortcoming through its case presentation or cross-examination.

For these reasons, Ford's motion to exclude Dr. Caves's expert opinions and testimony is denied.

### B. Ford's Motion to Exclude Dr. Colin Jordan

Ford moves to exclude Dr. Jordan's expert opinions and testimony. Plaintiffs retained Dr. Jordan to opine on the potential cause of excessive oil consumption in

the Class Vehicles, whether the Class Vehicles suffer from a common defect causing excessive oil consumption, and whether the TSBs issued by Ford sufficiently remedied the Class Vehicles' excessive oil consumption. He offers three overarching opinions. First, Dr. Jordan opines that the Class Vehicles "suffer from an engine design defect which causes oil consumption to grossly exceed Ford's own internal standard and its consumers' expectations." ECF No. 231-1, PageID.10434. He posits that this design defect is due to Ford's use of piston rings lacking sufficient tension, which "caused excessive engine oil to escape the crankcase, bypass the piston rings and burn off in the combustion chamber during the combustion cycle." *Id.* Second, Dr. Jordan opines that Ford knew about this purported defect "years before the Class Vehicles were put into production" and nevertheless opted to use the low-tension piston rings to improve fuel economy. *Id.* at PageID.10434-35. Lastly, Dr. Jordan asserts that "[t]o date, Ford has failed to develop a field remedy to reduce oil consumption in the Class Vehicles to meet its own standards or consumer expectations, which is 10,000 miles per quart," including through its issuance of the TSBs. *Id.* at PageID.10435-36.

Ford argues that Dr. Jordan's expert opinions and testimony should be excluded because (1) he is unqualified to offer certain opinions; (2) several of his opinions are unreliable; (3) certain opinions are irrelevant to the issues in this case; and (4) some opinions do not amount to expert testimony as contemplated by Rule

702.

### i. Dr. Jordan's Qualifications to Offer Certain Opinions

Ford contends that Dr. Jordan is unqualified to offer certain opinions. First, Ford argues that Dr. Jordan should be precluded from opining that the Class Vehicles consume oil at a rate exceeding customer expectations because, as he testified at his deposition, he is not an expert in consumer behavior and expectations. The Court disagrees. Dr. Jordan's opinions concerning consumer expectations are drawn from Ford's internal documents, which, in his view, provide that customers expected their vehicles to consume oil at a rate of approximately one quart per 10,000 miles. *See, e.g.*, ECF No. 231-1, PageID.10512, PageID.10474. Dr. Jordan's reliance on these documents in forming the challenged opinions is plainly permitted by Federal Rule of Evidence 703, which empowers an expert to base his opinions on "facts or data" made known to him. Fed. R. Evid. 703. His opinions regarding consumer expectations are not derived from purported expertise in consumer behavior and expectations.

Second, Ford argues that Dr. Jordan is unqualified to opine on the Class Vehicles' oil consumption rate or piston ring design. Ford contends that while Dr. Jordan is a highly educated mechanical engineer, he does not possess skills, knowledge, or expertise specifically relating to a vehicle's appropriate rate of oil consumption or the ideal piston ring design. Here too, the Court disagrees. As Ford

acknowledges, Dr. Jordan has a Bachelor's Degree, a Master's Degree, and a Ph.D. in Mechanical Engineering. His professional experience includes teaching undergraduate and graduate courses on topics such as engine design, engine testing, vehicle design, combustion engineering, vehicle performance, engineering cost analysis, and fuel system design. Moreover, Dr. Jordan has experience using oil consumption test results to estimate real-world consumption performance, and has also worked on thesis projects involving oil consumption.

The Court is satisfied that Dr. Jordan's education and experience provide a sufficiently reliable foundation for his opinions concerning vehicle oil consumption and piston ring design. While he may not specialize in these areas, "[c]ourts do not require experts to be specialists in every subject to which their testimony might relate—they must simply have expertise that would help a jury understand the expert's testimony." *Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 568 (E.D. Mich. 2022) (citations omitted). Such is the case here.

ii. <u>Reliability of Dr. Jordan's Opinions on Oil Consumption and Piston Ring Design</u>

Next, Ford raises two reliability challenges to Dr. Jordan's opinions concerning oil consumption and piston ring design. First, according to Ford, Dr. Jordan "opines that the [Class] Vehicles must consume oil at a rate no higher than 10,000 [miles per quart]." ECF No. 231, PageID.10418. Ford contends that this opinion is impermissible *ipse dixit* because "Ford's internal guidelines do not require

30

the [Class] Vehicles to consume oil at a rate no higher than 10,000 [miles per quart]."

*Id.*

Indeed, it is axiomatic that "[t]he '*ipse dixit* of the expert' alone is not sufficient to permit the admission of an opinion." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Thus, exclusion may be warranted where there is "too great an analytical gap between the data and the opinion proffered." *Id.* Here, however, Dr. Jordan does not opine that the Subject Vehicles *must* consume oil at a rate no higher than 10,000 miles per quart. Rather, as set forth in the portions of Dr. Jordan's report cited by Ford, he opines that the alleged defect causes oil consumption at a rate that grossly exceeds Ford's own internal standard and its consumers' expectations, and cites Ford documents in support. *See, e.g.*, ECF No. 231-1, PageID.10512, PageID.10474. Ford offers no argumentation as to how this opinion is unsupported by the Ford documents cited by Dr. Jordan.

Second, invoking the prepared-solely-for-litigation reliability factor established by *Daubert II*, Ford argues that Dr. Jordan's opinions concerning oil consumption and piston ring design must be excluded because they were developed specifically for this case. According to Ford, prior to this litigation, Dr. Jordan "never had an expert opinion on what level of oil consumption is appropriate for a truck like the F-150." ECF No. 231, PageID.10419. This argument is unavailing. Dr.

Jordan's challenged opinions flow naturally from his extensive education and experience in mechanical engineering, including engine design and related fields. The fact that he has never held an opinion specifically concerning the Class Vehicles or similar trucks does not, standing alone, render the challenged opinions unreliable. Experts are routinely permitted to apply their expertise to new factual scenarios. For these reasons, exclusion of Dr. Jordan's opinions concerning oil consumption and piston ring design is not warranted on this basis.

      iii. <u>Reliability of Methodology Underlying Dr. Jordan's Opinion That the Class Vehicles Consume Oil at Rate Exceeding 10,000 Miles Per Quart</u>

Next, Ford argues that Dr. Jordan's opinion "that every [Class] Vehicle consumes oil at a rate above 10,000 miles per quart" is the product of an unreliable methodology for two reasons. *Id.* First, Ford asserts that Dr. Jordan failed to calculate the actual rate of oil consumption on any F-150 vehicle by driving the vehicle and monitoring its oil consumption.

This argument is unpersuasive. "There is no requirement that an expert must physically inspect or test items on which they offer an opinion." *Weidman v. Ford Motor Co.*, 646 F. Supp. 3d 929, 933 (E.D. Mich. 2022). Here, Dr. Jordan opines that the Class Vehicles suffer from an engine *design* defect that causes oil consumption to exceed 10,000 miles per quart. In forming that opinion, Dr. Jordan reviewed, among other things, Ford's internal documents, deposition testimony from

Ford personnel, and the piston rings and engines themselves—precisely the type of materials experts routinely and appropriately rely upon in evaluating alleged design defects. *See, e.g.*, *Weidman*, 646 F. Supp. 3d at 933 (holding that expert appropriately relied upon "technical documents provided by Ford, including those describing in detail the various manufacturing and engineering design changes Ford and Hitachi implemented over time, the deposition transcript of a Ford witness, photographs of master cylinders in Plaintiffs' vehicles, and other sources to render his opinions on the nature and impact of changes to master cylinders installed in 2013-2018 F-150s over time"); *In re Gen. Motors Corp. Air Conditioning Mktg. and Sales Practices Litig.*, No. 18-md-02818, 2023 WL 2215953, at *4 (E.D. Mich. Feb. 4, 2023) (rejecting argument that expert's opinions regarding design defect were not based on sufficient facts or a reliable methodology due to failure to "conduct a single inspection, examination, test, or analysis of the vehicles or component parts at issue in [the] litigation" because the expert "was reasonably capable of assessing the designs by reviewing design drawings and applying his substantial knowledge and experience to those drawings"); *see also Won v. Gen. Motors, LLC*, No. 19-11044, 2022 WL 3010886, at *18 (E.D. Mich. July 28, 2022). The fact that Dr. Jordan did not perform the testing Ford posits he should have done goes to weight, not admissibility. *In re Gen. Motors Corp. Air Conditioning Mktg. and Sales Practices Litig.*, 2023 WL 2215953, at *4.

Second, Ford argues that Dr. Jordan "ignored relevant data, like the Named Plaintiffs' deposition testimony, which proves that multiple Plaintiffs' vehicles consume oil at a normal rate." ECF No. 231, PageID.10420. In support of this position, Ford cites *In re Rezulin Products Liability Litigation*, 369 F. Supp. 2d 398 (S.D.N.Y. 2005). That case is inapposite. There, the court explained that "if the relevant scientific literature contains evidence tending to refute the expert's theory and the expert does not acknowledge or account for that evidence, the expert's opinion is unreliable." *Id.* at 425. Here, however, the Named Plaintiffs' deposition testimony is not scientific literature. Moreover, this testimony does not conclusively establish that their vehicles consume oil at a normal rate and instead merely suggests the oil consumption in certain Named Plaintiffs' vehicles fell within manufacturer specifications. At bottom, Dr. Jordan's challenged opinion rests upon a reliable factual basis, and Ford's challenge bears on the weight of the opinion, not its admissibility.

iv.   Reliability of Dr. Jordan's Opinion on Sufficiency of TSBs

Ford next argues that Dr. Jordan's opinion that "[t]he proposed remedies that Ford implemented in its Technical Service Bulletins are insufficient" and "will not get the Class Vehicles to Ford's internal standard of 1 quart of engine oil per 10,000 miles," ECF No. 231-1, PageID.10513, must be excluded because "he did not test this hypothesis, either." ECF No. 231, PageID.10423. The Court disagrees. Here too,

34

Dr. Jordan's challenged opinion is based on his review of Ford's internal documents and the deposition testimony of Ford personnel. For example, as set forth in his expert report, Dr. Jordan has "not reviewed any documents that would indicate that the updated calibration would bring the vehicles in the field (with the original piston rings) to the Ford Trustmark of 1 quart of oil per 10,000 miles." ECF No. 231-1, PageID.10490. He also reviewed the deposition testimony of Ford employees, noting that one such employee "stated during his deposition that no Ford documents show the updated calibration released for field service would get vehicles to the Ford Oil Consumption Trustmark Standard." *Id.* at PageID.10491. Dr. Jordan's expert report also notes that "Ford's testing showed that the new calibrations alone would not achieve the Ford Oil Consumption Trustmark [S]tandard," and that "Ford's customer surveys also show that the new calibration would not resolve the excessive oil consumption." *Id.* Any purported shortcomings regarding Dr. Jordan's failure to perform testing go to weight, not admissibility.

      v.  <u>Relevance of Dr. Jordan's Opinions Comparing the Class Vehicles to Toyota Vehicles</u>

Ford seeks to exclude Dr. Jordan's opinions comparing the engine internals of certain Toyota vehicles he owns—namely, a 2009 Toyota Yaris with 150,000 miles and a 2013 Toyota Tundra with 109,000 miles—to those of the Class Vehicles. After inspecting both sets of engines, Dr. Jordan found that "[t]he Toyota engine internals had typically more than twice the mileage of the typical Class Vehicles, yet

showed very little wear or carbon deposits due to their very low oil consumption." ECF No. 231-1, PageID.10505-06. His expert report contains photographs of various components of the engine internals and brief descriptions of his findings. Ford argues that Dr. Jordan's comparison of the Toyota Yaris to the Class Vehicles does not "fit" the facts of this case because "the images of the internal components of a Toyota Yaris (a compact car) say nothing about oil consumption in the Subject Vehicles (full-size pickup trucks)." ECF No. 231, PageID.10423. Ford further contends that, although the Toyota Tundra and the Class Vehicles may be similarly sized, Dr. Jordan "admits he knows nothing about Toyota's oil consumption standard, meaning he cannot offer any meaningful comparison between the Tundra's and [Class] Vehicles' oil consumption performance." *Id.* at PageID.10423-24.

The Court disagrees. In essence, Dr. Jordan opines that engines with substantially higher mileage and lower oil consumption—i.e., the Toyota vehicles—did not exhibit the same carbon buildup and wear observed in the Class Vehicles. That comparison tends to support Plaintiffs' position that the engine wear observed in the Class Vehicles stems from excessive oil consumption, rather than, say, the age of the vehicle. As such, it is sufficiently tied to the facts of the case and will aid the jury in resolving factual disputes. The threshold for demonstrating relevance is low, and Ford's arguments regarding the vehicles' differences go to weight, not admissibility.

36

vi.   Whether Certain Opinions Amount to Expert Testimony Under 702

Ford seeks to exclude several of Dr. Jordan's opinions on the ground that they

do not amount to expert testimony as contemplated by Rule 702. First, Ford seeks

to exclude Dr. Jordan's opinions concerning Ford's knowledge, arguing that they

invade the factfinding function of the jury. For example, Dr. Jordan opines that

"Ford sold the Class Vehicles with piston rings of insufficient tension it knew would

result in grossly excessive oil consumption," and that "Ford also knew that the

effects of operating a vehicle suffering from excessive oil consumption would

include spark plug fouling, carbon deposits in the combustion chamber, reduced oil

pressure, engine component wear, reduced fuel economy, reduced power, increased

emissions, and premature engine failure." ECF No. 231-1, PageID.10434. He further

opines that "Ford learned of the excessive oil consumption problem with the Class

Vehicles['] engines during its pre-production testing"; that "Ford recognized that

increasing the piston ring tension would remedy the oil consumption issue"; and that

Ford "knew that due to inefficiencies in its 5.0L engine design, if it increased ring

tension to remedy the excessive oil consumption issue, fuel economy would suffer

and the Class Vehicles would not meet Ford's fuel economy targets." *Id.*

This Court has consistently recognized that expert witnesses may not opine

on a corporation's state of mind, subjective motivations, or intent. *See, e.g.*, *Hunt v.*

*Hadden*, 127 F. Supp. 3d 780, 788-89 (E.D. Mich. 2015); *In re Flint Water Cases*,

37

2024 WL 2244871, at *6-7 (E.D. Mich. May 17, 2024); *Visteon Global Techs., Inc. v. Garmin Int'l, Inc.*, No. 10-cv-10578, 2016 WL 4396085, at *4-5 (E.D. Mich. Aug. 18, 2016). This is because "[e]xpert testimony as to intent, motive, or state of mind offers no more than the drawing of an inference from the facts of the case," and a jury is sufficiently capable of drawing such inferences on its own. *Hunt*, 127 F. Supp. 3d at 788 (citation omitted). Allowing such testimony would therefore "merely substitut[e] the expert's [judgment] for the jury's and would not be helpful to the jury" as contemplated by Rule 702. *Id.* (citation omitted).

Here, the Court finds that Dr. Jordan's expert opinions concerning Ford's knowledge improperly invade the jury's factfinding function. While those opinions are derived from technical materials that may themselves be beyond the understanding of a lay juror, Dr. Jordan's challenged opinions do more than merely explain the contents or technical significance of those materials. Rather, based on his review of the materials, Dr. Jordan draws inferences regarding Ford's knowledge concerning the defect at various points in time, which the jury is competent of doing itself. To be sure, Dr. Jordan may provide expert testimony explaining the technical significance of those materials. He may not, however, take the additional step of attributing a particular state of mind to Ford based on his review of those materials. Whether Ford, in fact, knew of the alleged defect or appreciated its consequences at various points in time is an inference the jury is equally capable of drawing from the

evidence presented at trial. Accordingly, the Court finds that Dr. Jordan may testify regarding the contents and technical significance of Ford's internal documents, but he may not opine on Ford's knowledge. Permitting such testimony would improperly intrude upon the jury's factfinding role.

Second, Ford argues that Dr. Jordan's opinions improperly invade the jury's factfinding role because, as set forth in his report, he merely recites and summarizes Ford's internal documents. Indeed, courts within the Sixth Circuit have recognized that expert testimony may be excluded where the expert serves only as a conduit for record evidence rather than applying any specialized expertise. *See, e.g.*, *Schall v. Suzuki Motor of Am., Inc.*, No. 4:14-CV-00074-JHM, 2020 WL 1162193, at *5 (W.D. Ky. Mar. 10, 2020) (citation omitted) (recognizing that an expert "cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence" and that such a narrative is instead "properly presented through percipient witnesses and documentary evidence"); *Cincom Sys., Inc. v. Labware, Inc.*, No. 1:20-CV-83, 2024 WL 3926256, at *6 (S.D. Ohio Aug. 22, 2014) (same). That said, an expert is not prohibited from relying on record evidence in forming his opinions. Moreover, given that Federal Rule of Civil Procedure 26(a)(2)(B)(ii) requires an expert to disclose the facts and data considered in forming those opinions, the expert may therefore "articulate the factual underpinning upon which he bases his opinions." *Schall*, 2020 WL 1162193, at *5 (cleaned up).

Here, although a substantial portion of Dr. Jordan's expert report discusses Ford's internal documents, the Court finds that Dr. Jordan does more than merely recount their contents. Rather, Dr. Jordan applies his expertise to explain the meaning and significance of technical documents that, in the Court's judgment, may not be readily understandable to a layperson. In so doing, Dr. Jordan offers testimony that will assist the jury in understanding the issues and evidence in this case, rather than supplanting the jury's role as factfinder. Such testimony is permissible. *See In re Gen. Motors Corp. Air Conditioning Mktg. and Sales Pracs. Litig.*, No. 18-md-02818, 2023 WL 2215953, at *5 (E.D. Mich. Feb. 24, 2023) (finding that expert did more than "merely summarize" corporate documents because "[h]e reviewed the documents, analyzed them, and applied his experience and knowledge when assessing their contents and their significance").

Finally, Ford seeks to exclude Dr. Jordan's cost of repair opinions. Dr. Jordan performed an engineering cost analysis to determine the cost of repairing the Class Vehicles in various ways. Ford contends that exclusion of Dr. Jordan's cost of repair analysis is appropriate because the figures underlying the analysis were drawn from Ford documents, and as such, Dr. Jordan's opinions on this issue are not proper Rule 702 opinion testimony.

In support of this position, Ford relies on *Hampton v. General Motors LLC*, No. 21-CV-250-RAW, 2024 WL 718197 (E.D. Okla. 2024), where the court

40

excluded an expert's opinion that a piston ring replacement would cost $2,700. *Hampton*, however, is readily distinguishable from the present case. There, the expert merely adopted a cost figure from a General Motors document and admitted he had no independent personal knowledge as to the cost. *Id.* at \*13. Here, in contrast, Dr. Jordan conducted a multi-step engineering cost analysis. In the course of doing so, he reviewed Ford documents, deposition testimony, and other sources—including, for example, data from the American Automobile Association. Unlike *Hampton*, the ultimate cost of repair figures proffered by Dr. Jordan are not merely parroted from Ford documents and are instead the product of his own independent analysis. And while he may have relied on Ford documents in the course of conducting this analysis, an expert is entitled to rely upon record facts in the course of forming his expert opinions. Accordingly, because Dr. Jordan does not merely parrot Ford's figures and instead applies an independent analysis to the available record, his cost of analysis opinions are proper Rule 702 expert opinions.

In conclusion, Ford's motion to exclude Dr. Jordan's expert opinions and testimony is granted in part and denied in part. Dr. Jordan's opinions concerning Ford's knowledge are excluded. Ford's motion is denied in all other respects.

### C. Ford's Motion to Exclude Allise Wachs

Ford moves to exclude Dr. Allise Wachs's expert opinions and testimony. Dr. Wachs is a statistician who was retained by Plaintiffs to review and analyze Ford

41

warranty data as it pertains to warranty repairs for excessive oil consumption in the Class Vehicles, and Ford documents relating to oil consumption rates. She offers, in relevant part, the following analyses and opinions. First, using warranty and sales data provided by Ford, Dr. Wachs performed a "Reliability analysis to predict the reliability of the Class Vehicles at three, five, and ten years from purchase." ECF No. 232-1, PageID.10669. She opines that the warranty data does not support the conclusion that TSB 19-2365 resolved the excessive oil consumption problem. *Id.* Second, she asserts that "[t]he excess oil consumption claim rate for the 2018-2020 model year F150 5.0L is conservatively 18 times higher than the 2015-2017 model year F150 5.0 claims rate (at 60 months in service)," and that the Class Vehicles are "significantly worse than the 2018 model year Mustang with regard to oil consumption." *Id.* Third, she posits that "[t]he supposed Model Year 2021 piston ring pull-ahead 'fix' as of February 16, 2020 for Model Year 2020 vehicles did not resolve the excessive oil consumption problem." *Id.*

Ford argues that Dr. Wachs's expert opinions and testimony should be excluded because (1) her opinions do not reflect a reliable application of her methodology to the facts of the case; (2) she does not sufficiently explain her methodology for selecting the statistical models she used in her reliability analysis; and (3) her opinions concerning Ford's knowledge at various points in time invade the jury's factfinding function.

i. <u>Reliability of Dr. Wachs's Application of Methodology to the Facts of the Case</u>

Ford argues that Dr. Wachs's opinions do not reflect a reliable application of her methodology to the facts of the case because her methodology "does nothing to prevent warranty claims having nothing to do with the purported defect from being categorized as a defect-related failure." ECF No. 232, PageID.10646. Dr. Wachs's methodology for selecting warranty data to include in her reliability analysis involved reviewing Excel files produced by Ford, which contained warranty and sales data pertaining to the Class Vehicles. These Excel files each contained a spreadsheet column labeled "VFG_CD." Moreover, according to Dr. Wachs, some of the files were labeled with a TSB 19-2365 designation, and some were not.

For files lacking the TSB 19-2365 designation, Dr. Wachs selected claims where (1) the "VFG_CD" field was "V44," and (2) the "Tech Comments" or "Customer Comments" contained keywords associated with oil consumption concerns, such as "oil leak," "oil consumption," "consume oil," "low oil pressure," and "check oil." ECF No. 232-1, PageID.10680; ECF No. 256-2, PageID.12178. Dr. Wachs explains in her expert report that she used those keyword search terms because Bobby Matthews, a Ford employee involved in Ford's investigation into the Class Vehicles' oil consumption issues, testified at his deposition that he used the

43

same approach to identify relevant warranty claims.[2] ECF No. 232-1, PageID.10680. She further explained that V44 "is the code for the 'base engine' functional group and is used by Ford to 'allocate issues' to the 'base engine' function." *Id.* By limiting her analysis to claims containing the V44 code, Dr. Wachs explains that her "analysis is in line with some Ford warranty analysis of oil consumption that looks at the V44 data but is more conservative than other analyses Matthews conducted where he did not appear to limit it to just base engine related claims." *Id.* at PageID.10680-81. The Court finds that Dr. Wachs's selection of warranty data on this basis reflects a reliable methodology because it aligns with the processes Ford itself used to identify and analyze warranty claims related to oil consumption issues.

As for the files containing the TSB 19-2365 designation, Dr. Wachs removed duplicative vehicle identification numbers and then analyzed all of the remaining claims. As she explains in her expert report, TSB 19-2365 applies only to situations where there is "customer concern about excessive oil consumption," permitting her to be "reasonably certain" that the claims related to excessive oil consumption complaints. *Id.* at PageID.10681.

Ford contends that Dr. Wachs improperly assumes that all TSB 19-2365 data

---

[2] Specifically, Mr. Matthews testified that he "would pull every claim that was tagged as a base engine issue under five liter," then "do text searches in Excel . . . for phrases like, low oil or oil consumption . . . to filter down to the relevant claims." ECF No. 256-3, PageID.12212.

relates to customer concerns of excessive oil consumption. According to Ford, "TSB 19-2365 instructs dealerships to perform an oil consumption test, and *then* determine whether a vehicle passes or fails that test in order to determine whether there is an oil consumption issue stemming from something *other* than an oil leak." ECF No. 232, PageID.10649 (emphasis in original). Ford further asserts that Dr. Wachs failed to exclude claims in which technicians expressly determined that there was no excessive oil consumption. As such, Ford argues that the data Dr. Wachs derived from the TSB 19-2365 designated files includes claims unrelated to excessive oil consumption, rendering her methodology unreliable when applied to the facts of the case.

The Court is unpersuaded. By its own terms, TSB 19-2365 applies where a customer presents with a "customer concern of excessive oil consumption." ECF No. 232-3, PageID.10744. Moreover, the absence of excessive oil consumption during a particular inspection does not foreclose the possibility that the condition existed intermittently or manifested later in the vehicle's life. Ford's concerns regarding Dr. Wachs's potential overinclusion of warranty claims unrelated to excessive oil consumptions are issues of weight, not admissibility. Ford may challenge any purported overinclusion in the data she used through its case presentation and cross-examination.

For these reasons, the Court is satisfied that Dr. Wachs's methodology for

45

selecting warranty data to use in her reliability analysis is reliable. Dr. Wachs has given reasonable explanations for why she chose to include or omit certain data. "Her analytical criteria may be subject to fair criticism, but that does not render her testimony inadmissible." *Won v. Gen. Motors, LLC*, No. 19-11044, 2022 WL 3010886, at \*12 (E.D. Mich. July 28, 2022) (citation omitted).

### ii. Dr. Wachs's Methodology for Selecting Statistical Models

Next, Ford argues that Dr. Wachs's opinions should be excluded in their entirety because she does not sufficiently explain her methodology for selecting the statistical models used in her reliability analysis. Specifically, Ford contends that although Dr. Wachs's report references the terms "Weibull" and "Loglogistic," she does not explain how those models operate, why she selected them over other models, or how she applied them to the data, thereby making it difficult to ensure that the models produced reliable information.

In support, Ford points to *United States v. Gissantaner*, 990 F.3d 457, 463 (6th Cir. 2021), where the Sixth Circuit explained that "[i]f highly consequential evidence emerges from what looks like an indecipherable computer program to most non-scientists, non-statisticians, and non-programmers, it is imperative that qualified individuals explain how the program works and ensure that it produces reliable information about the case." But Dr. Wachs does just that in her expert report, explaining in great detail the methodology underlying her reliability analysis.

46

Relevant here is the second step of her methodology, which involved "determin[ing] the 'best-fit' models to describe the data." ECF No. 232-1, PageID.10676. She describes the process of doing so as follows:

> I use the data . . . to identify *probability distribution functions* (i.e., models) that best describe the time-to-failure (i.e., time from sale until complaint/claim observed in the field data) distribution. Numerous models are considered, and an algorithm (Maximum Likelihood Estimation) determines the "best-fitting" distribution (and reasonable distributions) for the data observed. There may be several distributions that appear to adequately describe the data. In each case, I looked at both the best fitting and the second-best fitting distribution to make sure that the estimates were not dependent on which distribution I selected—and that the estimates were robust. . . .

> An example of a common model that describes the time-to-failure is a *Weibull Distribution* with specified parameters. However, other models commonly used in reliability analysis may fit a given dataset better (or similarly) such as Lognormal, Loglogistic, Gamma, etc. The criteria for determining "best-fit" models include *Maximum Likelihood (likelihood values), Goodness-of-fit statistics*, and *Probability Plot* fits. The process of determining "best-fit" models is commonly referred to as "distribution fitting." An illustration of distribution fitting to data is shown in Appendix D.

*Id.* at PageID.10676-77 (emphasis in original).

Appendix D, in turn, provides that "[t]he warranty forecasting methods described in this report are peer reviewed and accepted in most industries, academia, and the leading software providers who provide software tools to facilitate the model fitting and warranty forecast calculation." *Id.* at PageID.10720. Dr. Wachs explains that "[t]he warranty forecasts for [her] analysis were performed using ReliaSoft's Weibull++ software product," which "is a leading software brand for reliability applications." *Id.* at PageID.10721. This software product "provide[s] 'distribution

47

fitting' functionality to assist in identifying 'best-fit' distributions," and "[o]nce a distribution is identified, future failures are predicted using the failure probability (determined by the model) and the risk set for future time periods." *Id.* at PageID.10721.

The Court is satisfied that Dr. Wachs sufficiently explains her methodology for selecting the statistical models she used, consistent with *Gissantaner*. Moreover, the Court emphasizes that *Gissantaner*'s notion that an expert must "explain how the program works and ensure that it produces reliable information about the case" was stated in the context of explaining the purpose of Rule 702's reliability requirement. Ford concedes that it "is not arguing that Weibull or Loglogistic distribution fitting analyses are not well-accepted methods that yield reliable results, or even that [Dr.] Wachs otherwise erred in performing such analyses—other than using fundamentally flawed data." ECF No. 232, PageID.10657. At bottom, the reliability inquiry probes whether an expert's opinions are the product of reliable principles and methods, and Ford concedes that such is the case here. For these reasons, the Court finds that exclusion of Dr. Wachs's expert opinions is not warranted on this basis.

### iii. Dr. Wachs's Opinions Concerning Ford's Knowledge

Lastly, Ford contends that Dr. Wachs should be precluded from providing expert opinions regarding Ford's knowledge. The Court agrees. As discussed above

with respect to Dr. Jordan, an expert witness generally may not opine on a corporation's state of mind, subjective motivations, or intent because such testimony "offers no more than the drawing of an inference from the facts of the case," and a jury is sufficiently capable of drawing such inferences on its own. *Hunt*, 127 F. Supp. 3d at 788. Here, Dr. Wachs offers several opinions concerning Ford's knowledge. For example:

> Ford knew that the "pull ahead ring pack" didn't solve the problem. Exhibit 18 from the Matthews deposition (FORD1_LYMAN00106696-97) shows that even with the new ring pack, half the customers would still get less than 5,200 miles per quart—whereas the Model Year 2021 vehicles were getting 8,300 and 8,400 miles per quart. Ford also knew and showed that the new rings did not resolve the oil consumption issue—and if there was any potential improvement, it was only a small percentage (9% - 19% at Ford's own selected percentiles). Ford also observed that nearly 90% of the model year 2018 vehicles with the pull ahead ring pack would be getting less than 6,000 miles per quart.

ECF No. 232-1, PageID.10699; *see also id.* at PageID.10692. As with Dr. Jordan, Dr. Wachs may not opine on Ford's knowledge. She may, however, provide expert testimony concerning the facts and analyses that lead her to believe that Ford knew or should have known something, but she may not take the additional step of attributing a particular state of mind to Ford based on those facts.

In conclusion, Ford's motion to exclude Dr. Wachs is granted in part and denied in part. Dr. Wachs may not proffer opinions or testimony concerning Ford's knowledge. Ford's motion is denied in all other respects.

49

**D. Ford's Motion to Exclude Dr. Wachs's Supplemental Report**

Ford moves to exclude Dr. Wachs's supplemental expert report. Therein, Dr. Wachs explains that she performed two additional reliability analyses using the same methodology described in her expert report, with one change: she removed some of the keywords she originally used when selecting warranty data from the Excel files lacking the TSB 19-2365 designation. According to Dr. Wachs, "[t]hese additional analyses demonstrate [that] such keyword changes do not substantively change the forecasts" set forth in her initial expert report. ECF No. 234-1, PageID.10947. Ford contends that Dr. Wachs's supplemental report must be excluded because it is not a proper supplemental report and instead impermissibly analyzes the same data in two new ways to bolster her opinions. Moreover, Ford notes that it was served after Plaintiffs' expert disclosure deadline had passed, and as such, allowing it to stand would circumvent the requirement for a timely and complete expert witness report.

Under Federal Rule of Civil Procedure 26(a), an expert witness disclosure for a retained witness must be accompanied by a written report containing, in pertinent part, "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B). "A party must make these disclosures at the times and in the sequence that the court orders" or the parties stipulate to. *See* Fed. R. Civ. P. 26(a)(2)(D). Moreover, a party must supplement its expert disclosures "in a timely manner if the party learns that in some material respect the

disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties[.]" Fed. R. Civ. P. 26(a)(2)(E), (e). Critically, however, supplementation is limited to "correcting inaccuracies" or "filling interstices" in an initial disclosure. *Bentley v. Highlands Hosp. Corp.*, No. 15-97-ART-EBA, 2016 WL 5867496, at *4 (E.D. Ky. Oct. 6, 2016) (quoting *Munchkin, Inc. v. Playtex Prods., LLC*, 600 F. App'x 537, 538 (9th Cir. 2015)). "A party may not use a supplemental report to disclose information that should have been disclosed in the initial expert report, thereby circumventing the requirement for a timely and complete expert witness report." *Moonbeam Cap. Invs., LLC v. Integrated Constr. Sols., Inc.*, No. 2:18-cv-12606, 2020 WL 1502004, at *6 (E.D. Mich. Mar. 30, 2020) (citation omitted). As such, "a supplemental report that states additional opinions or seeks to strengthen or deepen opinions expressed in the original report is beyond the scope of proper supplementation and subject to exclusion under Rule 37(c)." *Id.*

Rule 37(c) describes the sanctions a court must impose for failure to disclose or supplement, providing that if a party fails to timely do so, "the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "The expert disclosure deadlines established by the default provisions of Rule 26(a)(2)(D) or by the specific schedule implemented in an individual case, as

here, seek to ensure the orderly progression of pretrial discovery and to avoid surprise and undue prejudice." *Moonbeam Cap. Invs.*, 2020 WL 1502004, at *6.

Here, the Court finds that Dr. Wachs's additional analyses are not properly the subject of a supplemental disclosure. Dr. Wachs performed these additional analyses in response to questions from defense counsel at her deposition. In conducting these additional analyses, she relied upon information that was available to her at the time she prepared her initial expert report, but used that information to conduct new analyses intended to bolster the opinions she previously disclosed. As such, Dr. Wachs's additional report does not "supplement" her prior opinions as contemplated by Rule 26. Rather, it constitutes an untimely and impermissible attempt to strengthen her timely-disclosed opinions.

Because Dr. Wachs's supplemental report was disclosed after Plaintiffs' expert disclosure deadline, Rule 37(c) mandates its exclusion unless Plaintiffs demonstrate that their failure to timely disclose the opinions contained therein is substantially justified or was harmless. In making this determination, the Court must consider the following factors: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Howe v. City of Akron*, 801 F.3d 718, 477-48 (6th Cir. 2015) (citation

52

omitted).

Here, the Court finds that the *Howe* factors counsel against excusing Plaintiffs' untimely disclosure. First, Dr. Wachs's supplemental report plainly surprised Ford because it presented new analyses and additional support for the opinions disclosed in her initial report. While these analyses are based on data Ford has always had access to, at bottom, the analyses themselves are new. Second, Ford lacked a meaningful opportunity to cure the surprise. Ford received the supplemental report only *after* it had already deposed Dr. Wachs, and approximately one week before the deadline for dispositive motions, *Daubert* motions, and Ford's expert disclosures. In the Court's judgment, Ford did not have adequate time to meaningfully evaluate the new analyses and ensure that its dispositive motion, *Daubert* motions, and expert disclosures adequately addressed them. Third, permitting Dr. Wachs's additional report would disrupt the Court's scheduling order and management of this case. At minimum, the Court would likely need to reopen expert discovery to alleviate prejudice to Ford. At this stage in the case, however, the parties have already filed their *Daubert* motions, and Ford's motion for summary judgment is fully briefed and ripe for review. Thus, accommodating Plaintiffs' untimely disclosure would require scheduling adjustments that would unnecessarily disrupt the case's orderly progression.

Fourth, although Dr. Wachs's additional analyses may be important to

Plaintiffs' effort to bolster her expert opinions, the Court notes that Dr. Wachs herself states that these analyses do not alter the opinions expressed in her initial report. As such, the Court finds that the importance of the evidence factor does not weigh in favor of excusing Plaintiffs' untimeliness. Finally, Plaintiffs offer no persuasive explanation for why these analyses could not have been previously performed and disclosed in Dr. Wachs's original report, especially given that the data underlying the analyses was available to her at the time she prepared that report.

For these reasons, the Court finds that Plaintiffs' untimely disclosure of Dr. Wachs's additional report is not substantially justified or harmless. As such, Ford's motion to exclude this report is granted.

### E. Ford's Motion to Exclude Edward Stockton

Ford moves to exclude Edward Stockton's expert opinions and testimony. Mr. Stockton is a damages expert who opines that "Class Members suffered economic harm as a direct result of the" alleged defect, and that "[a] certain portion of that economic harm exists because Plaintiffs overpaid for the Class Vehicles at the point of acquisition and, for at least some period of time, were in possession of vehicles that were less valuable than reasonably expected and less valuable than the vehicle for which they bargained." ECF No. 233-1, PageID.10783-84. He estimates the amount by which Plaintiffs overpaid for the Class Vehicles "by way of a benefit of the bargain-based overpayment model, whereby the amount of overpayment at the

time of purchase is estimable by determining the additional cost that would have been necessary to remedy the Defect fully at the time of original sale." *Id.* at PageID.10784. According to Mr. Stockton, "[t]he objective of the benefit of the bargain model is to determine the amount of money necessary to place the injured party in a position as good as the position they would have occupied had the parties complied with their original agreement." *Id.*

Mr. Stockton utilizes the "repair cost model" to evaluate overpayment, which he explains "applies accepted economic theory and relevant market data to determine the amount of compensation that would restore Class Members to positions equivalent to those they would have occupied had the Class Vehicles not possessed the Defect at the point of sale." *Id.* at PageID.10791-92. Among these economic theories is "expected utility theory," which he posits "explains why the existence of a defect deteriorates the value of a durable good at the point of purchase, even when the defect is not yet visible and future visible manifestation of the defect is uncertain." *Id.* at PageID.10792. "By integrating the elements of decision theory, including expected utility theory," Mr. Stockton posits, "it is possible to demonstrate how a competent repair—one that remedies the Defect—restores Class Members to the positions they would have occupied for the portion of the vehicle's expected life after the provision of the repair." *Id.*

Ford contends that Mr. Stockton's expert opinions and testimony should be

excluded because (1) they are not the product of a reliable methodology; (2) they are irrelevant; and (3) their potential prejudice to Ford outweighs their probative value under Federal Rule of Evidence 403.

i.   Reliability of Mr. Stockton's Methodology

Ford argues that Mr. Stockton's expert opinions are the product of an unreliable methodology for several reasons. First, Ford contends that Mr. Stockton "never considers the terms of any actual bargain." ECF No. 233, PageID.10770. For instance, Ford notes that Mr. Stockton did not consider the factors Plaintiffs actually considered when buying their vehicles, the prices they paid, the extent to which their vehicles met their expectations, and how these factors differ between new and used car purchasers, and between owners and lessees. Moreover, Ford notes that he did not read Plaintiffs' deposition transcripts, nor could he say with certainty the names of the remaining Named Plaintiffs when asked at his deposition.

Mr. Stockton's purported failure to consider the terms of any actual bargain does not render his testimony unreliable under Rule 702. Mr. Stockton was retained by Plaintiffs to determine "whether a feasible method exists to quantify any damages suffered on a Class-wide basis, and if so, to describe that method." ECF No. 233-1, PageID.10779. He opines that using repair cost as a proxy for benefit of the bargain damages is a feasible way of quantifying the damages incurred by Plaintiffs and Class Members. This methodology has been approved as reliable by this Court and

56

others. *See, e.g.*, *In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 767 F. Supp. 3d 495, 510 (E.D. Mich. 2025) (recognizing that "Stockton's proposal to use the fair market value of the cost of repair for class vehicles as a proxy for damages sustained at the point of sale resulting from purchase of defective vehicles is straightforward and uncontroversial" and that "Stockton's expert testimony on damage estimates using the cost of repair methodology has been accepted by numerous other federal district courts in consumer product defect suits"); *Hampton v. Gen. Motors LLC*, No. 21-CV-250-RAW, 2024 WL 718197, at *16 (E.D. Okla. Jan. 4, 2024) ("Stockton's own use of the cost of repair as the proxy for the benefit of the bargain has been admitted as reliable in other courts.") (collecting cases); *Simmons v. Ford Motor Co.*, 576 F. Supp. 3d 1136, 1148 (S.D. Fla. 2021) (same). Moreover, at least one federal court has rejected this exact challenge, raised by Ford, to Mr. Stockton's expert opinions. *See, e.g.*, *Simmons*, 576 F. Supp. 3d at 1148 ("The contention that Stockton 'never considered the terms of any actual bargain[,]' is a similarly flawed challenge to his reliability as an expert."). For these reasons, the Court finds that Mr. Stockton's failure to consider the terms of the actual bargain does not undermine the reliability of his methodology and instead goes to weight, not admissibility.

Second, Ford suggests that Mr. Stockton's methodology is unreliable because he "does not attempt to quantify the actual alleged risk that an alleged defect will manifest" and instead "assumes *the same* loss in benefit of the bargain" regardless

of whether the defect actually manifests. ECF No. 233, PageID.10770 (emphasis in original). This argument is unavailing. Plaintiffs allege that the Class Vehicles were defective at the time of purchase, and Mr. Stockton assumes this to be true. *See* ECF No. 233-1, PageID.10783. The reliability of an expert's methodology is not undermined by his reliance on assumed facts drawn from the allegations of a pleading, so long as there is some support for those assumptions in the record. *In re Chrysler Pacifica Fire Recall Prods. Liab. Litig.*, 767 F. Supp. 3d at 510; *see also Hampton*, 2024 WL 718197, at *15 ("As a damage expert, it is acceptable for Stockton to assume liability to calculations. The role of a damages expert is to calculate hypothetical damages given an assumed set of facts; so long as those assumed facts are reasonably based on the evidence in the record, such assumptions are permissible." (cleaned up)). There is reasonable support in the record for Plaintiffs' contention that all of the Class Vehicles suffered from this defect, and Ford is free to present evidence to the contrary at trial.

Third, Ford asserts that Mr. Stockton's methodology is unreliable because he "ignores the fact that Ford issued a warranty to cover any defects in the Vehicle's engines, meaning that the cost of the vehicle already included a guarantee from Ford that any defects would be repaired free of charge." ECF No. 233, PageID.10771. Here too, however, Plaintiffs allege that the warranty was ineffective in this case, as the Class Vehicles still suffer from the defect which has not been remedied. *See, e.g.*,

58

162, PageID.8116 ("When owners of the Class Vehicles have asked Ford (or Ford's agents) to honor its warranty and address the Oil Consumption Defect and any resultant damage at no expense, Ford does not adequately repair the Class Vehicles."). Mr. Stockton assumes Plaintiffs' allegations to be true, and this allegation has some support in the record. As such, exclusion on this basis is not warranted.

Fourth, Ford argues that Mr. Stockton's expert opinions are unreliable because they were developed specifically for class certification. While Ford's argumentation on this issue is difficult to follow, it appears to invoke the prepared-solely-for-litigation reliability factor established by *Daubert II*. But the fact that he prepared these opinions for purposes of litigation, standing alone, does not render his opinions unreliable. Indeed, as discussed above, the Court finds that Mr. Stockton's methodology is reliable.

Lastly, Ford asserts, in passing, that Mr. Stockton's methodology "is supported by nothing other than his own *ipse dixit* assertions of reliability," and that Mr. Stockton fails to "point to any information about potential error rates for the methodologies he proposes, or anything to suggest those methodologies can be objectively tested and verified." ECF No. 233, PageID.10769. But beyond so claiming, Ford does not explain *how* these purported issues render his opinions unreliable. In any event, for the reasons discussed above, the Court is satisfied that

59

Mr. Stockton employed a reliable methodology.

### ii. Relevance of Mr. Stockton's Opinions

Next, Ford contends that Mr. Stockton's opinions are irrelevant because they are "contrary to the law applicable to Plaintiffs' claims." *Id.* at PageID.10766. Specifically, Ford contends that under his repair cost model, Mr. Stockton "proposes calculating damages for vehicle owners who have received, or can receive, a free repair by *also* awarding them" overpayment damages. *Id.* (emphasis in original). According to Ford, "[u]nder virtually every state's law, 'overpayment' or 'benefit of the bargain' damages are measured 'by *the lesser of* (1) the cost of repair, *or* (2) the difference between the fair market value of the vehicle as warranted and the fair market value of the vehicle as sold, reduced according to Plaintiffs' ability to mitigate or avoid damages.'" *Id.* (citations omitted) (emphasis in original). Ford asserts that Mr. Stockton's repair cost model "seeks to turn the law on its head by simultaneously allowing a plaintiff to receive the benefit of a free repair while also awarding legally impermissible and duplicative 'overpayment' damages." *Id.* at PageID.10767.

This argument is unavailing. Plaintiffs allege that Ford has not implemented an effective remedy for the alleged defect, and Mr. Stockton assumes this to be true. He further opines that, "to the extent that repairs or replacements provided at Defendant's expense restore Class Vehicles, at least for the remaining portions of

their useful lives, to the condition that would have existed absent the defect, a method exists to credit Defendant for the value of those repairs." ECF No. 233-1, PageID.10784. Under this hypothetical scenario, Plaintiffs would only be able to recover overpayment damages from the time they bought the defective vehicle until the time the competent repair became available. Contrary to what Ford suggests, if this scenario were to happen, Plaintiffs and Class Members would not receive duplicative damages. Rather, Plaintiffs allege that they suffered injury at the point of purchase, and Mr. Stockton's model accounts for damages suffered prior to the implementation of a competent repair for the defect.

Ford contends that Mr. Stockton's damages model "doubly fails under Illinois law." ECF No. 233, PageID.10768. In support of this position, Ford points to *Quackenbush v. Am. Honda Motor Co.*, Nos. 24-33, 24-40, 2025 WL 1009273 (9th Cir. Apr. 4, 2025), which states that "Illinois benefit-of-the-bargain damages do not contemplate using repair costs as a proxy for diminution of value where the latent defect will never materialize for the majority of the class." *Id.* at *1 (citing *Posner v. Davis*, 395 N.E.2d 133, 137-38 (Ill. App. Ct. 1979)). But the fact that such damages might not be available in Illinois does not render Mr. Stockton's opinions inadmissible. To avoid exclusion under *Daubert*, it is only necessary for Plaintiffs to demonstrate that Mr. Stockton's damages opinions are relevant to at least one of Plaintiffs' claims. *See* Fed. R. Evid. 702 (providing that an expert must help the trier

of fact to determine a *fact* in issue). Such is the case here.

For these reasons, the Court concludes that exclusion of Mr. Stockton's expert opinions is not warranted on this basis.

### iii. Exclusion of Mr. Stockton's Opinions Under Rule 403

Finally, Ford argues that "[b]ecause Stockton's opinions and testimony lack any relevant or helpful factual, analytical, or empirical foundation, it would defy Rule 403 'to permit such evidence to be introduced to the jury as its potential prejudicial effect resulting from the lack of a well-reasoned analysis supporting the opinion outweighs any probative value.'" ECF No. 233, PageID.10772 (quoting *Martinez v. Terez Corp.*, 241 F.R.D. 631, 640 (D. Ariz. 2007)). But beyond so asserting, Ford fails to explain *how* Mr. Stockton's opinions lack foundation. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in [a] skeletal way, leaving the court to put flesh on its bones." *El-Moussa v. Holder*, 569 F.3d 250, 257 (6th Cir. 2009) (citation omitted).

In conclusion, the Court finds that denial of Ford's motion to exclude Mr. Stockton is appropriate.

### F. Plaintiffs' Motion to Exclude Certain Opinions of Dr. Soderborg

Plaintiffs move to exclude certain expert opinions of Dr. Nathan Soderborg. Dr. Soderborg was retained by Ford to evaluate warranty claims potentially related

62

to excess oil consumption in the Class Vehicles and to respond to Dr. Wachs's expert opinions concerning warranty claims. According to Dr. Soderborg, the warranty data produced by Ford "includes information typically required for reliability analyses, including . . . [the] Warranty Component Classification (WCC) code." ECF No. 239-3, PageID.11017 WCC codes "identify vehicle *hardware* groupings related to the warranty claim." *Id.* at PageID.11018. (emphasis in original).

Plaintiffs seek to exclude the following opinions proffered by Dr. Soderborg in his expert report:

> I consulted independently with two engineers . . . who have theoretical and practical knowledge of internal combustion engines to identify WCC codes that most likely indicate either an external oil leak or another condition *other than* excessive oil consumption. They agreed that, among the codes pictured above, those with "D" or "B" as second digit belonged in this set. Also, those with code 1G88 (No Problem Found) would not relate to excessive oil consumption. Bars for these categories are colored in red in the chart in Figure 9. These categories account for nearly 1,700 claims for which there is reasonable doubt about their classification as excessive oil consumption.

*Id.* at PageID.11034 (emphasis in original). Plaintiffs contend that exclusion of these opinions is appropriate because they merely parrot the opinions of non-testifying mechanical engineers.

The Court agrees. Generally, "[u]sing staff to complete tasks and gather data relevant to the expert analysis is appropriate." *Bledsoe v. FCA US LLC*, No. 4:16-CV-14024-TGB-RSW, 2022 WL 4596156, at *16 (E.D. Mich. Sept. 30, 2022) (citations omitted). However, expert are "not permitted to premise their opinion

63

'entirely' on" those of others "without undertaking any of the necessary steps to form their own opinion." *See In re Flint Water Cases*, No. 16-10444, 2023 WL 6147255, at *3 (E.D. Mich. Sept. 20, 2023) (citation omitted). "Indeed, an expert's 'wholesale adoption' of another's opinions, without separately evaluating the bases for those opinions, 'goes beyond relying on facts or data and instead cloaks unexamined assumptions in the authority of expert analysis.' " *United States v. EES Coke Battery, LLC*, No. 22-11191, 2025 WL 1983451, at *9 (E.D. Mich. July 17, 2025) (quoting *Ask Chemicals, LP v. Computer Packages, Inc.*, 593 F. App'x 506, 510 (6th Cir. 2014)).

Here, Dr. Soderborg's challenged opinions are not the product of his own expert analysis. Rather, he merely recites the engineers' findings. At his deposition, Dr. Soderborg testified that he relied on the engineers to opine on this issue because they possess "theoretical and practical knowledge of internal combustion engines." ECF No. 254-2, PageID.12077. He also testified that he lacks the expertise to provide these opinions himself:

> Q: So this is a specific type of knowledge about internal combustion engines that you don't have, right?
>
> A: I couldn't opine on that particular question based on my engineering experience. That's why I enlisted them.
>
> Q: And when you say that particular question, you mean the question of –

64

A: The – the question of whether those causal part groupings represented by the WCCs would not indicate something other than excessive oil consumption.

*Id*. Moreover, Dr. Soderborg testified that he did not independently verify the engineers' work and that the engineers "essentially checked each other's work." *Id*.

Under these circumstances, Dr. Soderborg's wholesale adoption of the engineers' opinions merely parrots the findings of others and does not reflect an independent expert analysis. This is problematic because the engineers are not subject to *Daubert* scrutiny. For these reasons, the Court finds that exclusion of Dr. Soderborg's challenged expert opinions is appropriate, and as such, Plaintiffs' motion is granted.

## V.    **CONCLUSION**

Based on the foregoing:

- Ford's Motion to Exclude the Opinions of Plaintiffs' Expert Kevin W. Caves [#229] is DENIED;

- Ford's Motion to Exclude the Opinions and Testimony of Colin Jordan [#231] is GRANTED IN PART AND DENIED IN PART;

- Ford's Motion to Exclude the Opinions and Testimony of Allise Wachs [#232] is GRANTED IN PART AND DENIED IN PART;

- Ford's Motion to Exclude the Opinions and Testimony of Edward Stockton [#233] is DENIED;

- Plaintiffs' Motion to Exclude Certain Testimony and Opinions of Nathan Soderborg [#254] is GRANTED; and

- Ford's Motion to Strike the Untimely "Supplemental" Report of Allise Wachs [#234] is GRANTED.

SO ORDERED.

Dated: May 26, 2026                                    /s/Gershwin A. Drain
                                                       GERSHWIN A. DRAIN
                                                       United States District Judge


CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on May 26, 2026, by electronic and/or ordinary mail.
/s/ Marlena Williams
Case Manager