UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN


DAVID LYMAN, *et al.*,

       Plaintiffs,

                          Case No. 21-10024

                          U.S. DISTRICT COURT JUDGE
                          GERSHWIN A. DRAIN

v.


FORD MOTOR COMPANY,

       Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT FORD MOTOR COMPANY'S MOTION FOR SUMMARY JUDGMENT [#227]

## I.    INTRODUCTION

Presently before the Court is Defendant Ford Motor Company's ("Ford") motion for summary judgment. Upon review of the parties' submissions, the Court concludes that oral argument will not aid in the disposition of the motion, and thus it will be decided on the briefs. *See* E.D. Mich. L.R. 7.1(f)(2). For the reasons that follow, Ford's motion for summary judgment [#227] is GRANTED IN PART AND DENIED IN PART. Summary judgment is granted in favor of Ford and against

Plaintiffs on Counts 1, 10, 11, 12, 20, 23, 24, 39, 42, 45, 48, 51, 57, and 60. Ford's motion for summary judgment is denied in all other respects.

## II.      BACKGROUND

In this putative class action, the Named Plaintiffs bring various state law consumer protection, fraudulent concealment, negligent misrepresentation, and breach of warranty claims against Ford. Plaintiffs purchased or leased Ford F-150 vehicles for model years 2018 through 2020, which are equipped with 5.0L engines ("the Class Vehicles"). Plaintiffs allege that the 5.0L engine's piston ring assembly and cylinder coating are defective, causing the Class Vehicles to consume oil at excessive rates. They further claim that Ford knew about this oil consumption defect prior to their purchase or lease of the Class Vehicles, and that it is a serious issue for vehicle longevity and safety.

Since 2012, Ford has required its vehicles to achieve an oil consumption level that meets or exceeds 10,000 miles per quart ("MPQ"). The 10,000 MPQ threshold is "[t]he minimum criterion for oil consumption for average retail customers based on laboratory/customer correlation." ECF No. 227-2, PageID.9154. Ford refers to this as the "Trustmark" standard that its customers expect of Ford vehicles. It is calculated using "[e]ngine laboratory oil consumption . . . mapped to public road vehicle operating conditions," and utilizes "an appropriate dynamic customer correlated cycle which takes into consideration geographical location and regional

2

driving regulations." *Id.*

Ford designed the Class Vehicles' 5.0L engine between 2014 and 2018. Shortly after the Class Vehicles were first sold, Ford began receiving complaints about excessive oil consumption in the Class Vehicles. In an effort to resolve the complaints, Ford issued various Technical Service Bulletins ("TSBs"), which are communications to authorized dealerships that provide them with instructions on how to repair Ford vehicles and respond to particular consumer complaints. Plaintiffs contend that the TSBs did not adequately remedy the oil consumption defect.

While, at this stage, many plaintiffs and claims have been dismissed or stayed, the following are before the Court on summary judgment. First, Plaintiffs assert a claim under the Magnuson-Moss Warranty Act on behalf of a putative nationwide class or alternatively each of the state sub-classes (Count 1).

Second, Plaintiff Richard Carter, on behalf of himself and a putative California sub-class, asserts the following claims against Ford under California law: (1) violation of the California Consumer Legal Remedies Act ("CLRA") (Count 7); (2) violation of the California Unfair Competition Law ("UCL"), (Count 8); (3) violation of the California False Advertising Law (Count 9); (4) violations of the California Song-Beverly Consumer Warranty Act (Counts 10 and 11); (5) breach of express warranty (Count 12); (6) unjust enrichment (Count 13); (7) negligent

misrepresentation (Count 14); and (8) fraudulent concealment (Count 15).

Third, Plaintiffs Brian and Judith Janik bring the following claims under Illinois law on behalf of themselves and a putative Illinois sub-class: (1) violation of the Illinois Consumer Fraud and Deceptive Practices Act ("ICFA") (Count 19); (2) breach of express warranty (Count 20); (3) breach of the implied warranty of merchantability (Count 21); (4) unjust enrichment (Count 22); (5) negligent misrepresentation (Count 23); and (6) fraudulent concealment (Count 24).

Fourth, Plaintiff Timothy Thuering, on behalf of himself and a putative Ohio sub-class, asserts the following claims under Ohio law: (1) violation of the Ohio Consumer Sales Practices Act (Count 38); (2) breach of express warranty (Count 39); (3) unjust enrichment (Count 41); (4) negligent misrepresentation (Count 42); and (5) fraudulent concealment (Count 43).

Fifth, Plaintiffs Dana and John Herold bring the following claims under Pennsylvania law on behalf of themselves and a putative Pennsylvania sub-class: (1) violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (Count 44); (2) breach of express warranty (Count 45); (3) unjust enrichment (Count 47); (4) negligent misrepresentation (Count 48); and (5) fraudulent concealment (Count 49).

Sixth, Plaintiff David Flynn, on behalf of himself and a putative Virginia sub-class, asserts the following claims: (1) violation of the Virginia Consumer Protection

Act (Count 50); (2) breach of express warranty (Count 51); (3) unjust enrichment (Count 53); (4) negligent misrepresentation (Count 54); and (5) fraudulent concealment (Count 55).

Seventh, Benjamin Bettelli, on behalf of himself and a putative Washington sub-class, asserts the following claims under Washington law: (1) violation of the Washington Consumer Protection Act (Count 56); (2) breach of express warranty (Count 57); (3) breach of implied warranty of merchantability (Count 58); (4) unjust enrichment (Count 59); (5) negligent misrepresentation (Count 60); and (6) fraudulent concealment (Count 61).

## III.   <u>LEGAL STANDARD</u>

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if its resolution will affect the outcome of the lawsuit." *Martingale LLC v. City of Louisville*, 361 F.3d 297, 301 (6th Cir. 2004) (citation omitted). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 272, 248 (1986). Ultimately, the court evaluates "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Rocheleau v. Elder Living Const.*,

5

*LLC*, 814 F.3d 398, 400 (6th Cir. 2016) (citation omitted). The court must view the facts, and draw reasonable inferences from those facts, in the light most favorable to the nonmoving party. *Id.*

## IV. ANALYSIS

### A. Plaintiffs' Magnuson-Moss Warranty Act Claim (Count 1), Express Warranty Claims (Counts 10, 12, 20, 39, 45, 51, and 57), Implied Warranty Claim (Count 11), and Negligent Misrepresentation Claims (Count 23, 42, 48, and 60)

Ford seeks summary judgment on Plaintiffs' Magnuson-Moss Warranty Act claim, express warranty claims, implied warranty claim, and negligent misrepresentation claims. In their response to Ford's motion for summary judgment, Plaintiffs indicate that they "do not oppose dismissal" of these claims. ECF No. 251, PageID.11214. Accordingly, summary judgment on these claims (Counts 1, 10, 11, 12, 20, 23, 39, 42, 45, 48, 51, 57, and 60) will be granted in favor of Ford and against Plaintiffs.

### B. Plaintiffs' "Fraud-Based" Claims (Counts 7, 8, 9, 15, 19, 23, 24, 38, 43, 44, 49, 50, 55, and 61)

Next, Ford argues that it is entitled to summary judgment on all of Plaintiffs' "fraud-based" claims—which it characterizes as those set forth in Counts 7, 8, 9, 15, 19, 23, 24, 38, 43, 44, 49, 50, 55, and 61—because there is no evidence of Ford's pre-sale knowledge of the specific problems Plaintiffs experienced, or that Ford actively concealed the defect. Furthermore, Ford asserts that it is entitled to summary

6

judgment on Plaintiffs' "omission-based" claims brought under California, Illinois, and Pennsylvania law because there is no evidence demonstrating that Ford withheld information it was under a duty to disclose. Ford also contends that there is insufficient evidence to support Plaintiff Carter's UCL claim (Count 8) and Plaintiffs Brian and Judith Janik's ICFA claim (Count 19). Each argument will be discussed in turn.

### i.  Ford's Pre-Sale Knowledge of the Defect

First, with respect to Plaintiffs' "fraud-based" claims, Ford contends that "[i]t is axiomatic that, to prevail on any claim premised on fraudulent omissions or a failure to disclose a vehicle defect, Plaintiffs must prove Ford knew about the specific problem they themselves experienced, and had that knowledge prior to their own vehicle purchases." ECF No. 227, PageID.9140. According to Ford, there is no evidence satisfying this requirement. In so arguing, however, Ford fails to set forth the law governing each of the "fraud-based" claims, leaving the Court unable to determine whether this purported requirement applies uniformly to all claims, even though they arise under various states' laws. Moreover, while Ford cites several cases in support of this purported requirement, none of them stand for the proposition that all of the claims advanced by Plaintiffs share this requirement in common.

Indeed, the Sixth Circuit confronted a similar issue in *Smith v. General Motors*

7

*LLC*, 988 F.3d 873 (6th Cir. 2021), which involved a multi-state class action where plaintiffs alleged that an automobile manufacturer knowingly sold vehicles with defective dashboards. There, as here, the parties failed to identify the law governing the specific claims before the court and instead proceeded as though a uniform "knowledge" framework applied across all claims, despite them arising under various states' laws. The court observed that "various state laws recognize causes of action like the claims at issue" and that "the state laws governing these types of claims do not appear to be completely uniform." *Id.* at 879.  Accordingly, by failing to set forth the specific state law governing the claims at issue, the parties "venture[ed] close to asking [the court] to apply the general common law or federal common law, rather than the laws of the several states." *Id.* at 878 (cleaned up). The Sixth Circuit explained that "Congress commands that [courts] apply the law of the 'several states,'" a task that is made difficult when parties "eschew their obligation to set forth what that law is." *Id.* at 875. That same deficiency is present here.

Even assuming *arguendo*, as Ford contends and Plaintiffs do not dispute, that an element of all of the "fraud-based" claims is that Ford knew about the oil consumption defect prior to Plaintiffs purchasing or leasing the Class Vehicles, there is sufficient evidence from which a reasonable jury could make this finding in favor of Plaintiffs. For instance, Brian Armstrong, a piston and rod engineer at Ford, sent an email in June 2016 stating as follows with respect to the 5.0L engine: "Tricky

part is that oil consumption is not solved, so I don't have a feasible production design right now. We're discussing Piston next steps this afternoon. We're in a tough spot at the moment." ECF No. 253-7, PageID.12004.

Furthermore, between June and September 2016, Ford issued a series of internal communications regarding excessive oil consumption in the 2018 F-150 5.0L engine. One such communication was a "5D," which a Ford employee testified is used to "communicate significant issues" to the company's senior leadership. ECF No. 251-3, PageID.11272. Ford issued a 5D on oil consumption on June 29, 2016, stating that the 2018 F-150 5.0L engine did "not fully meet" Ford's 10,000 MPQ "requirement," and that there were "[i]ndications of potential oil consumption based on visual observations of intake valve/ intake port wet oil deposits and moderate to heavy gray ash deposit accumulation on exhaust valves." ECF No. 252-3, PageID.11623. The 5D identified the root cause of the issue as "Piston Ring Tension incompatible with Cylinder Block Bore 4th Order Distortion levels to adequately control oil consumption." *Id.* To remedy the issue, Ford noted that its "Permanent Corrective Action" was to change the "piston ring groove" design and increase the piston ring tension from 28.7 newtons ("N") to 39.2N. *Id.*; ECF No. 251-3, PageID.11274.

On July 22, 2016, Ford issued a "New Model Programs Assessment" document that evaluated, among other things, the technical readiness of the 2018 F-

9

150 5.0L engine against product development and manufacturing milestones. ECF No. 253-8, PageID.12007; ECF No. 251-3, PageID.11269. It identified "excessive oil consumption" as a "red" issue. ECF No. 253-8, PageID.12007; ECF No. 251-3, PageID.11269. Scott Russo, a Ford employee, testified at his deposition that a "red" issue is one that "has some significant issues." ECF No. 251-3, PageID.11269. Furthermore, like the June 2016 5D, the "New Model Programs Assessment" noted that the 2018 F-150 5.0L engine possessed "Heavy Oil film accumulation inside intake ports & on intake valves," and that these symptoms were "indications of excessive oil consumption." ECF No. 253-8, PageID.12007. It also identified the root cause of the issue as "[l]ack of piston ring tension" and set forth the following permanent corrective action: "Piston design change to ring pack groove geometry to improve ring pack pressure balance & Piston Ring Pack design changes to increase ring tension." *Id.*; ECF No. 251-3, PageID.11271.

Then, in an August 4, 2016 email exchange, Jay Boylard, who then served as Ford's Piston and Connecting Rod Assembly Technical Expert, explained to Mr. Russo and Mr. Armstrong that two 2018 F-150 5.0L oil consumption tests showed only 5,473 MPQ and 7,964 MPQ, respectively, for the "US06" cycle, which is the cycle that best represents real customer usage. ECF No. 252-13, PageID.11746; ECF No. 251-5, PageID.11286. Mr. Boylard described the test results as "meaningfully worse" and expressed that "we MUST make improvements from where we are."

10

ECF No. 252-13, PageID.11746. Mr. Russo testified at his deposition that, based on this email, he was aware that there was an oil consumption issue with the 2018 F-150 5.0L engines, and that it had not been resolved as of the date of the email. ECF No. 251-3, PageID.11278.

A September 2, 2016 Ford internal document titled "Powertrain Launch Status" also flagged excessive oil consumption as an issue with the 2018 F-150 5.0L engines. It too noted that the engine displayed "Heavy Oil film accumulation inside intake ports & on intake valves," indicating "excessive oil consumption." ECF No. 252-4, PageID.11625. This document also indicated that the "root cause" of the issue was "[l]ack of piston ring tension," and that the permanent corrective action was "Piston design change to ring pack groove geometry to improve ring pressure balance & increase ring tension." *Id.* Mr. Russo testified at his deposition that the oil consumption issue in the 2018 F-150 5.0L engine had not been resolved as of September 21, 2016. ECF No. 251-3, PageID.11277.

A Ford internal document indicates that, as of October 7, 2016, a piston design change had been approved that "include[d] 50N-ft total ring pack tension" and eliminated the "piston j-groove." ECF No. 252-5, PageID.11636. It also noted that oil consumption was "confirmed to meet 10,000 miles per quart requirement." *Id.*

Ford issued a 5D explaining that fuel economy in the 2018 F-150 5.0L engines was "projected to be lower than target." ECF No. 253-11, PageID.12015; ECF No.

11

251-5, PageID.11300. It noted that the root cause of the issue was, in part, the piston ring tension being increased from "27N-ft > 50N-ft," which "result[ed] in additional degradation" to fuel economy. ECF No. 253-11, PageID.12015. The 5D further explained that "[c]hanges to fuel economy were driven by oil consumption changes in the piston and ring design resulting in increases to ring tension." *Id.* Mr. Russo, who was listed on the 5D as one of its "Champions," testified at his deposition that the root cause of the lower fuel economy was the increase in ring tension, which had been implemented to resolve the excessive oil consumption issue. *Id.*; ECF No. 251-3, PageID.11281. Mr. Mazella, who was listed on the 5D as a "Team Leader," similarly testified that the increase in ring tension negatively impacted fuel economy. ECF No. 253-11, PageID.12015; ECF No. 251-5, PageID.11299. Ford issued additional 5Ds in October and November 2016 pertaining to fuel economy in the 2018 F-150 5.0L engines, each of which indicated that fuel economy continued to be 0.95 percent below target, with the root cause being the increase in the piston ring tension to improve oil consumption. ECF No. 251-5, PageID.11300; ECF No. 253-12; ECF No. 253-13.

In June 2017, after vehicle production had begun, Mr. Mazzella explained to Mr. Russo via email that oil consumption data looked "awful for the US06 cycle" at 3,782 MPQ. ECF No. 252-6, PageID.11668. Nevertheless, despite this being below Ford's 10,000 MPQ target, Ford approved a lower piston ring tension design for the

5.0L engine. ECF No. 251-49, PageID.11557. According to Plaintiffs' expert Dr. Colin Jordan, Ford did so to boost the vehicles' fuel economy and meet fuel economy targets. ECF No. 231-1, PageID.10467-78.

Based on this evidence, construed in the light most favorable to Plaintiffs, a reasonable jury could find that Ford knew about the oil consumption defect prior to any of the Named Plaintiffs purchasing or leasing their vehicles. Accordingly, Ford has not demonstrated an entitlement to summary judgment on this basis.

### ii. Ford's Active Concealment of the Defect

Second, Ford claims it is entitled to summary judgment on all of Plaintiffs' "fraud-based" claims because there is no evidence that it "actively concealed" the purported defect. ECF No. 227, PageID.9141. But here too, Ford fails to set forth any legal authority establishing that this is a requirement for all of Plaintiffs' "fraud-based" claims, and the cases Ford cites address only fraudulent concealment under California law.

Even with respect to that claim, active concealment is not a required element. The elements of fraudulent concealment under California law are: "(1) the defendant concealed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant concealed or suppressed the fact with an intent to defraud; (4) the plaintiff was unaware of the fact and would have acted if he or she had known about it; and (5) the concealment caused the plaintiff to sustain damage."

13

*Taragan v. Nissan North Am., Inc.*, No. 09-3660, 2013 WL 3157918, at *7 (N.D. Cal. June 20, 2013) (citations omitted). With respect to the second element, there are four circumstances where the duty to disclose arises: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d 921, 963 (E.D. Mich. 2022) (quoting *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 467 F. Supp. 3d 849, 860 (N.D. Cal. 2020) ("*In re Volkswagen 'Clean Diesel'*").

Contrary to what Ford suggests, active concealment of a material fact is only one of several circumstances that can give rise to a duty to disclose under California law. Ford has not established that none of the other circumstances giving rise to the duty to disclose are present here. Accordingly, Ford is not entitled to summary judgment on this basis.

### iii. Ford's Withholding of Material Information it Had a Duty to Disclose

Third, Ford contends that, to prevail on their "omission-based" claims under California, Illinois, and Pennsylvania law, Plaintiffs "must adduce evidence showing that Ford withheld material information that it was under a duty to disclose." ECF No. 227, PageID.9142. Here too, however, Ford does not specifically identify the

14

"omission-based" claims it seeks summary judgment on. The cases it cites address only fraudulent concealment under California, Illinois, and Pennsylvania law. The Court therefore construes Ford's argument as directed only to the fraudulent concealment claims under those states' laws.

### 1. Fraudulent Concealment under California Law

To prevail on a fraudulent concealment claim under California law, a plaintiff must establish "knowing concealment or non-disclosure by a defendant with the intent to defraud, which induces justifiable reliance and causes injury to the plaintiff." *In re Volkswagen "Clean Diesel,"* 467 F. Supp. 3d at 860 (citation omitted). The plaintiff must also show "that the defendant was under a legal duty to disclose [the concealed] facts." *Id.* (citation omitted and alteration in original). As discussed above, a duty to disclose arises under California law in four circumstances: "(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts." *In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d at 963 (citation omitted).

Here, viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that Ford had exclusive knowledge of the oil consumption defect before Plaintiff Carter purchased the Class Vehicle. Nothing in the record

15

suggests that Ford disclosed the defect to consumers. Moreover, a reasonable jury could find that the defect, which potentially diminished vehicle longevity and implicated vehicle safety, was a material fact Ford was duty-bound to disclose to consumers, and that Ford failed to adequately address the problem prior to Plaintiff Carter's purchase of the Class Vehicle.

Ford argues that, under California law, "proving materiality and a duty to disclose requires evidence showing the alleged defect either presents an 'unreasonable safety hazard' or is so significant it negates a product's 'central functionality' by rendering it 'incapable of use by any consumer.'" ECF No. 227, PageID.9142 (quoting *Oddo v. Arocaire Air Conditioning & Heating*, No. 8:15-cv-01985, 2020 WL 5267917, at *25 (C.D. Cal. May 18, 2020)). However, the cases cited by Ford do not establish such a requirement. Moreover, this Court is bound by its prior interpretations of California law, which do not require a plaintiff to make such a showing in order to prevail on a fraudulent concealment claim. Accordingly, Ford is not entitled to summary judgment on Plaintiff Carter's fraudulent concealment claim.

### 2. Fraudulent Concealment under Illinois Law

To prevail on a fraudulent concealment claim under Illinois law, a plaintiff must prove that the defendant "intentionally omitted or concealed a material fact that it was under a duty to disclose." *Flynn v. FCA US LLC*, 327 F.R.D. 206, 218 (S.D.

16

Ill. 2018) (quoting *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012)). "A duty to disclose arises if 'plaintiff and defendant are in a fiduciary or confidential relationship' or in a 'situation where plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff.'" *Id.* (quoting *Wigod*, 673 F.3d at 571). The latter situation, commonly referred to as a "special trust relationship," is "extremely similar to that of a fiduciary relationship." *Id.*

The standard for establishing the existence of a special trust relationship is a "high one." *Wigod*, 673 F.3d at 572. "The defendant must be clearly dominant, either because of superior knowledge of the matter derived from overmastering influence on the one side, or from weakness, dependence, or trust justifiably reposed on the other side." *Id.* (cleaned up) (quoting *Miller v. William Chevrolet/GEO, Inc.*, 326 Ill. App. 3d 642, 657 (Ill. Ct. App. 2001)). In determining whether such a relationship exists, courts consider factors such as "the degree of kinship of the parties; any disparity in age, health, and mental condition; differences in education and business experience between the parties; and the extent to which the allegedly servient party entrusted the handling of her business affairs to the dominant party, and whether the dominant party accepted such entrustment." *Id.* (quoting *Mitchell v. Norman James Constr. Co.*, 291 Ill. App. 3d 927, 934 (Ill. Ct. App. 1997)). "[A]symmetric information alone does not show the degree of dominance needed to establish a

17

special trust relationship." *Wigod*, 673 F.3d at 573.

Here, there is no evidence from which a reasonable jury could conclude that there was a fiduciary relationship between Ford and Plaintiffs Brian and Judith Janik. Nor is there evidence supporting any of the factors Illinois courts consider in determining whether a special trust relationship existed between the parties. The evidence, viewed in the light most favorable to Plaintiffs, suggests at most that Ford possessed information concerning the defect that Mr. and Mrs. Janik did not. But asymmetry of information, standing alone, is insufficient to establish the degree of dominance necessary to give rise to a special trust relationship under Illinois law. Accordingly, Ford is entitled to summary judgment on Mr. and Mrs. Janik's fraudulent concealment claim (Count 24).

### 3. Fraudulent Concealment under Pennsylvania Law

Lastly, to prevail on a fraudulent concealment claim under Pennsylvania law, a plaintiff must show, among other things, that the defendant had a duty to disclose. "Under Pennsylvania law, in the context of a business transaction between a seller and an ordinary non-business consumer, a duty to disclose exists 'when the seller has superior knowledge of a material fact that is unavailable to the consumer.'" *Miller v. Gen. Motors, LLC*, 773 F. Supp. 3d 461, 505-06 (E.D. Mich. 2025) (quoting *Zwiercan v. Gen. Motors Corp.*, No. 3235, 2002 WL 31053838, at *3 (Pa. Ct. Com. Pl. Sept. 11, 2002). This duty is limited to "known serious and life threatening latent

defects . . . *i.e.* those defects which are likely to cause significant bodily harm." *Matanky v. General Motors LLC*, 370 F. Supp. 3d 772, 795-96 (E.D. Mich. 2019) (quoting *Zwiercan v. Gen. Motors Corp.*, No. 3235, 2003 WL 1848571, at *2 (Pa. Ct. Com. Pl. Mar. 18, 2003)).

Ford argues that it is entitled to summary judgment because there is no evidence that the alleged defect actually caused significant bodily harm to any consumer. The standard, however, looks at whether the defect is *likely* to cause significant bodily harm, not at whether such harm did, in fact, manifest. Indeed, construing the evidence in the light most favorable to Plaintiffs, a reasonable jury could find that the oil consumption defect meets that standard. For example, Plaintiffs' expert Dr. Colin Jordan opines that "[i]f there is an insufficient amount of engine oil, the engine will not have the necessary lubrication or cooling, thereby causing . . . inadequate performance, and ultimately engine failure." ECF No. 231-1, PageID.10440. Moreover, Mr. Bettelli testified at his deposition that while driving the Class Vehicle at approximately sixty miles per hour on the freeway, "all of a sudden the truck lost power" and "barely moved." ECF No. 251-33, PageID.11353. He further testified that the truck was "incredibly low on oil" when this occurred. *Id.*

Based on this evidence, a jury could reasonably infer that the alleged defect is capable of causing a sudden and complete loss of engine power in the Class

Vehicles, leaving the driver unable to safely maneuver the vehicle, which in turn could cause significant bodily harm if, for example, a vehicle collision were to occur. Accordingly, Ford has not demonstrated entitlement to summary judgment on Plaintiffs Dana and John Herold's fraudulent concealment claim.

### iv.   Plaintiff Carter's UCL Claim

Next, Ford claims there is insufficient evidence to support Plaintiff Carter's UCL claim. "To bring a claim for a violation of § 17200 of the UCL, 'a plaintiff must show either an (1) unlawful, unfair, or fraudulent business act or practice, or (2) unfair, deceptive, untrue or misleading advertising.'" *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 748 (E.D. Mich. 2017) (quoting *Lippitt v. Raymond James Fin. Servs., Inc.*, 340 F.3d 1033, 1043 (9th Cir. 2003)). When proceeding under the first theory, the plaintiff must establish that the challenged business act or practice is either "(1) unlawful (i.e., is forbidden by law), (2) unfair (i.e., harm to victim outweighs any benefit) or (3) fraudulent (i.e., is likely to deceive members of the public)." *Id.* (quoting *Moss v. Infinity Ins. Co.*, 197 F. Supp. 3d 1191, 1198 (N.D. Cal. 2016)). "A plaintiff only needs to establish a violation of the UCL under one of these three prongs, as each operates independently from the others." *Id.*; *see also Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007) (holding that each prong of the UCL is a "separate and distinct theory of liability").

Ford argues that Mr. Carter cannot prevail under the "unlawful" or "unfair"

prongs. First, Ford contends that Mr. Carter cannot establish a claim under the "unlawful" prong because his California statutory claims are not viable. Indeed, to prevail under the "unlawful" prong, a plaintiff must establish "the violation of any other law," and when a plaintiff cannot prove a claim under another "borrowed" law, she cannot prevail under this prong of the UCL. *Altman v. PNC Mortg.*, 850 F. Supp. 2d 1057, 1077 (E.D. Cal. 2012). Here, however, Ford has not shown that it is entitled to summary judgment on any of Mr. Carter's California statutory claims. Because those claims remain viable, they may serve as valid predicates for his UCL claim under the "unlawful" prong.

Second, Ford contends that Mr. Carter's UCL claim under the "unfair" prong fails because there is no evidence "which could establish any anti-competitive behavior, or any conduct that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" ECF No. 227, PageID.9144 (quoting *Cornejo v. JPMorgan Chase Bank*, No. CV 11-4119, 2011 WL 6149246, at *5 (E.D. Mich. 2024)). The UCL does not define the term "unfair," and California courts have recognized that "[o]ne commonly used definition of an unfair practice is a practice that 'offends an established public policy or . . . is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 939 (Cal. Ct. App. 2003) (citation omitted). However, California courts have also recognized other tests for determining unfairness, one of

21

which "involves an examination of [the business practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer." *Id.* Under this test, "the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim[.]" *Id.* Ford has offered no argumentation as to how Mr. Carter's claim fails under various tests available under this prong. And in any event, the Court finds that there is sufficient evidence for a reasonable jury to find that Ford's conduct was immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

For these reasons, the Court concludes that Ford has not demonstrated an entitlement to summary judgment on Mr. Carter's UCL claim.

### v. ICFA Claim

Ford claims it is entitled to summary judgment on Plaintiffs Brian and Judith Janik's ICFA claim because there is no evidence that they received "some pre-sale communication from Ford that could and should have contained the allegedly withheld information." ECF No. 227, PageID.9144. The Court disagrees. "An 'omission' under the FCA is an omission from a communication, not a general failure to disclose[.]" *Darne v. Ford Motor Co.*, No. 13-C-03594, 2015 WL 9259455, at *9 (N.D. Ill. 2015). The Illinois Supreme Court has held that "to maintain an action under the [ICFA], the plaintiff must actually be deceived by a statement or omission that is made by the defendant." *De Bouse v. Bater*, 235 Ill. 2d

22

309, 316 (Ill. 2009). "If there has been no communication with the plaintiff, there have been no statements and no omission," and thus "[a] consumer cannot maintain an action under the [ICFA] when the plaintiff does not receive, directly or indirectly, communication or advertising from the defendant." *Id.*

Here, Ms. Janik testified at her deposition that prior to purchasing her vehicle, she saw Ford advertisements and viewed Ford's website, none of which disclosed the oil consumption defect. ECF No. 251-34, PageID.11390-91. She also testified that prior to purchasing her vehicle, she received a "lot of information" at the dealership, including with respect to the vehicle's reliability and towing capacity. *Id.* at PageID.11395. At no point during those conversations was the oil consumption defect disclosed to her. Accordingly, because, contrary to what Ford claims, there is evidence of pre-purchase communications from Ford to Ms. Janik, it is not entitled to summary judgment on this claim.

### C. Evidence Regarding Causation and Damages

Lastly, Ford argues that "[e]vidence of causation and damages are essential for nearly all the claims Plaintiffs assert here," and that Plaintiffs lack such evidence. ECF No. 227, PageID.9130. Instead, Ford contends, the evidence demonstrates that Plaintiffs "received free repairs whenever they reported any oil consumption issue within Ford's warranty time/mileage limits," and that "Plaintiffs have no viable claim for issues that were, or could have been, repaired for free." *Id.* at PageID.9130-

23

31.

This argument misses the mark. For one, here too Ford fails to specifically identify the claims this argument relates to. Moreover, Plaintiffs contend that they were damaged at the time they purchased the vehicles when they unknowingly paid for vehicles with the alleged oil consumption defect. As such, they seek benefit of the bargain damages. Ford's argument that its purported "free repair" cuts off Plaintiffs' ability to receive damages in this action is not well taken. For one, there is evidence in the record suggesting that it did not remedy the defect. Furthermore, even absent such evidence, Plaintiffs would still be entitled to damages, because a repair does not eliminate their point-of-sale injury and restore them to their bargained-for position. *See, e.g.*, *Crawford v. FCA US LLC*, No. 2:20-cv-12341, 2021 WL 3603342, at *3 (E.D. Mich. Aug. 13, 2021). Accordingly, summary judgment on this basis is unwarranted.

In conclusion, Ford's motion for summary judgment is granted in part and denied in part. It will be granted with respect to Counts 1, 10, 11, 12, 20, 23, 39, 42, 45, 48, 51, 57, and 60, as Plaintiffs do not oppose dismissal of those claims. It will also be granted with respect to Plaintiffs Brian and Judith Janik's fraudulent concealment claim (Count 24), as there is insufficient evidence of the existence of a fiduciary relationship or special trust relationship between Ford and the Janiks, as required by Illinois law. Ford's motion for summary judgment is denied in all other

respects.

## V.   <u>**CONCLUSION**</u>

Based on the foregoing, Ford's motion for summary judgment [#227] is GRANTED IN PART AND DENIED IN PART. Summary judgment is granted in favor of Ford and against Plaintiffs on Counts 1, 10, 11, 12, 20, 23, 24, 39, 42, 45, 48, 51, 57, and 60. Ford's motion for summary judgment is denied in all other respects.

SO ORDERED.

Dated: July 22, 2026                                      /s/Gershwin A. Drain
                                                          GERSHWIN A. DRAIN
                                                          United States District Judge


CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on July
22, 2026, by electronic and/or ordinary mail.
/s/ Marlena Williams
Case Manager